THE LAW OFFICES OF TERENCE J. SWEENEY, ESQ.
TERENCE J. SWEENEY
44 Fairmount Avenue, Suite 1
Chatham, New Jersey 07928
sweeneylawfirm@optonline.net
(973) 665-0400

NEW CIVIL LIBERTIES ALLIANCE
HARRIET HAGEMAN
Senior Litigation Counsel
JARED MCCLAIN
Staff Counsel
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
(856) 305-0034
*Motions forthcoming for* Pro Hac Vice *Admission*

*Counsel to Plaintiff Matthew Johnson*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MATTHEW JOHNSON, | |
| *Plaintiff*, | |
| v. | Civil Action No. _____ |
| | **VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| PHILIP D. MURPHY, in his official capacity as Governor of New Jersey; GURBIR S. GREWAL, in his official capacity as New Jersey Attorney General; and JUDITH M. PERSICHILLI, in her official capacity as Commissioner of the New Jersey Department of Health, | **[JURY TRIAL DEMANDED]** |
| *Defendants.* | |

Plaintiff Matthew Johnson submits this Verified Complaint for Declaratory Judgment and request for a Permanent Injunction to end Defendant Governor Philip D. Murphy's unlawful and unconstitutional Executive Order 128 ("EO 128" or the "Challenged Order"). The Challenged Order impairs Johnson's right to contract, exceeds the Governor's power, and violates the Constitutions of the United States and New Jersey. For the purposes of receiving service, Governor Murphy and Attorney General Gurbir S. Grewal are both located at 25 Market Street, Trenton, NJ 08625, and Commissioner Judith M. Persichilli is located at 369 South Warren Street, Trenton, NJ 08608. In support of this request Johnson claims and avers as follows:

## INTRODUCTORY STATEMENT

The outbreak of COVID-19 hit New Jersey especially hard. Governor Murphy has responded to the health threat posed by COVID-19 by issuing over 45 executive orders. This action challenges one of them. More specifically, this lawsuit challenges Governor Murphy's April 24, 2020, Executive Order 128, which purports to waive laws governing security deposits for residential leasehold contracts. In addition to unlawfully suspending the applicability of duly enacted laws, the Governor's order modified the rights and obligations of residential landlords and tenants who had mutually and voluntarily entered into contracts that required deposits to secure rental properties against the risk of damage. To make matters worse, Executive Order 128 also *criminalized* adhering to the terms of landlords' then-existing leasehold contracts and to lawfully adopted statutes governing such contracts. In issuing EO 128, the Governor purportedly waived these contracts and the statutory requirements contained therein without the consent of the contracting parties or the state legislature.

Put simply, this case is about the Governor's abuse of power. In excess of any authority granted by the citizens of New Jersey and the New Jersey Legislature, Governor Murphy has interfered with the contractual rights and obligations of private citizens. The question at hand is not whether one agrees or disagrees with the Governor's policy prescriptions, or whether they are effective or

ineffective in addressing some of the impacts of COVID-19. This case instead goes to the heart of our constitutional form of government and the separation of powers. This case focuses explicitly on whether the New Jersey Governor can rely on his own declared public-health emergency to assume authority the legislature never granted to waive or amend provisions in private contracts and to override and amend explicit statutory provisions as he chooses.

Matthew Johnson owns a rental property in Cherry Hill, New Jersey. When Mr. Johnson leased that property, he negotiated with his tenant to ensure that his tenant paid a security deposit that would secure and protect his property against any damage during the tenancy. Executive Order 128 interferes with that agreement and nullifies Mr. Johnson's rights and entitlements as a landlord under the private and voluntary contract that he negotiated in 2018. In a time of nationwide economic insecurity, Governor Murphy has unilaterally singled out one type of property owner—residential landlords—and canceled the security that protects their property from physical damage.

Adherence to the rule of law provides New Jerseyans with security during a crisis. Governor Murphy's Executive Order 128 does not advance or protect the rule of law; it instead undermines property rights and faith in the duly enacted laws by which we are governed.

We have been taught since our very first civics courses in elementary school that our form of government is unique and that no one branch of our government can assume the authority and responsibility of another. We have also been taught that we have the right to contract with our fellow man, and that courts will enforce such contractual terms as agreed to by the parties. These foundational truths have held fast during numerous crises throughout our history. We cannot abandon them now.

All legitimate authority in New Jersey flows from the people, as it is the people who vested the legislative power in the Senate and General Assembly. The people have never imbued the Governor with the constitutional authority to enact, waive, amend, or repeal laws, and a state of

emergency cannot and does not increase the Governor's authority beyond the scope of his power as granted by the Constitutions of the United States and New Jersey and duly enacted state statutes.

Mr. Johnson asks this Court to carry out and protect our constitutional framework. Mr. Johnson seeks an order from this Court declaring that Governor Murphy does not have the power to issue Executive Order 128 and that he does not have the power to interfere with leasehold contracts or to waive statutory law. A ruling in Mr. Johnson's favor will restore and protect the rule of law on which New Jersey landlords, tenants, and all New Jerseyans depend.

## JURISDICTION AND VENUE

1.      Pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S. §§ 1983 and 1988, this Court has subject-matter jurisdiction over this action, which involves questions arising under the United States Constitution and seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured thereby. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to the extent a claim may allege or may be construed to allege a claim under New Jersey law.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as the events giving rise to Mr. Johnson's causes of action arose or exist in this District.

## PARTIES

3.      Plaintiff Matthew Johnson is a resident of Vineland, New Jersey. He owns a residential property in Cherry Hill, New Jersey, which he rents pursuant to the terms of a written lease agreement entered into on October 2, 2018, which replaced the terms of the prior leases the parties had agreed to on October 27, 2017, and July 21, 2014. A copy of the Warranty Deed dated July 13, 2009, is attached as Exhibit 1; a copy of the 2014, 2017, and 2018 Lease Agreements are attached as Exhibits 2, 3 and 4 respectively.

4.      Defendant Philip D. Murphy is the Governor of the State of New Jersey. He is sued in his official capacity.

5.     Defendant Gurbir S. Grewal is the Attorney General of the State of New Jersey.  He is sued in his official capacity.

6.     Defendant Judith M. Persichilli is the Commissioner of the New Jersey Department of Health.  She is sued in her official capacity.

### STATEMENT OF FACTS

### A.  Mr. Johnson and His Tenant Voluntarily Contracted for a Residential Lease that Includes a Security Deposit

7.     Mr. Johnson owns Unit 312 of Barclay Towers Condominiums located in the Township of Cherry Hill in Camden County, New Jersey (the "Property").  *See* Exhibit 1.

8.     Since 2014, Mr. Johnson has rented his Property to Mr. Doe[1] (the "Tenant"), pursuant to a series of residential lease agreements.  *See* Exhibits 2 and 3.

9.     Mr. Johnson and his Tenant first executed a lease for the Property on July 21, 2014, for a term of one year, with such lease to begin on August 1, 2014.  (Exhibit 2, ¶ 1).

10.     The 2014 lease required the Tenant to pay a security deposit of $1,200.  (Exhibit 2, ¶ 3).  The monthly rent was $800 for the first year of the lease and increased to $900 per month after the first year, on a month-to-month basis, if the Tenant chose to remain on the Property with Mr. Johnson's permission.  (Exhibit 2, ¶¶ 2, 16).

11.     The 2014 Lease required the Tenant to pay a security deposit of $1,2000 "as security for damage caused to the [Property]" during the tenancy.  (Exhibit 2, ¶ 3).

12.     The 2014 Lease worked well for both Mr. Johnson and the Tenant, and they chose to continue the rental agreement on a month-to-month basis until October 2017.  (*See* Exhibit 3).

---

[1] To protect the privacy of Mr. Johnson's tenant, who is not a party to this lawsuit, this Complaint will refer to him as "Mr. Doe" or the "Tenant."

13.     Mr. Johnson and Mr. Doe updated their lease agreement on October 27, 2017 ("2017 Lease").  The 2017 lease provided for monthly rent of $850 for the first year of the lease and was set to increase to $900 per month, on a month-to-month basis, after the first year, if the Tenant chose to remain on the Property with Mr. Johnson's permission.  (Exhibit 3, ¶¶ 2, 17).

14.     Like the 2014 Lease, the 2017 Lease provided for a security deposit.  Specifically, the agreement required the Tenant to pay a $600 deposit "as security for any damage caused to the [Property]" during the tenancy.  (Exhibit 3, ¶ 3).

15.     On October 2, 2018, the parties once again modified the terms of their rental agreement by executing a new lease agreement (the "2018 Lease").  (*See* Exhibit 4).

16.     The 2018 Lease currently governs the parties' contractual relationship.

17.     According to the terms of the 2018 Lease, Mr. Johnson and the Tenant agreed to certain covenants and obligations:

a.    The Tenant agreed to lease the Property for one year for $9,900, payable on the first of each month in equal installments of $825.  (Exhibit 4, ¶ 1-2).  This monthly payment of $825 included the cost of utilities.  (Exhibit 4, ¶ 10).

b.    After one year elapsed, the 2018 Lease allowed the Tenant to remain in possession of the Property with the Landlord's consent, in which case, under the terms of the lease, a month-to-month tenancy would be created.  (Exhibit 4, ¶ 16).  Once the lease transitioned to month-to-month, the rent would increase to $875 per month and either party could terminate the 2018 Lease by giving 15 days' written notice.  (Exhibit 4, ¶ 16).

c.    If the Tenant failed to comply with any material provision of the 2018 Lease or any statutorily imposed duties, the lease specified that Mr. Johnson could terminate the lease after providing seven days' notice of the Tenant's non-compliance.  (Exhibit 4, ¶ 20).

d.   If the Tenant failed to pay rent for five business days of when due, Mr. Johnson could charge a $25 late fee.  (Exhibit 4, ¶ 21).  If the Tenant failed to pay rent for more than seven days, the 2018 Lease provides that Mr. Johnson could declare the Tenant in default and declare the remaining balance of rent due under the lease to be payable immediately. (Exhibit 4, ¶ 20).

e.   The 2018 Lease also included a "Modification" clause, by which the parties "agree[d] that [the lease] contains the entire agreement between the parties and [the lease] shall not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties [to the lease]."  (Exhibit 4, ¶ 31).

18.     Importantly for this case, the 2018 Lease also set out the terms governing the parties' rights and obligations with respect to the security deposit due under the lease.  Specifically, Paragraph 3 provides as follows:

> **SECURITY DEPOSIT.**  Upon the due execution of this Agreement, Tenant shall deposit with Landlord the sum of SIX HUNDRED DOLLARS ($600) payable on November 1st, 2018, as security for any damage caused to the [Property] during the term hereof.
> *Interest on Security Deposits.*  In accordance with New Jersey law (NJSA Section 46:8-19), Landlord will pay Tenant interest on Tenant's security deposit, less any service fees charged by the bank or investment company.  Interest will be paid annually on the anniversary of Tenant's lease in case or as a credit towards rent due.  Further, Landlord will annually notify Tenant of certain information concerning the security deposit: the name of the bank where the security deposit is held, the type of account in which the funds are deposited, and the account's interest rate.  Landlord is prohibited from increasing the amount of the security deposit by more than ten (10) percent per year.
> *Timing of Return of Security Deposit.*  Within thirty (30) days after the end of Tenant's Lease term, Landlord will return Tenant's security deposit to Tenant, plus any accrued interest and less any allowed deductions.  Interest and any deductions will be itemized. Tenant's security deposit or the balance thereof after deductions will be returned to Tenant by personal delivery or registered or certified mail.

(Exhibit 4, ¶ 3) (underlined emphasis added).

### B.  COVID-19 Is a Threat to the Health and Welfare of New Jersey Residents

19.     The novel coronavirus COVID-19 is a serious and contagious viral disease spread mainly through close contact from person-to-person. *How to Protect Yourself & Others*, Ctrs. For Disease

Ctrl. (Apr. 24, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

20.     The first case of COVID-19 in New Jersey was confirmed on March 4, 2020. *COVID-19 Confirmed Case Summary*, N.J. Dep't of Health 5 (May 27, 2020), *available at* https://www.nj.gov/health/cd/documents/topics/NCOV/COVID_Confirmed_Case_Summary.pdf.

21.     By March 9, 2020, there were 35 confirmed and presumptive cases of COVID-19 in New Jersey.   Murphy Exec. Order No. 103 (Mar. 9, 2020), *available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-103.pdf.

22.     As of May 29, 2020, New Jersey had 158,884 lab-confirmed cases of COVID-19. *NJ COVID-19 Data Dashboard*, Official Site of the State of New Jersey (May 29, 2020), *available at* https://covid19.nj.gov/#live-updates.

**C. Governor Murphy Declares a State of Emergency in Response to COVID-19**

23.     On March 9, 2020, Governor Murphy issued Executive Order No. 103, declaring a public health emergency and state of emergency in New Jersey.  Murphy Exec. Order No. 103.

24.     The stated purpose of the Governor's order was "to protect the health, safety and welfare of the people of the State of New Jersey[.]"  *Id.* at 4.

25.     As authority to declare a state of emergency through Executive Order 103, Governor Murphy relied on "the Constitution and statutes of the State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4 and all amendments and supplements thereto[.]"  *Id.*

26.     The Governor's stated justification for the first state of emergency declaration was N.J.S.A. 26:13-1 *et seq.*, the "Emergency Health Powers Act."

27.     The Emergency Health Powers Act permits the Governor, "in consultation with the [Commissioner of Health] and the Director of the State Office of Emergency Management" to "declare a public health emergency."  N.J.S.A. 26:13-3.

28.     A "public health emergency" is "an occurrence or imminent threat of an occurrence" that "is caused or is reasonably believed to be caused by" several biological threats, including " the appearance of a novel or previously controlled or eradicated biological agent[,]" and "poses a high probability of … a large number of deaths, illness, or injury" or "a large number of serious or long-term impairments" or that "poses a significant risk of substantial future harm to a large number of people[.]"  N.J.S.A. 26:13-2.

29.     Section 13-3 of Title 26 requires any order by the Governor declaring a public health emergency to specify: "(1) the nature of the public health emergency; (2) the geographic area subject to the declaration; (3) the conditions that have brought about the public health emergency to the extent known; and (4) the expected duration of the public health emergency, if less than 30 days."

30.     Any public health emergency "terminate[s] automatically after 30 days unless renewed by the Governor under the same standards and procedures" set out in ¶ 29 of this Complaint.  N.J.S.A. 26:13-3(b).

31.     Once the Governor has declared a public health emergency under 26:13-1 *et seq.*, the Act grants certain specific, health-related authority to the Governor and the Commissioner of the New Jersey Department of Health, *see* N.J.S.A. 26:13-2, including the authority to: (1) investigate the health event, N.J.S.A. 26:13-4, 13-5; (2) establish a registry of available health-care workers, N.J.S.A. 26:13-6; (3) provide for the safe disposition of human remains, N.J.S.A. 26:13-7; (4) "close, compel the evacuation of, or denominate" facilities that "may endanger the public health," N.J.S.A. 26:13-8; (5) dispose of infectious waste, N.J.S.A. 26:13-10; (6) control the supply and distribution of pharmaceutical agents, N.J.S.A. 26:13-11; (7) prevent transmission of the disease, N.J.S.A. 26:13-12;

(8) require persons to submit to testing, N.J.S.A. 26:13-13; (9) require the vaccination, treatment, decontamination, isolation, or quarantine of persons, N.J.S.A. 26:13-14, -15; (10) educate the public about the efficacy of vaccines, N.J.S.A. 26:13-23; (11) reinstate the employment of persons who were isolated or quarantined, N.J.S.A. 26:13-16; (12) access and disclose medical records in certain circumstances, N.J.S.A. 26:13-17; (13) disseminate information about food-access programs, N.J.S.A. 26:13-17.1; (14) require the assistance of health-care workers, N.J.S.A. 26:13-18; (15) provide for potassium iodine in case of a radiological emergency, N.J.S.A. 26:13-20; and (16) administer a Biological Agent registry, N.J.S.A. 26:13-22.

32.    In addition to certain powers to control health-care facilities, the Governor or the commissioner may also "procure, by condemnation or otherwise, subject to the payment of reasonable costs" to "construct, lease, transport, store, maintain, renovate or distribute property and facilities as may be reasonable and necessary to respond to the public health emergency[.]" N.J.S.A. 26:13-9. "Such property and facilities include, but are not limited to, communication devices, carriers, real estate, food and clothing." *Id.*

33.    The Governor or the commissioner may also "inspect, control, restrict, and regulate by rationing and using quotas, prohibitions on shipments, allocation or other means, the use, sale, dispensing, distribution or transportation of food, clothing and other commodities, as may be reasonable and necessary to the public health emergency." *Id.*

34.    The Governor or the commissioner also has the authority to restrict the movement of persons "if such action is reasonable and necessary to respond to the public health emergency." *Id.*

35.    Governor Murphy's second justification for issuing the Executive Order is N.J.S.A. 38A:3-6.1, which governs "[a]id to localities in circumstances which threaten or endanger public health, safety, or welfare." This provision authorizes the Governor "to order active duty, with or

without pay, in State service, such members of the New Jersey National Guard … to provide aid to localities in circumstances which threaten or are a danger to public health, safety or welfare." *Id.*

36.    Governor Murphy's third justification for issuing the Executive Order is N.J.S.A. 38A:2-4, which authorizes the Governor, "in case of insurrection, invasion, tumult, riot, breach of peace, natural disaster, or imminent danger to public safety," to "order to active duty all or any part of the militia that he may deem necessary."

### D.  Governor Murphy Issued Scores of Executive Orders and Extended the Public Health Emergency Several Times

37.    Between March 9, 2020, when Governor Murphy declared a state of emergency, and May 22, 2020, Governor Murphy issued another 46 executive orders relating to COVID-19.  *See* Murphy   Exec.   Order   No.   148   (May   22,   2020),   *available   at* https://nj.gov/infobank/eo/056murphy/pdf/EO-148.pdf.

38.    In one such order, Executive Order 106, Governor Murphy stayed foreclosures and evictions.    Murphy   Exec.   Order   No.   106   (March   19,   2020),   *available   at* https://nj.gov/infobank/eo/056murphy/pdf/EO-106.pdf.  Specifically, Executive Order 106 stayed enforcement of all judgments for possession, warrants of removal, and writs of possession, except when a court determines that enforcement is necessary in the interest of justice.  *Id.*

39.    Executive Order 106 remains in effect until two months "following the end of the Public Health Emergency or State of Emergency established by Executive Order No. 103 (2020), whichever ends later[.]"  *Id.* at 4.

40.    On April 7, 2020, Governor Murphy announced that the Public Health Emergency declared in Executive Order No. 103 continued to exist.  Murphy Exec. Order No. 119 (April 7, 2020), *available at*  https://nj.gov/infobank/eo/056murphy/pdf/EO-119.pdf.

41.     Governor Murphy subsequently announced on May 6, 2020, that the Public Health Emergency continued to exist.   Murphy Exec. Order 138 (May 6, 2020), *available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-138.pdf

### E.  The Gubernatorial Power to Issue Executive Orders Does Not Include Power to Interfere with Contract Obligations or to Waive or Amend Laws

42.     The Governor may issue an executive order only when acting within his authority.  *See* Michael S. Herman, *Gubernatorial Executive Orders*, 30 Rutgers. L.J. 987, 989-90 (1999).

43.     An executive action that goes beyond the Governor's grant of statutory or constitutional authority, such that it is "fundamentally incompatible" with "existing laws and statutes as to impair the 'essential integrity' of the constitutional powers of the Legislature" is invalid.  *Commc'ns Workers of Am., AFL-CIO v. Christie*, 413 N.J. Super. 229, 274–75 (App. Div. 2010).

44.     The New Jersey Constitution vests executive power in the Governor.  N.J. Const. art. V, § 1, ¶ 1.

45.     "[P]lenary law-making authority" is vested in "the State Senate and General Assembly."  *Commc'ns Workers of Am.*, 413 N.J. Super. at 255 (citing N.J. Const. art. IV, § 1, ¶ 1).

46.     Through Article IV, § 1, ¶ 1, "the people vested full sovereign authority in the Legislature, save as otherwise therein provided."  *Gangemi v. Berry*, 25 N.J. 1, 8 (1957).

47.     The legislative authority includes the power to amend or repeal duly enacted laws.  *See Commc'ns Workers of Am.*, 413 N.J. Super. at 274.  The Presentment Clause of the New Jersey Constitution, art. V, § 1, ¶ 14(a), requires not only that the Legislature be part of the law-making process, but sets forth how laws must be passed, amended, and repealed.

48.     The Governor has no authority to waive duly enacted statutes. *Cf. Commc'ns Workers of Am.*, 413 N.J. Super. at 274 ("It is well settled that administrative regulations adopted by the Executive Branch cannot amend or repeal statutes.").

49.     The New Jersey Constitution provides explicitly for the separation of powers: "The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. *No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others except as expressly provided in this Constitution.*" N.J. Const. art. III, ¶ 1 (emphasis added).

50.     The Governor's authority to execute the laws and the Legislature's authority to make, amend, and repeal laws must remain separate.

51.     One "main objective" of the separation of powers "is to prevent the concentration of 'unchecked power' in one branch of government." *Commc'ns Workers of Am.*, 413 N.J. Super. at 257 (quoting *David v. Vesta Co.,* 45 N.J. 301, 326 (1965)). The separation-of-powers doctrine prevents "one branch of government from claiming power reserved to another[.]" *Ironbound Health Rights Advisory Comm'n v. Diamond Shamrock Chem. Co.*, 216 N.J. Super. 166, 175 (App. Div. 1987). "[N]o deviation from … the doctrine of separation of powers will be tolerated" if the deviation "impairs the essential integrity of one of the great branches of government." *Massett Bldg. Co. v. Bennett*, 4 N.J. 53, 57 (1950).

52.     The separation of powers guards against one branch aggrandizing its own power unilaterally—including when the Governor does so through an executive order. *Commc'ns Workers of Am.*, 413 N.J. Super. at 258-59.

### F.  Governor Murphy Purported to Unilaterally Alter Private Contractual Relationships and Waive Statutory Law by Executive Decree

#### i.  The Purpose of Executive Order 128 Is to Interfere with Contractual Obligations and Waive Statutory Law

53. On April 24, 2020, Governor Murphy issued Executive Order 128, which purported to "waive[] provisions of statutory law that prohibit the use of security deposits for rental payments, enabling tenants to instruct landlords to use their security deposits to offset rent or back rent." Press Release, *Governor Murphy Signs Executive Order Providing Critical Short-Term Support for Renters*, Official Site of the State of New Jersey (Apr. 24, 2020), *available at* https://www.nj.gov/governor/news/news/562020/20200424c.shtml.

54. In Executive Order 128, Governor Murphy explained that "many New Jerseyans [are] experiencing substantial loss of income as a result of business closures, reduction in hours, or layoffs related to COVID-19," and that "tenants may be suffering from one or more financial hardships that are caused by or related to the COVID-19 pandemic, including but not limited to a substantial loss of or drop in income, and additional expenses such as those relating to necessary health care[.]" Murphy Exec. Order 128 (April 24, 2020), *available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-128.pdf.

55. Governor Murphy reasoned that it was "plainly in the public interest" to "enable[e] individuals to pay portions of their rent with the security deposit they own" to "allow those individuals to mitigate the consequences regarding evictions and accumulation of interest and late fees upon termination of Executive Order No. 106 (2020)" because tenants may face "consequences from a late payment of rent, including interest and late fees, which they may be unable to satisfy in light of their substantial loss of income[.]" *Id.* at 3.

56. Specifically, Governor Murphy ordered that a tenant may request in writing that his or her "security deposit governed by the provisions of N.J.S.A. 46:8-19 et seq., as well as the tenant's portions of interest and/or earnings accumulated thereon, shall be applied to or credited towards rent payments due or to become due from the tenant during the Public Health Emergency established in

Executive Order No. 103 (2020) or up to 60 days after the Public Health Emergency terminates." *Id.* at 3-4 ¶ 1.

57. The statutes that Governor Murphy waived apply to leases of residential units used for dwelling purposes. *See* N.J.S.A. 46:8-26, -27.

58. According to Executive Order 103, "When a tenant applies or credits such deposit, interest, or earnings to pay rent pursuant to Paragraph 1 of this Order, the following additional provisions shall apply *for the duration* of the tenant's current contract, lease, or license agreement:"

    a. The landlord may recoup from the tenant any monies the landlord expected that would have been reimbursable by the security deposit and interest or earnings thereon, at the time that such reimbursement from the deposit and interest or earnings thereon would have taken place; and

    b. The tenant shall otherwise be without obligation to make any further security deposit relating to the current contract, lease, or license agreement. If, however, the tenant and landlord extend or renew their contract, lease, or license agreement [after April 24, 2020], then the tenant shall be obligated to replenish the security deposit in full either on the date six months following the end of the Public Health Emergency established by Executive Order No. 103 (2020), which was extended by Executive Order No. 119 (2020), or on the date on which the current contract, lease, or license agreement is extended or renewed, whichever is later.

*Id.* at 4 ¶ 2 (emphasis added).

59. Under the terms of Executive Order 128, a tenant's "[u]se of a security deposit for the purposes outlined in [Executive Order 128] shall not be considered a violation of N.J.S.A. 46:8-19 et seq." *Id.* at 5 ¶ 3.

60. Governor Murphy noted in Executive Order 128 that "pursuant to N.J.S.A. 46:8-19, a security deposit and the accumulated interest and earnings on the investment of such deposit remain the property of the tenant[.]" *Id.* at 3.

61. By so noting, Governor Murphy made clear that he did not consider Executive Order 128 to be authorizing a public taking.

62. Remarkably, Governor Murphy declared, "Any provisions of N.J.S.A. 46:8-19 et seq. that are not inconsistent with [Executive Order 128] remain in full force and effect." *Id.* at 5 ¶ 3.

63.     By inverse implication, Governor Murphy declared that any provision of N.J.S.A. 46:8-19 *et seq.* that *are* inconsistent with Executive Order 128 are no longer in force and effect until Executive Order 128 terminates.  As a result, not only is Governor Murphy arrogating the power to suspend a statute, but also the power to reimpose the statute's effects at a future point in time.

64.     Executive Order 128 "remain[s] in effect until 60 days following the end of the Public Health Emergency established by Executive Order No. 103 (2020), which was extended by Executive Order No. 119 (2020)."  *Id.* at 5 ¶ 5.

65.     Governor Murphy also created criminal penalties for violations of Executive Order 128: "Penalties for violations of [Executive Order 128] may be imposed under, among other statutes, N.J.S.A. App. A:9-49 and -50."  *Id.* at 5 ¶ 4.

### ii. New Jersey Law Requires Landlords to Comply with the Statutes that Governor Murphy Waived

66.     Leaseholds in New Jersey are highly regulated by statute.  In fact, Title 46, Chapter 8, which governs "Leasehold Estates; Landlord and Tenant," contains over 50 separate statutory provisions that set out the rights of landlords and tenants in a leasehold contract.  *See* N.J.S.A. 46:8-1 *et seq.*

67.     Security deposits, specifically, are regulated by N.J.S.A. 46:8-19 *et seq.*, the provisions of which Executive Order 128 purported to suspend to the extent those provisions are inconsistent with the Governor's order.  Murphy Exec. Order 128.

68.     Statutes governing security deposits regulate everything from how a security deposit is paid, maintained, and returned, N.J.S.A. 46:8-19, -21.1; how large of a security deposit a landlord may require, N.J.S.A. 46:8-21.2; how and with whom the security deposit must be invested and accrue interest, N.J.S.A. 46:8-19; how and when the depositor must pay interest on the deposit, N.J.S.A. 46:8-19, -21.1; how a security deposit should be handled during a foreclosure, bankruptcy, or conveyance of the property, N.J.S.A. 46:8-20, -21; and how the parties can adjudicate their rights regarding security

deposits, N.J.S.A. 46:8-21.4, -31, -35, & -41.  Parties to residential leases in New Jersey necessarily account for and rely on these statutory provisions when crafting their contracts—including other provisions of their contracts.

69.  Notably, two separate statutes treat as void and unenforceable any attempt by a landlord or tenant to voluntarily agree to a contract that waives the applicability of any statutory provisions that govern leasehold security deposits.  *See* N.J.S.A. 46:8-24, -36.

70.  Governor Murphy, however, has attempted to do precisely what the New Jersey Statutes prohibit:  waive the applicability of these statutory provisions that govern leasehold security deposits.  Murphy Exec. Order No. 128.

71.  Governor Murphy has no authority to waive state law governing the landlord-tenant relationship.

### iii. Executive Order 128 Interfered with Mr. Johnson's Contractual Relationship

72.  Mr. Johnson negotiated his 2018 Lease to include a provision requiring the Tenant to pay Mr. Johnson a security deposit "as security for any damage caused to the [Property]" during the term of the lease.

73.  Despite the terms of Mr. Johnson's Lease, Executive Order 128 allows the Tenant, at any time, to choose to apply his security deposit to the rent owed on the 2018 Lease.

74.  If the Tenant chooses to use the security deposit to pay rent owed on the 2018 Lease, the security deposit will necessarily be unavailable "as security for any damage caused to the [Property]."  Consequently, Executive Order 128 substantially altered the terms of 2018 Lease and the parties' rights and obligations thereunder.

75.  On March 31, 2020, Mr. Johnson's Tenant informed him that he was laid off from his job and would be filing for unemployment benefits with the State.  (A copy of the message notifying Mr. Johnson is attached as Exhibit 5).

76.     The Tenant is increasingly likely to take advantage of the changes Governor Murphy made unilaterally to the terms of the 2018 Lease.

77.     Without a security deposit to insure against any damage the Property may incur during the nearly six years of the Tenant's tenancy, Mr. Johnson will be forced to cover the cost of any damage out of his own pocket or bring a costly and timely small-claims action against the Tenant.

78.     The purpose of the security deposit that Mr. Johnson bargained for and that Mr. Johnson and his Tenant contractually agreed to in the 2018 Lease was to inure to Mr. Johnson the benefit of avoiding the cost and time associated with repairing any damage that the Tenant may cause to Mr. Johnson's Property during the tenancy.

79.     Through Executive Order 128, Governor Murphy unilaterally altered the rights and obligations of Mr. Johnson and the Tenant under the 2018 Lease.

### iv. Executive Order 128 Is Beyond Governor Murphy's Authority

80.     As authority for Executive Order 128, Governor Murphy invoked "certain emergency powers" conferred on the Governor of New Jersey by "the Constitution and statutes of the State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. App. A:9-33 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4[.]"

81.     As described above in ¶¶ 27 - 32, N.J.S.A. 26:13-1 *et seq.* gives the Governor certain authority relating to the spread of pathogens and medical treatment in response to a Public Health Emergency.

82.     The specific, enumerated powers granted by N.J.S.A. 26:13-1 *et seq.* do not vest in the Governor the authority to alter the terms of residential leases.  None of these provisions permits the Governor to waive statutory requirements relating to residential leases based on financial hardship, regardless of whether that financial hardship may result from a public health emergency.

83. As described in ¶ 35 above, N.J.S.A. 38A:3-6.1 pertains to the Governor's authority to control the New Jersey National Guard.

84. Governor Murphy's authority to control the New Jersey National Guard has nothing to do with his claimed authority to alter the terms of residential leases or any authority to waive statutory provisions relating to residential leases.

85. As described in ¶ 36 above, the specific power granted by N.J.S.A. 38A:2-4 pertains to the Governor's authority over the state militia.

86. The New Jersey Governor's authority to control the state militia has nothing to do with Governor Murphy's claimed authority to waive statutory provisions relating to residential leases or any authority to alter the terms of residential leases.

87. N.J.S.A. App. A:9-33 *et seq.*, enacted during World Word II, encompasses the Civilian Defense and Disaster Control Act. N.J.S.A. App. A:9-33.

88. The purpose of the Civilian Defense and Disaster Control Act is

> to provide for the health, safety and welfare of the people of the State of New Jersey and **to aid in the prevention of damage to and the destruction of property** during any emergency herein defined by prescribing a course of conduct for the civilian population of this State during such emergency and by centralizing control of all civilian activities having to do with such emergency under the Governor and for that purpose to give the Governor control over such resources of the State Government and of each and every political subdivision thereof as may be necessary to cope with any condition that shall arise out of such emergency and to invest the Governor with all other power convenient or necessary to effectuate such purpose.

*Id.* (emphasis added).

89. Assuming the Civilian Defense and Disaster Control Act even applies to the current pandemic, security deposits provided for in residential leasehold contracts *also* exist to aid in the prevention of damage to and the destruction of property. Yet, contrary to the purpose of the Civilian Defense and Disaster Control Act, Governor Murphy decided unilaterally to cancel those measures that New Jersey landlords have put in place to protect their property.

90.     Appendix A:9-34 authorizes the Governor "to utilize and employ all the available resources of the State Government and of each and every political subdivision of [New Jersey], whether of men, properties or instrumentalities, and to commandeer and utilize any personal services and any privately owned property necessary to avoid or protect against any emergency subject to the future repayment of the reasonable value of such services and privately owned property" as provided in the subsequent provisions of the Civilian Defense and Disaster Control Act (N.J.S.A. App. A:9-33 *et seq.*).  N.J.S.A. App. A:9-34.

91.     But as mentioned in ¶ 61, Governor Murphy did not consider Executive Order 128 to authorize commandeering or utilizing privately owned property; and there is no indication he intends the State to compensate landlords for any property value lost as a result of Executive Order 128.

92.     Appendix A:9-51(a), which Governor Murphy explicitly referenced in Executive Order 128, authorizes the Governor, whenever the Governor believes that control of a disaster "is beyond the capabilities of local authorities":

a.   To "assume control of all emergency management operations;"

b.   to "proclaim an emergency;" and

c.   to temporarily "employ, take or use the personal services, or real or personal property, of any citizen or resident of [New Jersey], or of any firm, partnership or unincorporated association doing business or domiciled in this State, or of any corporation incorporated in or doing business in this State, or the real property of a nonresident located in this State, for the purpose of securing the defense of the State or of protecting or promoting the public health, safety or welfare; provided, that such personal services or property shall not be employed or used beyond the borders of this State unless otherwise authorized by law."

N.J.S.A. App. A:9-51(a).

93.     If the Governor takes private property or demands personal services pursuant to N.J.S.A. App. A:9-51(a), the State must pay compensation at the prevailing rate.  N.J.S.A. App. A:9-51(b)-(d).

94.     Again, Executive Order 128 makes clear that Governor Murphy does not consider the reallocation of deposits paid as security on residential leases to be a taking that would require compensation.  He is wrong.

95.     Other provisions outlining the Governor's authority under the Civilian Defense and Disaster Control Act are similarly inapplicable to Executive Order 128, most of which deal with the coordination of defense and disaster response between the State and Federal governments and between the State and local, municipal governments.  *See, e.g.*, N.J.S.A. App. A:9-35, -40 through -43.6, -51.6, -51.7, -59, -62.  The Governor may also "require any public official, citizen or resident … to furnish him any information reasonably necessary to enable [the Governor] to carry out the purposes of this act[,]" N.J.S.A. App. A:9-36; and the Governor may appoint deputies or other persons to assist with the purposes of the act.  N.J.S.A. App. A:9-38, -54.

96.     Consistent with the subject matter of the Civilian Defense and Disaster Control Act, the other powers that the Act vests in the Governor relate to military defense.  *See, e.g.*, N.J.S.A. App. A:9-35, -37.  These powers pertain to the issuance of rules associated with blackouts, air raids, recruiting and training emergency response crews, the conduct of civilians "during the threat of an imminence of danger," counteracting sabotage and subversive activities, evacuating residents of threatened districts, and any other matter "that may be necessary to protect the health, safety and welfare of the people or that will aid in the prevention of loss to and destruction of property."  N.J.S.A. App. A:9-45.  The Governor may also issue rules regulating vehicles and traffic relating to "any black-out, air raid, threatened air raid, preparations for emergencies or during the threat or imminences of danger or emergency[.]"  N.J.S.A. App. A:9-47.

97.     None of the authority granted to Governor Murphy by the Civilian Defense and Disaster Control Act, N.J.S.A. App. A:9-34 *et seq.*, encompasses any authority even remotely connected to a power to modify the terms of residential leasehold contracts or to waive the statutory provisions relating to those leases.

98.     Governor Murphy also claimed authority for Executive Order 128 under the New Jersey Constitution.  The New Jersey Constitution mentions the power to waive duly enacted laws only in the context of habeas corpus: "The privilege of the writ of habeas corpus shall not be suspended, unless in case of rebellion or invasion the public safety may require it."  N.J. Const. art. I, ¶ 14.

99.     State constitutions that provide for the suspension of habeas corpus in emergencies are understood to have vested that authority in the legislature.  *See* Philip Hamburger, *Beyond Protection*, 109 COLUM. L. REV. 1823, 1919 (2009); *see also* Amanda L. Tyler, *Habeas Corpus in Wartime: From the Tower of London to Guantanamo Bay* (2017) (chronicling the original meaning of the federal Habeas Corpus Suspension Clause).  In contrast to the legislature, the executive "could not, even during an emergency, seize property" or "constrain the natural liberty of persons who were within the protection of the law, unless [the executive] had legislative authorization."  Hamburger, *supra* ¶ 99 at 1919.

100.    The New Jersey Constitution prohibits interference with contractual obligations: "The Legislature shall not pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made." N.J. Const. article IV, § VII, ¶ 3.

101.    The New Jersey Constitution protects the rights of all persons to acquire, possess, and *protect* property.  N.J. Const. art. I, ¶ 1.

102.    As with the other sources of authority that Governor Murphy invoked, the New Jersey Constitution does not authorize the Governor to interfere with contracts.  In fact, the Constitution

22

explicitly forbids governmental interference with private contracts.   Moreover, the Constitution does not authorize the Governor to waive or suspend statutes or other legal rights.

### G.  Mr. Johnson Has Experienced, and Will Continue to Experience, Concrete and Particularized Harm as a Direct Result of Governor Murphy's Unilateral Executive Decree

103.    As a direct result of Governor Murphy's Executive Order 128, Mr. Johnson has suffered harm and is threatened with additional future harm.

104.    Governor Murphy has unilaterally altered the rights, entitlements, and protections of Mr. Johnson under the terms of the 2018 Lease, to which Mr. Johnson and his Tenant voluntarily agreed. The Governor's interference with Mr. Johnson's contractual rights is a substantial impairment. Mr. Johnson relied on the terms of his Lease and the security deposit due thereunder to ensure that he could protect his property against damage during the tenancy.   Governor Murphy's ultra vires Executive Order 128 has caused Mr. Johnson to suffer actual harm.

105.    The Contracts Clause of the U.S. Constitution exists to prevent state governments from disrupting private contractual arrangements and from picking winners and losers between parties to a contract.   *See Ogden v. Saunders*, 25 U.S. (1 Wheat.) 213, 354-55 (1827).   Executive Order 128, however, does just that—it picks Mr. Johnson, and other residential landlords, as losers.   "The Contracts Clause restricts the power of the States to disrupt contractual arrangements."   *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).

106.    By singling out residential landlords for disfavored treatment, Executive Order 128 has deprived Mr. Johnson of the equal protection of the law and the privileges and immunities guaranteed by the Fourteenth Amendment to the U.S. Constitution.  This loss of his civil liberties is permanent and cannot be mitigated or recovered.

107.    Mr. Johnson's damage is not merely hypothetical.  The intended result of Executive Order 128 was to alter the terms of residential leases like the 2018 Lease between Mr. Johnson and

his Tenant.  The right to hold a deposit as security against damage was provided for and protected by contract, as well as by New Jersey statutory law at the time Mr. Johnson executed the 2018 Lease.  But, as of April 24, 2020, when Governor Murphy entered Executive Order 128 without any lawful authority, Mr. Johnson no longer has the security for which he rightfully contracted.  He is now in a worse position than he was before, due solely to an executive order the Governor had no legal power to make.

108.    Mr. Johnson, like all other New Jerseyans, has a right to be governed by laws that are duly enacted through their elected representatives in the New Jersey Legislature.  These laws, of course, are subject to the Contracts Clauses of the New Jersey and United States Constitutions.  Governor Murphy's unilateral Executive Order 128 violated the due process rights protected by both the United States Constitution and the New Jersey Constitution by altering Mr. Johnson's private contract and the laws that govern his leasehold without being adopted pursuant to the proper legislative channels of government.

109.    Mr. Johnson has suffered a violation of his procedural and substantive due process rights as a result of the Governor's actions in issuing Executive Order 128.

### COUNT I: VIOLATION OF THE CONTRACTS CLAUSE OF THE UNITED STATES CONSTITUTION EXECUTIVE ORDER 128 IMPERMISSIBLY INTERFERES WITH CONTRACTUAL OBLIGATIONS

110.    Plaintiffs reallege and incorporate by reference the allegations contained in their Introductory Statement and paragraphs 1 through 109, as if fully set forth herein.

111.    Article I, § 10 of the U.S. Constitution forbids States from impairing contractual obligations: "No State shall … pass any Law impairing the Obligation of Contracts[.]"

112.    "The Contracts Clause restricts the power of the States to disrupt contractual arrangements."  *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).

113.    The Founders included the Contracts Clause in the United States Constitution to prevent states from picking winners and losers and allowing the hand-picked winners to avoid their contractual obligations.  *See Ogden*, 25 U.S. (1 Wheat.) at 354-55 ("The power of changing the relative situation of debtor and creditor, of interfering with contracts, … had been used to such an excess by the state legislatures, as to break in upon the ordinary intercourse of society, and destroy all confidence between man and man.  This mischief had become so great, so alarming, as not only to impair commercial intercourse, and threaten the existence of credit, but to sap the morals of the people, and destroy the sanctity of private faith.  To guard against the continuance of the evil, was an object of deep interest with all the truly wise, as well as the virtuous, of this great community, and was one of the important benefits expected from a reform of government."); *see also Keystone Bituminous Coal Ass'n v. DeBendicitis*, 480 U.S. 470, 503 n.30 (1987) ("It was made part of the Constitution to remedy a particular social evil—the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts—and thus was intended to prohibit States from adopting as their policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them.") (citations omitted; cleaned up).

114.    Governor Murphy has done in Executive Order 128 exactly what our Founders sought to prevent—destroyed or nullified agreed-upon and bargained-for contract terms.

115.    A state actor violates the Contracts Clause by effecting "a change in state law that has operated as a substantial impairment of a contractual relationship."  *Transport Workers Union, Local 290 v. Se. Pa. Transp. Auth.*, 145 F.3d 619, 621 (3d Cir. 1998) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).

116.    Governor Murphy violated the Contracts Clause because: (1) Mr. Johnson had a contractual relationship with his Tenant; (2) Executive Order 128 was a subsequent change in law that impaired Mr. Johnson's contractual relationship; and (3) the impairment was substantial.  *See id.*

117.    Through its unique (and unlawful) nature, Executive Order 128 seeks to change the law—despite the fact that it is nothing more than an executive order and not properly vetted and adopted legislation.

118.    Although Contracts Clause claims typically arise from state legislation, a state cannot avoid a justiciable Contracts Clause claim by also denying the guarantee to a republican form of government.  *See* U.S. Const. art. IV, § 4.  Otherwise, the state could routinely—and without consequence—interfere with the right to contract by ruling through executive fiat as Governor Murphy has here.

119.    Governor Murphy's action is no less violative of the Contracts Clause merely because Executive Order 128 does not totally destroy Mr. Johnson's contract: "Total destruction of contractual expectations is not necessary" for a court to find that the State substantially impaired a private contract.  *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983) (citing *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 26-27 (1977)).

120.    Courts employ a "legitimate-purpose inquiry" to determine "whether the adjustment of 'the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the [] adoption.'" *Id.* at 412 (quoting *U.S. Trust Co.*, 431 U.S. at 22) (cleaned up).  On this point, courts will defer to the "*legislative* judgment as to the necessity and reasonableness of a particular measure."  *Id.* at 412-13 (quoting *U.S. Trust Co.*, 431 U.S. at 22-23) (emphasis added).  Although deferential, the standard courts apply to Contracts Clause claims is a "more exacting" review than rational-basis review.  *See Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 369 (3d Cir. 2012).

121.    What makes this case unique is that there was no legislative judgment.  Not only does the character of the public purpose—a health emergency—not relate sufficiently to residential

leasehold contracts, but the Governor is not authorized to make legislative judgments when he issues executive orders. *See Commc'ns Workers of Am.*, 413 N.J. Super. at 265–66, 272.

122.     In determining whether a state action violated the Contracts Clause, courts look to the industry and whether persons in that industry could have expected further regulation in the area at issue. *Energy Reserves Grp.*, 459 U.S. at 411.

123.     Mr. Johnson, along with other residential landlords in New Jersey, could not have expected the Governor to unilaterally waive the application of certain statutory provisions in a heavily regulated area of law.

124.     A security deposit is an integral and widely used feature of residential leasehold contracts.  The security deposit protects the landlord from incurring damage to the property. By allowing a landlord to insure against risk, a security deposit helps facilitate contracts and can even affect the rent that a landlord charges, which of course affects the residential leasing market.  Although a landlord may still resort to the courts to seek reimbursement for damage to his or her property, the time and expense of litigation can often exceed the damage to the property.  When a landlord insures against damage to his or her rental property through a security deposit, the tenant may be more careful to avoid damaging the property.  Executive Order 128 "interferes with a [landlord]'s reasonable expectations, and prevents [the landlord] from safeguarding or reinstating his rights."  *Sveen*, 138 S. Ct. at 1822 (cleaned up).  This is exactly what the Contracts Clause forbids.

125.     Accordingly, Executive Order 128 violates the Contracts Clause of the U.S. Constitution and is void.

126.     Mr. Johnson has been damaged and continues to be damaged by Defendants' conduct. There is no adequate remedy at law, as no damages could compensate Mr. Johnson for the deprivation of his constitutional rights, and he will suffer serious and irreparable harm to his constitutional rights unless defendants are enjoined from enforcing Executive Order 128.

127.     Mr. Johnson is entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

## COUNT II: VIOLATION OF DUE PROCESS
### DENIAL OF RIGHT TO DUE PROCESS | UNITED STATES CONST. amend. XIV

128.     Plaintiff realleges and incorporates by reference the allegations contained in his Introductory Statement and paragraphs 1 through 109, as if fully set forth herein.

129.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits the states from denying due process of law.  U.S. Const. amend. XIV, § 1.

130.     When a change in state law retroactively affects the legitimate expectations and economic rights of its citizens, the inherent unfairness triggers a due-process inquiry.  *See Gen. Motors Corp.*, 503 U.S. at 191.

131.     The state violates the Fourteenth Amendment's guarantee of procedural due process when it diverges from established procedures in a way that deprives an individual of a property right. *See Reich v. Beharry*, 883 F.2d 239, 242-43 (3d Cir. 1989).

132.     The State violates substantive due process by arbitrarily or capriciously depriving a person of a substantive right.  *Id.* at 244.

133.     Mr. Johnson has a fundamental right to contract, protected by the United States Constitution.

134.     Without following the state's established procedures, Governor Murphy's ultra vires order deprived Mr. Johnson of his right to contract and the property interest he had in that contract without due process of law.

135.     Governor Murphy also deprived Mr. Johnson of his right to be heard, as guaranteed by the Due Process Clause of the Fourteenth Amendment.  Typically, a citizen is heard during the lawmaking process through his or her elected representative.  *See* U.S. Const. art. IV, § 4 (guaranteeing

each state will maintain a republican form of government).  Governor Murphy circumvented the established (and constitutionally guaranteed) legislative process, however, and created law outside the democratic process.  By doing so, Governor Murphy again denied Mr. Johnson due process of law.

136.    Executive Order 128 purports to penalize non-compliance with the Governor's Order pursuant to the Civilian Defense and Disaster Control Act, N.J.S.A. App. A:9-49 and -50.  But, as discussed throughout, that Act does not authorize the Governor to issue Executive Order 128.  Without a lawful source of authority to issue the order, the Governor cannot rely on N.J.S.A. App. A:9-49 and -50 to criminalize the failure to comply with his unlawful order.  Any prosecution based on the failure to abide by an unlawful order violates due process.  Nor does a landlord have to violate the EO 128 in order to challenge the unlawful and unconstitutional criminal penalties contained in it.

137.    Mr. Johnson has suffered damage and will continue to suffer damage by Defendants' conduct.  There is no adequate remedy at law, as there are no damages that could compensate Mr. Johnson for the deprivation of his constitutional rights, and he will suffer serious and irreparable harm to his constitutional rights unless defendants are enjoined from enforcing Executive Order 128.

138.    Mr. Johnson is entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

### COUNT III: VIOLATION OF EQUAL PROTECTION
### DENIAL OF EQUAL PROTECTION OF THE LAW | UNITED STATES CONST. AMEND. XIV

139.    Plaintiff realleges and incorporates by reference the allegations contained in his Introductory Statement and paragraphs 1 through 109, as if fully set forth herein.

140.    The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "This is essentially a direction that all persons similarly situated should be treated alike."

*Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

141.    By granting special relief to residential tenants, Executive Order 128 singles out landlords of residential leases to suffer an extra loss as a result of the COVID-19 pandemic. *See* N.J.S.A. 46:8-26, -27 (explaining that the act applies to rental properties used for dwelling purposes).

142.    Although courts traditionally defer to the policy judgments of the legislature when analyzing an equal protection claim, *see Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018), such deference is inappropriate given this case of executive fiat. The Governor cannot rely on public-policy rationale in the same way the legislature can. *Cf. Commc'ns Workers of Am.*, 413 N.J. Super. at 265–66, 272 ("We cannot accord deference to EO 7's unilateral attempt to exercise the Legislature's powers, where the Legislature has not ceded those powers to the Executive.").

143.    Regardless, there is no rational basis to support Executive Order 128. *See Newark Cab Ass'n*, 901 F.3d at 156. The bases that Governor Murphy asserted in support of Executive Order 128 are wholly arbitrary and irrational. *See id.* The Governor's order purports to respond to a health pandemic and does so by telling owners of private residential property that their leasehold contracts are void. The connection between the stated rationale and the decision to treat residential landlords differently under the law is beyond tenuous.

144.    Mr. Johnson has been damaged and continues to be damaged by Defendants' conduct. There is no adequate remedy at law, as no damages could compensate Mr. Johnson for the deprivation of his constitutional rights, and he will suffer serious and irreparable harm to his constitutional rights unless defendants are enjoined from enforcing Executive Order 128.

145.    Mr. Johnson is entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

### COUNT IV: VIOLATION OF PRIVILEGES OR IMMUNITIES
### DENIAL OF PRIVILEGES OR IMMUNITIES | UNITED STATES CONST. AMEND. XIV

146.    Plaintiff realleges and incorporates by reference the allegations contained in his Introductory Statement and paragraphs 1 through 109, as if fully set forth herein.

147.    The Privileges or Immunities Clause of the Fourteenth Amendment provides that no state "shall abridge the privileges or immunities of citizens of the United States."  U.S. Const. amend. XIV, § 1.

148.    Governor Murphy denied Mr. Johnson the privileges and immunit protected by the United States Constitution.  Namely, Executive Order 128 denies Mr. Johnson's right to freely contract and to protect his property.

149.    Mr. Johnson has been damaged and continues to be damaged by Defendants' conduct. There is no adequate remedy at law, as no damages could compensate Mr. Johnson for the deprivation of his constitutional rights, and he will suffer serious and irreparable harm to his constitutional rights unless defendants are enjoined from enforcing Executive Order 128.

150.    Mr. Johnson is entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

### COUNT V: VIOLATION OF THE CONTRACTS CLAUSE OF THE NEW JERSEY CONSTITUTION
### EXECUTIVE ORDER 128 IMPERMISSIBLY INTERFERES WITH CONTRACTUAL OBLIGATIONS

151.    Plaintiff realleges and incorporates by reference the allegations contained in his Introductory Statement and paragraphs 1 through 109, as if fully set forth herein.

152.    The New Jersey Constitution forbids the state from passing any "law impairing the obligation of contract[] or depriving a party of any remedy for enforcing a contract which existed when the contract was made."  N.J. Const. art. IV, § VII, ¶ 3.

153.    The Contracts Clause of the New Jersey Constitution provides a "similar, parallel prohibition" as its counterpart in the United States Constitution.  *In re Recycling & Salvage Corp.*, 246 N.J. Super. 79, 100 (App. Div. 1991).  "These two constitutional provisions are construed and applied in the same way to provide the same protection."  *Id.*

154.    The Governor may never legislate through executive fiat.  *See Commc'ns Workers of Am.*, 413 N.J. Super. at 265–66, 272.  Moreover, the Governor certainly cannot use executive fiat to decree laws that the Legislature is not itself competent to enact.

155.    Executive Order 128 violates the Contracts Clause of the New Jersey Constitution and is void.

### COUNT VI: VIOLATION OF PROCEDURAL DUE PROCESS
### DENIAL OF RIGHT TO DUE PROCESS | N.J. CONST. ART. I

156.    Plaintiff realleges and incorporates by reference the allegations contained in his Introductory Statement and paragraphs 1 through 109, as if fully set forth herein.

157.    The first paragraph of the first article of the New Jersey Constitution guarantees that all persons "have certain natural and unalienable rights" including the right of "acquiring, possessing, and protecting property[.]"  N.J. Const. art. I, ¶ 1.

158.     "Established procedures lie at the heart of due process and are as important to the attainment of ultimate justice as the factual merits of a cause."  *Band's Refuse Removal, Inc. v. Borough of Fair Lawn*, 62 N.J. Super. 522, 553 (App. Div. 1960), *supplemented,* 64 N.J. Super. 1 (App. Div. 1960).

159.    Governor Murphy's Executive Order 128, which nullifies contract terms, makes law, and criminalizes otherwise lawful behavior through executive decree violates Mr. Johnson's right to due process under the New Jersey Constitution.

160.    Governor Murphy has also violated Mr. Johnson's right to due process by interfering with his right to protect his property through a private contract.

161.     Executive Order 128 violates Mr. Johnson's right to due process because it deprives him of his right to protect his property.  N.J. Const. art. I, ¶ 1.

### COUNT VII: UNLAWFUL WAIVER OF LAW
### NEITHER STATUTE NOR CONSTITUTION AUTHORIZES GOVERNOR MURPHY TO WAIVE STATUTORY PROVISIONS

162.     Plaintiff realleges and incorporates by reference the allegations contained in his Introductory Statement and paragraphs 1 through 109, as if fully set forth herein.

163.     Governor Murphy has no authority to waive duly enacted statutes.  *Comm'ns Workers of Am.*, 413 N.J. Super. at 274 ("It is well settled that administrative regulations adopted by the Executive Branch cannot amend or repeal statutes.").

164.     The Presentment Clause, N.J. Const. art. V, § 1, ¶ 14(a), requires that "[t]he Legislature, given its constitutionally delegated realm of authority … ha[s] to be part of th[e] law-making process." *Comm'ns Works of Am.*, 413 N.J. Super. at 272.

165.     Executive Order 128 is predicated on Governor Murphy's assertion that he has statutory authority under the Emergency Health Powers Act, N.J.S.A. 26:13-1 *et seq.*; the Civilian Defense and Disaster Control Act, N.J.S.A App. A:9-33 *et seq.*; and the New Jersey Constitution to do what he has done.  He does not.

166.     As explained above, the Emergency Health Powers Act gives the Governor certain, specific, enumerated powers relating to health care and stopping the spread of pathogens.  These powers have nothing to do with the waiver of security deposits for residential leases.  *See supra* ¶¶ 26 – 34.

167.     Similarly, the statutory provisions authorizing the Governor to control the New Jersey National Guard and state militia have nothing to do with the authority Governor Murphy claims in Executive Order 128 to alter the term of residential leases, nor do they authorize the Governor to waive statutory provisions relating to residential leases.  *See supra* ¶¶ 35 – 36.

168.    The Civilian Defense and Disaster Control Act vests no power in Governor Murphy to issue Executive Order 128.

169.    The specifically enumerated powers granted by the Civilian Defense and Disaster Control Act deal with the military defense, coordination between governments, and the taking of private property.  *See supra* ¶¶ 87 – 97.

170.    No provision of the Civilian Defense and Disaster Control Act comes close to encompassing the authority to alter the obligations of parties to residential leases or to suspend the applicability of laws.

171.    Without a statutory grant of authority, Governor Murphy fares no better in relying on the New Jersey Constitution.  No constitutional provision empowers the Governor to suspend the statutory provisions regulating security deposits.

172.    To the contrary, the New Jersey Constitution forbids the Governor from doing so.

173.    The New Jersey Constitution forbids the suspension of habeas corpus, which indicates that the Governor is without power to suspend laws.

174.    State constitutions that provide for the suspension of habeas corpus in emergencies are understood to have vested that authority in the legislature.  *See* Hamburger, *supra* ¶ 99 at 1919; *see also* Tyler, *supra* ¶ 99.  In contrast to the legislature, the executive "could not, even during an emergency, seize property" or "constrain the natural liberty of persons who were within the protection of the law, unless [the executive] had legislative authorization."  Hamburger, *supra* ¶ 99 at 1919.

175.    The New Jersey Constitution forbids the Legislature from passing any "law impairing the obligation of contract[] or depriving a party of any remedy for enforcing a contract which existed when the contract was made."  N.J. Const. art. IV, § VII, ¶ 3.  The Governor, who has no legislative authority, cannot use an executive fiat to accomplish legislative ends that the duly elected members of the Senate and General Assembly are constitutionally forbidden from enacting.

176.     With no applicable grant of statutory authority to suspend laws or alter contractual obligations, Governor Murphy cannot invoke a general constitutional authority to do that which he is otherwise without authority to do.  *See Home Bldg & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425 (1934) ("Emergency does not create power.  Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved.").

177.     Because Governor Murphy could not lawfully waive the application of N.J.S.A. 46:8-19 or the private leasehold contracts negotiated in reliance on those provisions, Executive Order 128 is void ab initio and must fail.

### COUNT VIII: VIOLATION OF THE SEPARATION OF POWERS
### EXECUTIVE ORDER 128 VIOLATES N.J. CONST. ART. III, § 1

178.     Plaintiffs reallege and incorporate by reference the allegations contained in their Introductory Statement and paragraphs 1 through 109, as if fully set forth herein.

179.     The New Jersey Constitution vests executive power in the Governor, N.J. Const. art. V, § 1, ¶ 1., and vests "plenary law-making authority" in "the State Senate and General Assembly." *Commc'ns Workers of Am.*, 413 N.J. Super. at 255 (citing N.J. Const. art. IV, § 1, ¶ 1).  Through this constitutional provision, "the people vested full sovereign authority in the Legislature, save as otherwise therein provided."  *Gangemi*, 25 N.J. at 8-9.

180.     One legislative authority is the power to amend or repeal duly enacted laws.  *See Commc'ns Workers of Am.*, 413 N.J. Super. at 274.

181.     The New Jersey Constitution provides explicitly for the separation of powers.  N.J. Const. art. III, ¶ 1.

182.     When one branch aggrandizes its own power unilaterally—including when the Governor does so through an executive order—New Jersey courts apply a strict standard of review. *Commc'ns Workers of Am.*, 413 N.J. Super. at 258-59.

183.     A clear indication that the Governor has acted beyond his statutory grant of authority is when the statutory schemes that he invokes as the source of his authority are detailed and numerous but omit the specific type of action the Governor attempts to take.  *See id.* at 271 (reasoning that the Legislature's "omission of labor organizations and collective bargaining agreements" was "self-evident" from the statutory scheme).

184.     The courts must hold invalid an executive action that goes beyond the Governor's grant of authority, such that it is "fundamentally incompatible" with "existing laws and statutes as to impair the 'essential integrity' of the constitutional powers of the Legislature."  *Id.* at 274.

185.     Governor Murphy has unilaterally waived or modified numerous validly enacted laws without legislative authorization.

186.     Thus, Governor Murphy's unilaterally waiving or amending of valid legislative enactments violated the separation of powers, so his actions are void ab initio and must fail.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief against Defendants:

A.     Issuance of a declaratory judgment that Executive Order 128 violates the Contracts Clause of the United States Constitution by interfering with the contractual rights and obligations of residential landlords and tenants in New Jersey.

B.     Issuance of a declaratory judgment that the statutory and constitutional sources of authority that Governor Murphy invoked in enacting Executive Order 128 do not empower the Governor to waive or modify laws or contracts relating to residential leases.

C.     Issuance of a declaratory judgment that Executive Order 128 violated Matthew Johnson's right to due process

D.     Issuance of a declaratory judgment that Executive Order 128 denied Matthew Johnson equal protection of the law.

E.      Issuance of a declaratory judgment that Executive Order 128 denied Matthew Johnson the privileges and immunities guaranteed to citizens of the United States.

F.      Issuance of a declaratory judgment that Executive Order 128 violates the Contracts Clause of the New Jersey Constitution by interfering with the contractual rights and obligations of residential landlords and tenants in New Jersey.

G.      Issuance of a declaratory judgment that Executive Order 128 violates the separation of powers by waiving or amending law.

H.      Issuance of a declaratory judgment that Executive Order 128 is void ab initio.

I.      Issuance of permanent injunctive relief prohibiting Governor Murphy, Attorney General Grewal, and Commissioner Persichilli from enforcing Executive Order 128.

J.      For an award for all reasonable attorneys' fees incurred herein, as applicable, pursuant to 42 U.S.C. § 1988.

K.      For costs of this suit incurred herein, as applicable.

L.      For such other relief as the Court deems just and proper.


**JURY DEMAND**

Plaintiff Matthew Johnson hereby demands a trial by jury on all issues triable by jury in the above-entitled action.

Dated:  June 2, 2020

Respectfully submitted,

_____ /s/ *Terence Sweeney*

Terence J. Sweeney
THE LAW OFFICES OF TERENCE J. SWEENEY, ESQ.
44 Fairmount Avenue, Suite 1

Chatham, New Jersey 07928
sweeneylawfirm@optonline.net
(973) 665-0400

NEW CIVIL LIBERTIES ALLIANCE
HARRIET HAGEMAN
Senior Litigation Counsel
JARED MCCLAIN
Staff Counsel
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
(856) 305-0034
*Motions forthcoming for* Pro Hac Vice *Admission*

*Counsel to Plaintiff Matthew Johnson*

**<u>VERIFICATION</u>**

I, Matthew Johnson, the owner and landlord of Unit 312 of Barclay Towers Condominiums located in the Township of Cherry Hill in Camden County, New Jersey, am the plaintiff in this proceeding. I have read this complaint and hereby verify that the contents are true and correct to the best of my knowledge, information, and belief, this 1st day of June 2020.


*Matthew Johnson*
Matthew Johnson

# EXHIBIT 1

*PTP*

3

CUMBERLAND TITLE AGENCY, LLC  **DEED**
2030 SPRINGDALE RD., SUITE 800
*C306D*  CHERRY HILL, NJ 08003

Prepared by (Print signers name below signature)

*Gerald A. Sinclair*

Gerald A. Sinclair, Esquire

This Deed is made on *July 13,*            , 2009

**BETWEEN**

whose address is:                    ████████████████

referred to as the **Grantor**.
**AND**

                                     Matt Johnson

whose post office address is:        624 Highland Avenue, Vineland, NJ 08360

referred to as the **Grantee**.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

1.  **Transfer of Title.**  The Grantor grants and conveys (transfers ownership of) the property (called the "Property") described below to the Grantee.  This transfer is made for the sum of **Fifty Thousand...............................................and 00/100 Dollars ($50,000.00)**

The Grantor acknowledges receipt of this money.

2.  **Tax Map Reference.**  (N.J.S.A. 46:15-2.1) Municipality of Township of Cherry Hill Block No. **342.18** Lot No. **6-C0312,** Account No.

3.  **Property.**  The property consists of the land and all the buildings and structures on the land in **Township of Cherry Hill**, County of **Camden,** and State of New Jersey.  The legal description is:

ALL that certain real property in the Township of Cherry Hill, in the County of Camden and State of New Jersey, described as follows:

This property consists of the land and all the buildings and structures on the land in the Township of Cherry Hill, County of Camden and State of New Jersey, and other appurtenances thereto, in fee simple, subject to the provisions of the New Jersey Condominium Act (RS 46:8B-1 et seq.) as amended, and to the provisions of that certain Master Deed of Barclay Towers Condominium, a Condominium, dated October 22, 1986 and recorded in the Office of the Clerk of Camden County on October 23, 1986 in Deed Book 4167, Page 232, which real property is more particularly described as Unit No. 312 of said Condominium, together with other appurtenances to said unit which unit and appurtenances have been more specifically defined in the Master Deed, which is comprised of premises known as Block 342.18, Lot 6 on the Tax Map of Cherry Hill Township, New Jersey and including an undivided interest in the general common elements of said Condominium appurtenant to said unit, which Unit and appurtenant general common elements have been more specifically defined in the Master Deed and depicted on certain exhibits thereto.

FOR INFORMATION ONLY:  BEING known as Lot 6, Qualifier C0312, Block 342.18 on the Official Tax Map of Township of Cherry Hill.

CAMDEN COUNTY, NJ
CAMDEN COUNTY CLERK'S OFFICE
DEED-OR BOOK 09108 PG 0359
RECORDED 09/25/2009 12:43:48
FILE NUMBER 2009071467
RCPT#: 814300; RECD BY: annal
RECORDING FEES 60.00
MARGINAL NOTATION 0.00
TOTAL TAX 200.00

RETURN NUMBER -815683

Being the same real property conveyed to ██████ by Deed from ██████ and ██████, dated October 10, 2003 and recorded December 29, 2003 in Deed OR Book 7302, Page 224.

Said ██████ appointed ██████ as his attorney-in-fact by Power of Attorney dated _____ and recorded _____ in Deed Book _____, Page _____.

The street address of this Property is: 312 Barclay Towers, Cherry Hill Township, NJ

4.  **Promises by Grantor.**  The Grantor promises that the Grantor has done no act to encumber the Property.  This promise is called a "covenant as to grantor's act" (N.J.S.A. 46:4-6).  This promise means that the Grantor has not allowed anyone else to obtain any legal right which would affect the Property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

5.  **Signatures.**  The Grantor signs this Deed as of date at the top of the first page (Print name below each signature.)

Witnessed by:



_____  ████████████  (SEAL)   7. 13. 09

_____  ████████████  _____ (SEAL)

STATE OF NEW JERSEY:

COUNTY OF Cumberland  ss:

I CERTIFY that on 7-13-09

██████

Personally came before me and stated to my satisfaction that this person (or if more than one, each person):
(a)  was the maker of this Deed.
(b)  executed this Deed as his or her own act; and,
(c)  made this Deed for $50,000.00 as the full and actual consideration paid or to be paid for the transfer of title. (Such consideration is defined N.J.S.A.46:15-5)

RECORD AND RETURN TO:
CUMBERLAND TITLE AGENCY, LLC
2030 SPRINGDALE ROAD, SUITE 800
CHERRY HILL, NJ 08003
FILE NO.  C3060

_____
(Print name and title below signature)

**IRMA PLAZA**
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 12/18/2012

2012

DEED BARGAIN AND SALE

GIT/REP-3
(12-07)

**State of New Jersey**
**SELLER'S RESIDENCY CERTIFICATION/EXEMPTION**
(C.55, P.L. 2004)

(Please Print or Type)

**SELLER(S) INFORMATION (See Instructions, Page 2)**

Name(s)

Current Resident Address:

Street:

City, Town, Post Office: HOBOKEN   State: NJ   Zip Code: 07030

**PROPERTY INFORMATION (Brief Property Description)**

Block(s): 342.18   Lot(s): 6 - C0312   Qualifier:

Street Address: 312 Barclay Towers

City, Town, Post Office: Cherry Hill   State: NJ   Zip Code:

Seller's Percentage of Ownership: 100%   Consideration: $50,000.—   Closing Date: 1/12/09

**SELLER ASSURANCES (Check the Appropriate Box)  (Boxes 2 through 8 apply to NON-residents)**

1. ☒ I am a resident taxpayer (individual, estate, or trust) of the State of New Jersey pursuant to N.J.S.A. 54A:1-1 et seq. and will file a resident gross income tax return and pay any applicable taxes on any gain or income from the disposition of this property.

2. ☐ The real property being sold or transferred is used exclusively as my principal residence within the meaning of section 121 of the federal Internal Revenue Code of 1986, 26 U.S.C. s. 121.

3. ☐ I am a mortgagor conveying the mortgaged property to a mortgagee in foreclosure or in a transfer in lieu of foreclosure with no additional consideration.

4. ☐ Seller, transferor or transferee is an agency or authority of the United States of America, an agency or authority of the State of New Jersey, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, or a private mortgage insurance company.

5. ☐ Seller is not an individual, estate or trust and as such not required to make an estimated payment pursuant to N.J.S.A.54A:1-1 et seq.

6. ☐ The total consideration for the property is $1,000 or less and as such, the seller is not required to make an estimated payment pursuant to N.J.S.A. 54A:5-1-1 et seq.

7. ☐ The gain from the sale will not be recognized for Federal income tax purposes under I.R.C. Section 721, 1031, 1033 or is a cemetery plot. (CIRCLE THE APPLICABLE SECTION). If such section does not ultimately apply to this transaction, the seller acknowledges the obligation to file a New Jersey income tax return for the year of the sale (see instructions).

   ☐ No non-like kind property received.

8. ☐ Transfer by an executor or administrator of a decedent to a devisee or heir to effect distribution of the decedent's estate in accordance with the provisions of the decedent's will or the intestate laws of this state.

**SELLER(S) DECLARATION**

The undersigned understands that this declaration and its contents may be disclosed or provided to the New Jersey Division of Taxation and that any false statement contained herein could be punished by fine, imprisonment, or both. I furthermore declare that I have examined this declaration and, to the best of my knowledge and belief, it is true, correct and complete.

7.13.09
Date

Signature
(Seller) Please indicate if Power of Attorney or Attorney in Fact

Date

Signature
(Seller) Please indicate if Power of Attorney or Attorney in Fact

# EXHIBIT 2

Matthew Johnson and ████████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

# Residential Lease Agreement

**THIS LEASE AGREEMENT** (hereinafter referred to as the "Agreement") made

and entered into this 21st day of July, 2014, by and between

MATTHEW JOHNSON

Address: 2139 E Chestnut Ave #51 Vineland, NJ 08361

(hereinafter referred to as "Landlord") and

████████████████

Address:

(hereinafter referred to as "Tenant").

**WITNESSETH:**

**WHEREAS**, Landlord is the fee owner of certain real property being, lying and situated in Camden County, New Jersey, such real property having a street address of 312 Barclay Towers, Cherry Hill NJ 08034 (hereinafter referred to as the "Premises").

**WHEREAS**, Landlord is desirous of leasing the Premises to Tenant upon the terms and conditions as contained herein; and

**WHEREAS**, Tenant is desirous of leasing the Premises from Landlord on the terms and conditions as contained herein;

**NOW, THEREFORE**, for and in consideration of the covenants and obligations contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.  **TERM**. Landlord leases to Tenant and Tenant leases from Landlord the above described Premises together with any and all appurtenances thereto, for a term of one (1) year, such term beginning on August 1st 2014, and ending at 12 o'clock midnight on July 31st 2015.

2.  **RENT**. The total rent for the term hereof is the sum of NINETY SIX HUNDRED DOLLARS ($9600) payable on the 1st day of each month of the term, in equal installments of EIGHT HUNDRED DOLLARS ($800), first installment to be paid upon the due execution of this Agreement, the second installment to be paid on September 1st 2014. All such payments shall be made to Landlord at Landlord's address as set forth in the preamble to this Agreement on or before the due date and without demand.

3.  **SECURITY DEPOSIT**. Upon the due execution of this Agreement, Tenant shall deposit with Landlord the sum of TWELVE HUNDRED DOLLARS ($1200), payable in THREE (3) installments, starting with SIX HUNDRED DOLLARS ($600) payable on August 1st

1

Matthew Johnson and ▮▮▮▮▮▮▮▮ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

2014, a second payment of THREE HUNDRED DOLLARS ($300) on September 1st 2014, and a final payment of THREE HUNDRED DOLLARS ($300) on October 1st 2014, as security for any damage caused to the Premises during the term hereof. *Interest on Security Deposits.* In accordance with New Jersey law (NJSA Section 46:8-19), Landlord will pay Tenant interest on Tenant's security deposit, less any service fee charged by the bank or investment company. Interest will be paid annually on the anniversary of Tenant's Lease in cash or as a credit towards rent due. Further, Landlord will annually notify Tenant of certain information concerning the security deposit: the name of the bank where the security deposit is held, the type of account in which the funds are deposited, and the account's interest rate. Landlord is prohibited from increasing the amount of the security deposit by more than ten (10) percent per year. *Timing of Return of Security Deposit.* Within thirty (30) days after the end of Tenant's Lease term, Landlord will return Tenant's security deposit to Tenant, plus any accrued interest and less any allowed deductions. Interest and any deductions will be itemized. Tenant's security deposit or the balance thereof after deductions will be returned to Tenant by personal delivery or registered or certified mail.

4. **USE OF PREMISES**. The Premises shall be used and occupied by Tenant and Tenant's immediate family, consisting of ▮▮▮▮▮▮▮▮▮▮▮ exclusively, as a private single family dwelling, and no part of the Premises shall be used at any time during the term of this Agreement by Tenant for the purpose of carrying on any business, profession, or trade of any kind, or for any purpose other than as a private single family dwelling. Tenant shall not allow any other person, other than Tenant's immediate family or transient relatives and friends who are guests of Tenant, to use or occupy the Premises without first obtaining Landlord's written consent to such use. Tenant shall comply with any and all laws, ordinances, rules and orders of any and all governmental or quasi-governmental authorities affecting the cleanliness, use, occupancy and preservation of the Premises.

5. **CONDITION OF PREMISES**. Tenant stipulates, represents and warrants that Tenant has examined the Premises, and that they are at the time of this Lease in good order, repair, and in a safe, clean and tenantable condition.

6. **ASSIGNMENT AND SUB-LETTING**. Tenant shall not assign this Agreement, or sub-let or grant any license to use the Premises or any part thereof without the prior written consent of Landlord. A consent by Landlord to one such assignment, sub-letting or license shall not be deemed to be a consent to any subsequent assignment, sub-letting or license. An assignment, sub-letting or license without the prior written consent of Landlord or an assignment or sub-letting by operation of law shall be absolutely null and void and shall, at Landlord's option, terminate this Agreement.

7. **ALTERATIONS AND IMPROVEMENTS**. Tenant shall make no alterations to the buildings or improvements on the Premises or construct any building or make any other improvements on the Premises without the prior written consent of Landlord. Any and all alterations, changes, and/or improvements built, constructed or placed on the Premises by Tenant shall, unless otherwise provided by written agreement between Landlord and Tenant, be and become the property of Landlord and remain on the Premises at the expiration or earlier termination of this Agreement.

2

Matthew Johnson and ███████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

8. **NON-DELIVERY OF POSSESSION**. In the event Landlord cannot deliver possession of the Premises to Tenant upon the commencement of the Lease term, through no fault of Landlord or its agents, then Landlord or its agents shall have no liability, but the rental herein provided shall abate until possession is given. Landlord or its agents shall have thirty (30) days in which to give possession, and if possession is tendered within such time, Tenant agrees to accept the demised Premises and pay the rental herein provided from that date. In the event possession cannot be delivered within such time, through no fault of Landlord or its agents, then this Agreement and all rights hereunder shall terminate.

9. **HAZARDOUS MATERIALS**. Tenant shall not keep on the Premises any item of a dangerous, flammable or explosive character that might unreasonably increase the danger of fire or explosion on the Premises or that might be considered hazardous or extra hazardous by any responsible insurance company.

10. **UTILITIES**. Landlord shall be responsible for arranging for and paying for all utility services required on the Premises.

11. **MAINTENANCE AND REPAIR; RULES**. Tenant will, at its sole expense, keep and maintain the Premises and appurtenances in good and sanitary condition and repair during the term of this Agreement and any renewal thereof. Without limiting the generality of the foregoing, Tenant shall:

(a) Not obstruct the driveways, sidewalks, courts, entry ways, stairs and/or halls,  which shall be used for the purposes of ingress and egress only;

(b) Keep all windows, glass, window coverings, doors, locks and hardware in good, clean order and repair; Not obstruct or cover the windows or doors;

(c) Not leave windows or doors in an open position during any inclement weather;

(d) Not hang any laundry, clothing, sheets, etc. from any window, rail, porch or balcony nor air or dry any of same within any yard area or space;

(e) Not cause or permit any locks or hooks to be placed upon any door or window or change existing locks without the prior written consent of Landlord;

(f) Keep all air conditioning filters clean and free from dirt;

(g) Keep all lavatories, sinks, toilets, and all other water and plumbing apparatus in good order and repair and shall use same only for the purposes for which they were constructed. Tenant shall not allow any  sweepings, rubbish, sand, rags, ashes or other substances to be thrown or deposited therein. Any damage to any such apparatus and the cost of clearing stopped plumbing resulting from misuse shall be borne by Tenant;

(h) And Tenant's family and guests shall at all times maintain order in the Premises and at all places on the Premises, and shall not make or permit any loud or improper noises, or otherwise disturb other residents;

Matthew Johnson and ███████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

(i)  Keep all radios, television sets, stereos, phonographs, etc., turned down to a level of sound that does not annoy or interfere with other residents;

(j)  Deposit all trash, garbage, rubbish or refuse in the locations provided therefore and shall not allow any trash, garbage, rubbish or refuse to be deposited or permitted to stand on the exterior of any building or within the common elements;

(k) Tenant shall not smoke or allow guests to smoke within the unit;

(l)  Abide by and be bound by any and all rules and regulations affecting the Premises or the common area appurtenant thereto which may be adopted or promulgated by the Condominium or Homeowners' Association having control over them. Any damage, disturbance, or violation of Condominium Association rules done by the tenant that results in a fine against the landlord will be the sole responsibility of the tenant to be collected within thirty (30) days of the levying of the fine.

12.  **DAMAGE TO PREMISES**. In the event the Premises are destroyed or rendered wholly untenantable by fire, storm, earthquake, or other casualty not caused by the negligence of Tenant, this Agreement shall terminate from such time except for the purpose of enforcing rights that may have then accrued hereunder. The rental provided for herein shall then be accounted for by and between Landlord and Tenant up to the time of such injury or destruction of the Premises, Tenant paying rentals up to such date and Landlord refunding rentals collected beyond such date. Should a portion of the Premises thereby be rendered untenantable, the Landlord shall have the option of either repairing such injured or damaged portion or terminating this Lease. In the event that Landlord exercises its right to repair such untenantable portion, the rental shall abate in the proportion that the injured parts bears to the whole Premises, and such part so injured shall be restored by Landlord as speedily as practicable, after which the full rent shall recommence and the Agreement continue according to its terms.

13.  **PROPERTY INSURANCE**. Landlord's property insurance does not insure the personal property of the tenant. Tenant acknowledges that he has been advised by the landlord to secure a separate renter's insurance policy if he wishes to protect his belongings from any potential damages.

14.  **INSPECTION OF PREMISES**. Landlord and Landlord's agents shall have the right at all reasonable times during the term of this Agreement and any renewal thereof to enter the Premises with 24 hours noticefor the purpose of inspecting the Premises and all buildings and improvements thereon. And for the purposes of making any repairs, additions or alterations as may be deemed appropriate by Landlord for the preservation of the Premises or the building. Landlord and its agents shall further have the right to exhibit the Premises and to display the usual "for sale", "for rent" or "vacancy" signs on the Premises at any time within forty-five (45) days before the expiration of this Lease. The right of entry shall likewise exist for the purpose of removing placards, signs, fixtures, alterations or additions, but do not conform to this Agreement or to any restrictions, rules or regulations affecting the Premises. The tenant must provide access to Barclay Towers Condominium Association employees in the event of an emergency that requires access to the unit. The tenant must provide access to the unit for any

4

Matthew Johnson and ███████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

government-mandated inspections.

15. **SUBORDINATION OF LEASE**. This Agreement and Tenant's interest hereunder are and shall be subordinate, junior and inferior to any and all mortgages, liens or encumbrances now or hereafter placed on the Premises by Landlord, all advances made under any such mortgages, liens or encumbrances (including, but not limited to, future advances), the interest payable on such mortgages, liens or encumbrances and any and all renewals, extensions or modifications of such mortgages, liens or encumbrances.

16. **TENANT'S HOLD OVER**. If Tenant remains in possession of the Premises with the consent of Landlord after the natural expiration of this Agreement, a new tenancy from month-to-month shall be created between Landlord and Tenant which shall be subject to all of the terms and conditions hereof except that rent shall then be due and owing at NINE HUNDRED DOLLARS ($900) per month and except that such tenancy shall be terminable upon fifteen (15) days written notice served by either party.

17. **SURRENDER OF PREMISES**. Upon the expiration of the term hereof, Tenant shall surrender the Premises in as good a state and condition as they were at the commencement of this Agreement, reasonable use and wear and tear thereof and damages by the elements excepted.

18. **ANIMALS**. Tenant shall be entitled to keep no more than ONE (1) domestic cat or bird; however, at such time as Tenant shall actually keep any such animal on the Premises, Tenant shall pay to Landlord a pet deposit of TWO HUNDRED DOLLARS ($200), ONE HUNDRED DOLLARS ($100) of which shall be non-refundable and shall be used upon the termination or expiration of this Agreement for the purposes of cleaning the unit.

19. **QUIET ENJOYMENT**. Tenant, upon payment of all of the sums referred to herein as being payable by Tenant and Tenant's performance of all Tenant's agreements contained herein and Tenant's observance of all rules and regulations, shall and may peacefully and quietly have, hold and enjoy said Premises for the term hereof.

19. **INDEMNIFICATION**. Landlord shall not be liable for any damage or injury of or to the Tenant, Tenant's family, guests, invitees, agents or employees or to any person entering the Premises or the building of which the Premises are a part or to goods or equipment, or in the structure or equipment of the structure of which the Premises are a part, and Tenant hereby agrees to indemnify, defend and hold Landlord harmless from any and all claims or assertions of every kind and nature.

20. **DEFAULT**. If Tenant fails to comply with any of the material provisions of this Agreement, other than the covenant to pay rent, or of any present rules and regulations or any that may be hereafter prescribed by Landlord, or materially fails to comply with any duties imposed on Tenant by statute, within seven (7) days after delivery of written notice by Landlord specifying the non-compliance and indicating the intention of Landlord to terminate the Lease by reason thereof, Landlord may terminate this Agreement. If Tenant fails to pay rent when due and the default continues for seven (7) days thereafter, Landlord may, at Landlord's option, declare the entire balance of rent

5

Matthew Johnson and ▪▪▪▪▪▪▪▪ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available to Landlord at law or in equity or may immediately terminate this Agreement.

21.   **LATE CHARGE**. In the event that any payment required to be paid by Tenant hereunder is not made within five (5) business days of when due, Tenant shall pay to Landlord, in addition to such payment or other charges due hereunder, a "late fee" in the amount of TWENTY FIVE ($25). For purposes of this section, a "business day" means any day other than a Saturday, Sunday or State or federal holiday.

22.   **ABANDONMENT**. If at any time during the term of this Agreement Tenant abandons the Premises or any part thereof, Landlord may, at Landlord's option, obtain possession of the Premises in the manner provided by law, and without becoming liable to Tenant for damages or for any payment of any kind whatever. Landlord may, at Landlord's discretion, as agent for Tenant, relet the Premises, or any part thereof, for the whole or any part thereof, for the whole or any part of the then unexpired term, and may receive and collect all rent payable by virtue of such reletting, and, at Landlord's option, hold Tenant liable for any difference between the rent that would have been payable under this Agreement during the balance of the unexpired term, if this Agreement had continued in force, and the net rent for such period realized by Landlord by means of such reletting. If Landlord's right of reentry is exercised following abandonment of the Premises by Tenant, then Landlord shall consider any personal property belonging to Tenant and left on the Premises to also have been abandoned, in which case Landlord may dispose of all such personal property in any manner Landlord shall deem proper and Landlord is hereby relieved of all liability for doing so.

23.   **ATTORNEYS' FEES**. Should it become necessary for Landlord to employ an attorney to enforce any of the conditions or covenants hereof, including the collection of rentals or gaining possession of the Premises, Tenant agrees to pay all expenses so incurred, including a reasonable attorneys' fee.

24.   **RECORDING OF AGREEMENT**. Tenant shall not record this Agreement on the Public Records of any public office. In the event that Tenant shall record this Agreement, this Agreement shall, at Landlord's option, terminate immediately and Landlord shall be entitled to all rights and remedies that it has at law or in equity.

25.   **GOVERNING LAW**. This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of New Jersey.

26.   **SEVERABILITY**. If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

27.   **BINDING EFFECT**. The covenants, obligations and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

6

Matthew Johnson and ████████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

28. **DESCRIPTIVE HEADINGS**. The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations of the Landlord or Tenant.

29. **CONSTRUCTION**. The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

30. **NON-WAIVER**. No indulgence, waiver, election or non-election by Landlord under this Agreement shall affect Tenant's duties and liabilities hereunder.

31. **MODIFICATION**. The parties hereby agree that this document contains the entire agreement between the parties and this Agreement shall not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto.

32. **CRIME INSURANCE**. As required by New Jersey law (NJSA Section 46:8-39), under Title VI of the Housing and Urban Development Act of 1970, the Federal Government is subsidizing crime insurance in order to make the same available to Residents in the State of New Jersey. Tenant, as a Resident, may be eligible to purchase this insurance from the SAFETY MANAGEMENT INSTITUTE, located in Washington, D.C. Tenant may contact this company directly to obtain an application and further information. Tenant may call the following toll free number: (800) 638-8780. Crime insurance is available for tenants in all habitable property through the New Jersey Underwriters Association, Crime Insurance Indemnity Plan. To apply for crime insurance, contact the New Jersey Underwriters Association, Crime Insurance for Habitable Property, 744 Broad Street, Newark, New Jersey, 07102 directly for an application.

33. **CHILD PROTECTION WINDOW GUARD OPTION**. Pursuant to New Jersey law (NJSA Section 55:13A-7.14), Tenant can have window guards installed on the Premises and the public halls (1) by making a written request to Landlord and (2) if a child 10 years of age or younger resides on the Premises and (3) if Tenant lives in a dwelling above the first floor. Residents living on the first floor may only request window guards on windows in public halls above the first floor to which persons in the resident's dwelling have access without having to go out of the building. Landlord may, at Landlord's option, recoup the costs associated with the installation of the window guards through increased rent.

34. **RETURN OF KEYS**. Tenant must return the keys/passes to the Premises, mailbox, building, and laundry to Landlord when Tenant vacates the Premises.

35. **TRUTH IN RENTING**. Resident acknowledges receipt today of the Truth in Renting information, required to be provided by New Jersey law (NJSA Section 46: 8-45).

36. **NOTICE**. Any notice required or permitted under this Lease or under state law shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:

Matthew Johnson and ▮▮▮▮▮▮▮ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

If to Landlord to:

MATTHEW JOHNSON

2139 E CHESNUT AVE #51 VINELAND NJ 08361

If to Tenant to: ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ [*Tenant's Address*]

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

**As to Landlord this 21st day of July, 2014.**

Sign: ▮▮▮▮

Print: MATTHEW JOHNSON

Date: 7/21/2014

**As to Tenant, this 21st day of July, 2014.**

Sign: ▮▮▮▮▮▮▮

Print: ▮▮▮▮▮▮▮

Date: 7/21/2014

8

# EXHIBIT 3

Matthew Johnson and ▮▮▮▮▮▮▮▮ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

# Residential Lease Agreement

**THIS LEASE AGREEMENT** (hereinafter referred to as the "Agreement") made

and entered into this 27th day of October, 2017, by and between

MATTHEW JOHNSON

Address: 2139 E Chestnut Ave #51 Vineland, NJ 08361

(hereinafter referred to as "Landlord") and



Address:

(hereinafter referred to as "Tenant").

**WITNESSETH:**

**WHEREAS**, Landlord is the fee owner of certain real property being, lying and situated in Camden County, New Jersey, such real property having a street address of 312 Barclay Towers, Cherry Hill NJ 08034 (hereinafter referred to as the "Premises").

**WHEREAS**, Landlord is desirous of leasing the Premises to Tenant upon the terms and conditions as contained herein; and

**WHEREAS**, Tenant is desirous of leasing the Premises from Landlord on the terms and conditions as contained herein;

**NOW, THEREFORE**, for and in consideration of the covenants and obligations contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.  **TERM**. Landlord leases to Tenant and Tenant leases from Landlord the above described Premises together with any and all appurtenances thereto, for a term of one (1) year, such term beginning on November 1st 2017, and ending at 12 o'clock midnight on October 31st 2018.

2.  **RENT**. The total rent for the term hereof is the sum of TEN THOUSAND TWO HUNDRED ($10,200) payable on the 1st day of each month of the term, in equal installments of EIGHT HUNDRED FIFTY DOLLARS ($850), first installment to be paid upon the due execution of this Agreement, the second installment to be paid on December 1st 2017. All such payments shall be made to Landlord at Landlord's address as set forth in the preamble to this Agreement on or before the due date and without demand.

3.  **SECURITY DEPOSIT**. Upon the due execution of this Agreement, Tenant shall deposit with Landlord the sum of SIX HUNDRED DOLLARS ($600) payable on November 1st

1

Matthew Johnson and ▮▮▮▮▮▮▮▮▮ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

2017, as security for any damage caused to the Premises during the term hereof. *Interest on Security Deposits*. In accordance with New Jersey law (NJSA Section 46:8-19), Landlord will pay Tenant interest on Tenant's security deposit, less any service fee charged by the bank or investment company. Interest will be paid annually on the anniversary of Tenant's Lease in cash or as a credit towards rent due. Further, Landlord will annually notify Tenant of certain information concerning the security deposit: the name of the bank where the security deposit is held, the type of account in which the funds are deposited, and the account's interest rate. Landlord is prohibited from increasing the amount of the security deposit by more than ten (10) percent per year.

*Timing of Return of Security Deposit*. Within thirty (30) days after the end of Tenant's Lease term, Landlord will return Tenant's security deposit to Tenant, plus any accrued interest and less any allowed deductions. Interest and any deductions will be itemized. Tenant's security deposit or the balance thereof after deductions will be returned to Tenant by personal delivery or registered or certified mail.

4.    **USE OF PREMISES**. The Premises shall be used and occupied by Tenant and Tenant's immediate family, consisting of ▮▮▮▮▮▮▮▮▮▮▮ exclusively, as a private single family dwelling, and no part of the Premises shall be used at any time during the term of this Agreement by Tenant for the purpose of carrying on any business, profession, or trade of any kind, or for any purpose other than as a private single family dwelling. Tenant shall not allow any other person, other than Tenant's immediate family or transient relatives and friends who are guests of Tenant, to use or occupy the Premises without first obtaining Landlord's written consent to such use. Tenant shall comply with any and all laws, ordinances, rules and orders of any and all governmental or quasi-governmental authorities affecting the cleanliness, use, occupancy and preservation of the Premises.

5.    **CONDITION OF PREMISES**. Tenant stipulates, represents and warrants that Tenant has examined the Premises, and that they are at the time of this Lease in good order, repair, and in a safe, clean and tenantable condition.

6.    **ASSIGNMENT AND SUB-LETTING**. Tenant shall not assign this Agreement, or sub-let or grant any license to use the Premises or any part thereof without the prior written consent of Landlord. A consent by Landlord to one such assignment, sub-letting or license shall not be deemed to be a consent to any subsequent assignment, sub-letting or license. An assignment, sub-letting or license without the prior written consent of Landlord or an assignment or sub- letting by operation of law shall be absolutely null and void and shall, at Landlord's option, terminate this Agreement.

7.    **ALTERATIONS AND IMPROVEMENTS**. Tenant shall make no alterations to the buildings or improvements on the Premises or construct any building or make any other improvements on the Premises without the prior written consent of Landlord. Any and all alterations, changes, and/or improvements built, constructed or placed on the Premises by Tenant shall, unless otherwise provided by written agreement between Landlord and Tenant, be and become the property of Landlord and remain on the Premises at the expiration or earlier termination of this Agreement.

8.    **NON-DELIVERY OF POSSESSION**. In the event Landlord cannot deliver possession of

2

Matthew Johnson and ▮▮▮▮▮▮▮▮ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

the Premises to Tenant upon the commencement of the Lease term, through no fault of Landlord or its agents, then Landlord or its agents shall have no liability, but the rental herein provided shall abate until possession is given. Landlord or its agents shall have thirty (30) days in which to give possession, and if possession is tendered within such time, Tenant agrees to accept the demised Premises and pay the rental herein provided from that date. In the event possession cannot be delivered within such time, through no fault of Landlord or its agents, then this Agreement and all rights hereunder shall terminate.

9.    **HAZARDOUS MATERIALS**. Tenant shall not keep on the Premises any item of a dangerous, flammable or explosive character that might unreasonably increase the danger of fire or explosion on the Premises or that might be considered hazardous or extra hazardous by any responsible insurance company.

10.    **UTILITIES**. Landlord shall be responsible for arranging for and paying for all utility services required on the Premises.

11.    **MAINTENANCE AND REPAIR; RULES**. Tenant will, at its sole expense, keep and maintain the Premises and appurtenances in good and sanitary condition and repair during the term of this Agreement and any renewal thereof. Without limiting the generality of the foregoing, Tenant shall:

(a) Not obstruct the driveways, sidewalks, courts, entry ways, stairs and/or halls,  which shall be used for the purposes of ingress and egress only;

(b) Keep all windows, glass, window coverings, doors, locks and hardware in good, clean order and repair; Not obstruct or cover the windows or doors;

(c)Not leave windows or doors in an open position during any inclement weather;

(d) Not hang any laundry, clothing, sheets, etc. from any window, rail, porch or balcony nor air or dry any of same within any yard area or space;

(e) Not cause or permit any locks or hooks to be placed upon any door or window or change existing locks without the prior written consent of Landlord;

(f) Keep all air conditioning filters clean and free from dirt;

(g) Keep all lavatories, sinks, toilets, and all other water and plumbing apparatus in good order and repair and shall use same only for the purposes for which they were constructed. Tenant shall not allow any  sweepings, rubbish, sand, rags, ashes or other substances to be thrown or deposited therein. Any damage to any such apparatus and the cost of clearing stopped plumbing resulting from misuse shall be borne by Tenant;

(h) And Tenant's family and guests shall at all times maintain order in the Premises and at all places on the Premises, and shall not make or permit any loud or improper noises, or otherwise disturb other residents;

Matthew Johnson and ▮▮▮▮▮▮▮▮▮ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

(i)  Keep all radios, television sets, stereos, phonographs, etc., turned down to a level of sound that does not annoy or interfere with other residents;

(j)  Deposit all trash, garbage, rubbish or refuse in the locations provided therefore and shall not allow any trash, garbage, rubbish or refuse to be deposited or permitted to stand on the exterior of any building or within the common elements;

(k) Tenant shall not smoke or allow guests to smoke within the unit;

(l)  Abide by and be bound by any and all rules and regulations affecting the Premises or the common area appurtenant thereto which may be adopted or promulgated by the Condominium or Homeowners' Association having control over them. Any damage, disturbance, or violation of Condominium Association rules done by the tenant that results in a fine against the landlord will be the sole responsibility of the tenant to be collected within thirty (30) days of the levying of the fine.

12.   **DAMAGE TO PREMISES**. In the event the Premises are destroyed or rendered wholly untenantable by fire, storm, earthquake, or other casualty not caused by the negligence of Tenant, this Agreement shall terminate from such time except for the purpose of enforcing rights that may have then accrued hereunder. The rental provided for herein shall then be accounted for by and between Landlord and Tenant up to the time of such injury or destruction of the Premises, Tenant paying rentals up to such date and Landlord refunding rentals collected beyond such date. Should a portion of the Premises thereby be rendered untenantable, the Landlord shall have the option of either repairing such injured or damaged portion or terminating this Lease. In the event that Landlord exercises its right to repair such untenantable portion, the rental shall abate in the proportion that the injured parts bears to the whole Premises, and such part so injured shall be restored by Landlord as speedily as practicable, after which the full rent shall recommence and the Agreement continue according to its terms.

13.   **PROPERTY INSURANCE**. Landlord's property insurance does not insure the personal property of the tenant. Tenant acknowledges that he has been advised by the landlord to secure a separate renter's insurance policy if he wishes to protect his belongings from any potential damages.

14.   **INSPECTION OF PREMISES**. Landlord and Landlord's agents shall have the right at all reasonable times during the term of this Agreement and any renewal thereof to enter the Premises with 24 hours' notice for the purpose of inspecting the Premises and all buildings and improvements thereon. And for the purposes of making any repairs, additions or alterations as may be deemed appropriate by Landlord for the preservation of the Premises or the building. Landlord and its agents shall further have the right to exhibit the Premises and to display the usual "for sale", "for rent" or "vacancy" signs on the Premises at any time within forty-five (45) days before the expiration of this Lease. The right of entry shall likewise exist for the purpose of removing placards, signs, fixtures, alterations or additions, but do not conform to this Agreement or to any restrictions, rules or regulations affecting the Premises. The tenant must provide access to Barclay Towers Condominium Association employees in the event of an emergency that requires access to the unit. The tenant must provide access to the unit for any

4

Matthew Johnson and ▮▮▮▮▮▮▮▮▮ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

government-mandated inspections.

15. **SUBORDINATION OF LEASE**. This Agreement and Tenant's interest hereunder are and shall be subordinate, junior and inferior to any and all mortgages, liens or encumbrances now or hereafter placed on the Premises by Landlord, all advances made under any such mortgages, liens or encumbrances (including, but not limited to, future advances), the interest payable on such mortgages, liens or encumbrances and any and all renewals, extensions or modifications of such mortgages, liens or encumbrances.

16. **TENANT'S HOLD OVER**. If Tenant remains in possession of the Premises with the consent of Landlord after the natural expiration of this Agreement, a new tenancy from month-to-month shall be created between Landlord and Tenant which shall be subject to all of the terms and conditions hereof except that rent shall then be due and owing at NINE HUNDRED DOLLARS ($900) per month and except that such tenancy shall be terminable upon fifteen (15) days written notice served by either party.

17. **SURRENDER OF PREMISES**. Upon the expiration of the term hereof, Tenant shall surrender the Premises in as good a state and condition as they were at the commencement of this Agreement, reasonable use and wear and tear thereof and damages by the elements excepted.

18. **ANIMALS**. Tenant shall be entitled to keep no more than ONE (1) domestic cat or bird; however, at such time as Tenant shall actually keep any such animal on the Premises, Tenant shall pay to Landlord a pet deposit of TWO HUNDRED DOLLARS ($200), ONE HUNDRED DOLLARS ($100) of which shall be non-refundable and shall be used upon the termination or expiration of this Agreement for the purposes of cleaning the unit.

19. **QUIET ENJOYMENT**. Tenant, upon payment of all of the sums referred to herein as being payable by Tenant and Tenant's performance of all Tenant's agreements contained herein and Tenant's observance of all rules and regulations, shall and may peacefully and quietly have, hold and enjoy said Premises for the term hereof.

19. **INDEMNIFICATION**. Landlord shall not be liable for any damage or injury of or to the Tenant, Tenant's family, guests, invitees, agents or employees or to any person entering the Premises or the building of which the Premises are a part or to goods or equipment, or in the structure or equipment of the structure of which the Premises are a part, and Tenant hereby agrees to indemnify, defend and hold Landlord harmless from any and all claims or assertions of every kind and nature.

20. **DEFAULT**. If Tenant fails to comply with any of the material provisions of this Agreement, other than the covenant to pay rent, or of any present rules and regulations or any that may be hereafter prescribed by Landlord, or materially fails to comply with any duties imposed on Tenant by statute, within seven (7) days after delivery of written notice by Landlord specifying the non-compliance and indicating the intention of Landlord to terminate the Lease by reason thereof, Landlord may terminate this Agreement. If Tenant fails to pay rent when due and the default continues for seven (7) days thereafter, Landlord may, at Landlord's option, declare the entire balance of rent

Matthew Johnson and ██████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available to Landlord at law or in equity or may immediately terminate this Agreement.

21.   **LATE CHARGE**. In the event that any payment required to be paid by Tenant hereunder is not made within five (5) business days of when due, Tenant shall pay to Landlord, in addition to such payment or other charges due hereunder, a "late fee" in the amount of TWENTY FIVE ($25). For purposes of this section, a "business day" means any day other than a Saturday, Sunday or State or federal holiday.

22.   **ABANDONMENT**. If at any time during the term of this Agreement Tenant abandons the Premises or any part thereof, Landlord may, at Landlord's option, obtain possession of the Premises in the manner provided by law, and without becoming liable to Tenant for damages or for any payment of any kind whatever. Landlord may, at Landlord's discretion, as agent for Tenant, relet the Premises, or any part thereof, for the whole or any part thereof, for the whole or any part of the then unexpired term, and may receive and collect all rent payable by virtue of such reletting, and, at Landlord's option, hold Tenant liable for any difference between the rent that would have been payable under this Agreement during the balance of the unexpired term, if this Agreement had continued in force, and the net rent for such period realized by Landlord by means of such reletting. If Landlord's right of reentry is exercised following abandonment of the Premises by Tenant, then Landlord shall consider any personal property belonging to Tenant and left on the Premises to also have been abandoned, in which case Landlord may dispose of all such personal property in any manner Landlord shall deem proper and Landlord is hereby relieved of all liability for doing so.

23.   **ATTORNEYS' FEES**. Should it become necessary for Landlord to employ an attorney to enforce any of the conditions or covenants hereof, including the collection of rentals or gaining possession of the Premises, Tenant agrees to pay all expenses so incurred, including a reasonable attorneys' fee.

24.   **RECORDING OF AGREEMENT**. Tenant shall not record this Agreement on the Public Records of any public office. In the event that Tenant shall record this Agreement, this Agreement shall, at Landlord's option, terminate immediately and Landlord shall be entitled to all rights and remedies that it has at law or in equity.

25.   **GOVERNING LAW**. This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of New Jersey.

26.   **SEVERABILITY**. If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

27.   **BINDING EFFECT**. The covenants, obligations and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

6

Matthew Johnson and ▮▮▮▮▮▮▮▮▮ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

28. **DESCRIPTIVE HEADINGS**. The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations of the Landlord or Tenant.

29. **CONSTRUCTION**. The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

30. **NON-WAIVER**. No indulgence, waiver, election or non-election by Landlord under this Agreement shall affect Tenant's duties and liabilities hereunder.

31. **MODIFICATION**. The parties hereby agree that this document contains the entire agreement between the parties and this Agreement shall not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto.

32. **CRIME INSURANCE**. As required by New Jersey law (NJSA Section 46:8-39), under Title VI of the Housing and Urban Development Act of 1970, the Federal Government is subsidizing crime insurance in order to make the same available to Residents in the State of New Jersey. Tenant, as a Resident, may be eligible to purchase this insurance from the SAFETY MANAGEMENT INSTITUTE, located in Washington, D.C. Tenant may contact this company directly to obtain an application and further information. Tenant may call the following toll free number: (800) 638-8780. Crime insurance is available for tenants in all habitable property through the New Jersey Underwriters Association, Crime Insurance Indemnity Plan. To apply for crime insurance, contact the New Jersey Underwriters Association, Crime Insurance for Habitable Property, 744 Broad Street, Newark, New Jersey, 07102 directly for an application.

33. **CHILD PROTECTION WINDOW GUARD OPTION**. Pursuant to New Jersey law (NJSA Section 55:13A-7.14), Tenant can have window guards installed on the Premises and the public halls (1) by making a written request to Landlord and (2) if a child 10 years of age or younger resides on the Premises and (3) if Tenant lives in a dwelling above the first floor. Residents living on the first floor may only request window guards on windows in public halls above the first floor to which persons in the resident's dwelling have access without having to go out of the building. Landlord may, at Landlord's option, recoup the costs associated with the installation of the window guards through increased rent.

34. **RETURN OF KEYS**. Tenant must return the keys/passes to the Premises, mailbox, building, and laundry to Landlord when Tenant vacates the Premises.

35. **TRUTH IN RENTING**. Resident acknowledges receipt today of the Truth in Renting information, required to be provided by New Jersey law (NJSA Section 46: 8-45).

36. **NOTICE**. Any notice required or permitted under this Lease or under state law shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:

Matthew Johnson and ████████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

If to Landlord to:

MATTHEW JOHNSON

2139 E CHESNUT AVE #51 VINELAND NJ 08361

If to Tenant to: ████████████████

████████████████████████████████

████████████████████████████████ _____ [*Tenant's Address*]

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

**As to Landlord this 27th day of October, 2017.**

Sign: *Matthew Johnson*
Matthew Johnson (Oct 27, 2017)

Print: **Matthew Johnson**

Date:   Oct 27, 2017

**As to Tenant, this 27th day of October, 2017.**

Sign: ████████████

Print: ████████████

Date:   Nov 1, 2017

8

# EXHIBIT 4

Matthew Johnson and ███████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

# Residential Lease Agreement

**THIS LEASE AGREEMENT** (hereinafter referred to as the "Agreement") made

and entered into this 2nd day of October, 2018, by and between

MATTHEW JOHNSON

Address: 2139 E Chestnut Ave #51 Vineland, NJ 08361

(hereinafter referred to as "Landlord") and



Address:

(hereinafter referred to as "Tenant").

**WITNESSETH:**

**WHEREAS**, Landlord is the fee owner of certain real property being, lying and situated in Camden County, New Jersey, such real property having a street address of 312 Barclay Towers, Cherry Hill NJ 08034 (hereinafter referred to as the "Premises").

**WHEREAS**, Landlord is desirous of leasing the Premises to Tenant upon the terms and conditions as contained herein; and

**WHEREAS**, Tenant is desirous of leasing the Premises from Landlord on the terms and conditions as contained herein;

**NOW, THEREFORE**, for and in consideration of the covenants and obligations contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.   **TERM**. Landlord leases to Tenant and Tenant leases from Landlord the above described Premises together with any and all appurtenances thereto, for a term of one (1) year, such term beginning on November 1st 2018, and ending at 12 o'clock midnight on October 31st 2019.

2.   **RENT**. The total rent for the term hereof is the sum of NINE THOUSAND NINE HUNDRED ($9,900) payable on the 1st day of each month of the term, in equal installments of EIGHT HUNDRED TWENTY FIVE DOLLARS ($825), first installment to be paid upon the due execution of this Agreement, the second installment to be paid on December 1st 2018. All such payments shall be made to Landlord at Landlord's address as set forth in the preamble to this Agreement on or before the due date and without demand.

3.   **SECURITY DEPOSIT**. Upon the due execution of this Agreement, Tenant shall deposit with Landlord the sum of SIX HUNDRED DOLLARS ($600) payable on November 1st

1

Matthew Johnson and ▮▮▮▮▮▮▮▮ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

2018, as security for any damage caused to the Premises during the term hereof. *Interest on Security Deposits*. In accordance with New Jersey law (NJSA Section 46:8-19), Landlord will pay Tenant interest on Tenant's security deposit, less any service fee charged by the bank or investment company. Interest will be paid annually on the anniversary of Tenant's Lease in cash or as a credit towards rent due. Further, Landlord will annually notify Tenant of certain information concerning the security deposit: the name of the bank where the security deposit is held, the type of account in which the funds are deposited, and the account's interest rate. Landlord is prohibited from increasing the amount of the security deposit by more than ten (10) percent per year. *Timing of Return of Security Deposit*. Within thirty (30) days after the end of Tenant's Lease term, Landlord will return Tenant's security deposit to Tenant, plus any accrued interest and less any allowed deductions. Interest and any deductions will be itemized. Tenant's security deposit or the balance thereof after deductions will be returned to Tenant by personal delivery or registered or certified mail.

4.   **USE OF PREMISES**. The Premises shall be used and occupied by Tenant and Tenant's immediate family, consisting of ▮▮▮▮▮▮▮▮ exclusively, as a private single family dwelling, and no part of the Premises shall be used at any time during the term of this Agreement by Tenant for the purpose of carrying on any business, profession, or trade of any kind, or for any purpose other than as a private single family dwelling. Tenant shall not allow any other person, other than Tenant's immediate family or transient relatives and friends who are guests of Tenant, to use or occupy the Premises without first obtaining Landlord's written consent to such use. Tenant shall comply with any and all laws, ordinances, rules and orders of any and all governmental or quasi-governmental authorities affecting the cleanliness, use, occupancy and preservation of the Premises.

5.   **CONDITION OF PREMISES**. Tenant stipulates, represents and warrants that Tenant has examined the Premises, and that they are at the time of this Lease in good order, repair, and in a safe, clean and tenantable condition.

6.   **ASSIGNMENT AND SUB-LETTING**. Tenant shall not assign this Agreement, or sub-let or grant any license to use the Premises or any part thereof without the prior written consent of Landlord. A consent by Landlord to one such assignment, sub-letting or license shall not be deemed to be a consent to any subsequent assignment, sub-letting or license. An assignment, sub-letting or license without the prior written consent of Landlord or an assignment or sub- letting by operation of law shall be absolutely null and void and shall, at Landlord's option, terminate this Agreement.

7.   **ALTERATIONS AND IMPROVEMENTS**. Tenant shall make no alterations to the buildings or improvements on the Premises or construct any building or make any other improvements on the Premises without the prior written consent of Landlord. Any and all alterations, changes, and/or improvements built, constructed or placed on the Premises by Tenant shall, unless otherwise provided by written agreement between Landlord and Tenant, be and become the property of Landlord and remain on the Premises at the expiration or earlier termination of this Agreement.

8.   **NON-DELIVERY OF POSSESSION**. In the event Landlord cannot deliver possession of

2

Matthew Johnson and ██████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

the Premises to Tenant upon the commencement of the Lease term, through no fault of Landlord or its agents, then Landlord or its agents shall have no liability, but the rental herein provided shall abate until possession is given. Landlord or its agents shall have thirty (30) days in which to give possession, and if possession is tendered within such time, Tenant agrees to accept the demised Premises and pay the rental herein provided from that date. In the event possession cannot be delivered within such time, through no fault of Landlord or its agents, then this Agreement and all rights hereunder shall terminate.

9.   **HAZARDOUS MATERIALS**. Tenant shall not keep on the Premises any item of a dangerous, flammable or explosive character that might unreasonably increase the danger of fire or explosion on the Premises or that might be considered hazardous or extra hazardous by any responsible insurance company.

10.   **UTILITIES**. Landlord shall be responsible for arranging for and paying for all utility services required on the Premises.

11.   **MAINTENANCE AND REPAIR; RULES**. Tenant will, at its sole expense, keep and maintain the Premises and appurtenances in good and sanitary condition and repair during the term of this Agreement and any renewal thereof. Without limiting the generality of the foregoing, Tenant shall:

(a) Not obstruct the driveways, sidewalks, courts, entry ways, stairs and/or halls,  which shall be used for the purposes of ingress and egress only;

(b) Keep all windows, glass, window coverings, doors, locks and hardware in good, clean order and repair; Not obstruct or cover the windows or doors;

(c) Not leave windows or doors in an open position during any inclement weather;

(d) Not hang any laundry, clothing, sheets, etc. from any window, rail, porch or balcony nor air or dry any of same within any yard area or space;

(e) Not cause or permit any locks or hooks to be placed upon any door or window or change existing locks without the prior written consent of Landlord;

(f) Keep all air conditioning filters clean and free from dirt;

(g) Keep all lavatories, sinks, toilets, and all other water and plumbing apparatus in good order and repair and shall use same only for the purposes for which they were constructed. Tenant shall not allow any  sweepings, rubbish, sand, rags, ashes or other substances to be thrown or deposited therein. Any damage to any such apparatus and the cost of clearing stopped plumbing resulting from misuse shall be borne by Tenant;

(h) And Tenant's family and guests shall at all times maintain order in the Premises and at all places on the Premises, and shall not make or permit any loud or improper noises, or otherwise disturb other residents;

3

Matthew Johnson and █████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

(i)  Keep all radios, television sets, stereos, phonographs, etc., turned down to a level of sound that does not annoy or interfere with other residents;

(j)  Deposit all trash, garbage, rubbish or refuse in the locations provided therefore and shall not allow any trash, garbage, rubbish or refuse to be deposited or permitted to stand on the exterior of any building or within the common elements;

(k) Tenant shall not smoke or allow guests to smoke within the unit;

(l)  Abide by and be bound by any and all rules and regulations affecting the Premises or the common area appurtenant thereto which may be adopted or promulgated by the Condominium or Homeowners' Association having control over them. Any damage, disturbance, or violation of Condominium Association rules done by the tenant that results in a fine against the landlord will be the sole responsibility of the tenant to be collected within thirty (30) days of the levying of the fine.

12.   **DAMAGE TO PREMISES**. In the event the Premises are destroyed or rendered wholly untenantable by fire, storm, earthquake, or other casualty not caused by the negligence of Tenant, this Agreement shall terminate from such time except for the purpose of enforcing rights that may have then accrued hereunder. The rental provided for herein shall then be accounted for by and between Landlord and Tenant up to the time of such injury or destruction of the Premises, Tenant paying rentals up to such date and Landlord refunding rentals collected beyond such date. Should a portion of the Premises thereby be rendered untenantable, the Landlord shall have the option of either repairing such injured or damaged portion or terminating this Lease. In the event that Landlord exercises its right to repair such untenantable portion, the rental shall abate in the proportion that the injured parts bears to the whole Premises, and such part so injured shall be restored by Landlord as speedily as practicable, after which the full rent shall recommence and the Agreement continue according to its terms.

13.   **PROPERTY INSURANCE**. Landlord's property insurance does not insure the personal property of the tenant. Tenant acknowledges that he has been advised by the landlord to secure a separate renter's insurance policy if he wishes to protect his belongings from any potential damages.

14.   **INSPECTION OF PREMISES**. Landlord and Landlord's agents shall have the right at all reasonable times during the term of this Agreement and any renewal thereof to enter the Premises with 24 hours' notice for the purpose of inspecting the Premises and all buildings and improvements thereon. And for the purposes of making any repairs, additions or alterations as may be deemed appropriate by Landlord for the preservation of the Premises or the building. Landlord and its agents shall further have the right to exhibit the Premises and to display the usual "for sale", "for rent" or "vacancy" signs on the Premises at any time within forty-five (45) days before the expiration of this Lease. The right of entry shall likewise exist for the purpose of removing placards, signs, fixtures, alterations or additions, but do not conform to this Agreement or to any restrictions, rules or regulations affecting the Premises. The tenant must provide access to Barclay Towers Condominium Association employees in the event of an emergency that requires access to the unit. The tenant must provide access to the unit for any

4

Matthew Johnson and ████████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

government-mandated inspections.

15. **SUBORDINATION OF LEASE**. This Agreement and Tenant's interest hereunder are and shall be subordinate, junior and inferior to any and all mortgages, liens or encumbrances now or hereafter placed on the Premises by Landlord, all advances made under any such mortgages, liens or encumbrances (including, but not limited to, future advances), the interest payable on such mortgages, liens or encumbrances and any and all renewals, extensions or modifications of such mortgages, liens or encumbrances.

16. **TENANT'S HOLD OVER**. If Tenant remains in possession of the Premises with the consent of Landlord after the natural expiration of this Agreement, a new tenancy from month-to-month shall be created between Landlord and Tenant which shall be subject to all of the terms and conditions hereof except that rent shall then be due and owing at EIGHT HUNDRED SEVENTY FIVE ($875) per month and except that such tenancy shall be terminable upon fifteen (15) days written notice served by either party.

17. **SURRENDER OF PREMISES**. Upon the expiration of the term hereof, Tenant shall surrender the Premises in as good a state and condition as they were at the commencement of this Agreement, reasonable use and wear and tear thereof and damages by the elements excepted.

18. **ANIMALS**. Tenant shall be entitled to keep no more than ONE (1) domestic cat or bird; however, at such time as Tenant shall actually keep any such animal on the Premises, Tenant shall pay to Landlord a pet deposit of TWO HUNDRED DOLLARS ($200), ONE HUNDRED DOLLARS ($100) of which shall be non-refundable and shall be used upon the termination or expiration of this Agreement for the purposes of cleaning the unit.

19. **QUIET ENJOYMENT**. Tenant, upon payment of all of the sums referred to herein as being payable by Tenant and Tenant's performance of all Tenant's agreements contained herein and Tenant's observance of all rules and regulations, shall and may peacefully and quietly have, hold and enjoy said Premises for the term hereof.

19. **INDEMNIFICATION**. Landlord shall not be liable for any damage or injury of or to the Tenant, Tenant's family, guests, invitees, agents or employees or to any person entering the Premises or the building of which the Premises are a part or to goods or equipment, or in the structure or equipment of the structure of which the Premises are a part, and Tenant hereby agrees to indemnify, defend and hold Landlord harmless from any and all claims or assertions of every kind and nature.

20. **DEFAULT**. If Tenant fails to comply with any of the material provisions of this Agreement, other than the covenant to pay rent, or of any present rules and regulations or any that may be hereafter prescribed by Landlord, or materially fails to comply with any duties imposed on Tenant by statute, within seven (7) days after delivery of written notice by Landlord specifying the non-compliance and indicating the intention of Landlord to terminate the Lease by reason thereof, Landlord may terminate this Agreement. If Tenant fails to pay rent when due and the default continues for seven (7) days thereafter, Landlord may, at Landlord's option, declare the entire balance of rent

5

Matthew Johnson and ▓▓▓▓▓▓▓▓ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

payable hereunder to be immediately due and payable and may exercise any and all rights and remedies available to Landlord at law or in equity or may immediately terminate this Agreement.

21. **LATE CHARGE**. In the event that any payment required to be paid by Tenant hereunder is not made within five (5) business days of when due, Tenant shall pay to Landlord, in addition to such payment or other charges due hereunder, a "late fee" in the amount of TWENTY FIVE ($25). For purposes of this section, a "business day" means any day other than a Saturday, Sunday or State or federal holiday.

22. **ABANDONMENT**. If at any time during the term of this Agreement Tenant abandons the Premises or any part thereof, Landlord may, at Landlord's option, obtain possession of the Premises in the manner provided by law, and without becoming liable to Tenant for damages or for any payment of any kind whatever. Landlord may, at Landlord's discretion, as agent for Tenant, relet the Premises, or any part thereof, for the whole or any part thereof, for the whole or any part of the then unexpired term, and may receive and collect all rent payable by virtue of such reletting, and, at Landlord's option, hold Tenant liable for any difference between the rent that would have been payable under this Agreement during the balance of the unexpired term, if this Agreement had continued in force, and the net rent for such period realized by Landlord by means of such reletting. If Landlord's right of reentry is exercised following abandonment of the Premises by Tenant, then Landlord shall consider any personal property belonging to Tenant and left on the Premises to also have been abandoned, in which case Landlord may dispose of all such personal property in any manner Landlord shall deem proper and Landlord is hereby relieved of all liability for doing so.

23. **ATTORNEYS' FEES**. Should it become necessary for Landlord to employ an attorney to enforce any of the conditions or covenants hereof, including the collection of rentals or gaining possession of the Premises, Tenant agrees to pay all expenses so incurred, including a reasonable attorneys' fee.

24. **RECORDING OF AGREEMENT**. Tenant shall not record this Agreement on the Public Records of any public office. In the event that Tenant shall record this Agreement, this Agreement shall, at Landlord's option, terminate immediately and Landlord shall be entitled to all rights and remedies that it has at law or in equity.

25. **GOVERNING LAW**. This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of New Jersey.

26. **SEVERABILITY**. If any provision of this Agreement or the application thereof shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Agreement nor the application of the provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

27. **BINDING EFFECT**. The covenants, obligations and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

6

Matthew Johnson and ████████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

28.   **DESCRIPTIVE HEADINGS**. The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations of the Landlord or Tenant.

29.   **CONSTRUCTION**. The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

30.   **NON-WAIVER**. No indulgence, waiver, election or non-election by Landlord under this Agreement shall affect Tenant's duties and liabilities hereunder.

31.   **MODIFICATION**. The parties hereby agree that this document contains the entire agreement between the parties and this Agreement shall not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties hereto.

32.   **CRIME INSURANCE**. As required by New Jersey law (NJSA Section 46:8-39), under Title VI of the Housing and Urban Development Act of 1970, the Federal Government is subsidizing crime insurance in order to make the same available to Residents in the State of New Jersey. Tenant, as a Resident, may be eligible to purchase this insurance from the SAFETY MANAGEMENT INSTITUTE, located in Washington, D.C. Tenant may contact this company directly to obtain an application and further information. Tenant may call the following toll free number: (800) 638-8780. Crime insurance is available for tenants in all habitable property through the New Jersey Underwriters Association, Crime Insurance Indemnity Plan. To apply for crime insurance, contact the New Jersey Underwriters Association, Crime Insurance for Habitable Property, 744 Broad Street, Newark, New Jersey, 07102 directly for an application.

33.   **CHILD PROTECTION WINDOW GUARD OPTION**. Pursuant to New Jersey law (NJSA Section 55:13A-7.14), Tenant can have window guards installed on the Premises and the public halls (1) by making a written request to Landlord and (2) if a child 10 years of age or younger resides on the Premises and (3) if Tenant lives in a dwelling above the first floor. Residents living on the first floor may only request window guards on windows in public halls above the first floor to which persons in the resident's dwelling have access without having to go out of the building. Landlord may, at Landlord's option, recoup the costs associated with the installation of the window guards through increased rent.

34.   **RETURN OF KEYS**. Tenant must return the keys/passes to the Premises, mailbox, building, and laundry to Landlord when Tenant vacates the Premises.

35.   **TRUTH IN RENTING**. Resident acknowledges receipt today of the Truth in Renting information, required to be provided by New Jersey law (NJSA Section 46: 8-45).

36.   **NOTICE**. Any notice required or permitted under this Lease or under state law shall be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:

Matthew Johnson and ████████████ Lease Agreement
312 Barclay Towers Cherry Hill New Jersey

If to Landlord to:

MATTHEW JOHNSON

2139 E CHESNUT AVE #51 VINELAND NJ 08361

If to Tenant to: ████████████

████████████████████████████

██████████████████ _____ [*Tenant's Address*]

Landlord and Tenant shall each have the right from time to time to change the place notice is
to be given under this paragraph by written notice thereof to the other party.

**As to Landlord this 2nd day of October, 2018.**

Sign: ████████████ _____

Print: ████████████ _____

Date:   10/02/2018

**As to Tenant, this 2nd day of October, 2018.**

Sign: *Matthew Johnson* _____
     Matthew Johnson (Oct 2, 2018)

Print: Matthew Johnson _____

Date:   10/02/2018

8

# EXHIBIT 5



5

Hey bud. How are you making out with your job situation? Let me know if you end up unemployed as a result of this crisis. I am currently working on refinancing my mortgage so I can take cash out as a cushion in case things get bad.

Doing well so far, been working from home since Wednesday

If anything changes I'll let you know

Sounds good bud. Stay healthy.

You too man

Tue, Mar 31, 5:26 PM

Welp I just got temporarily laid off

Sucks bud. Hope it's super temporary. Fortunately they're giving away unemployment like candy right now

Haha I know I'm gonna file in an hour or two



Text Message