NEW CIVIL LIBERTIES ALLIANCE
KARA ROLLINS (Attorney ID 107002014)
Litigation Counsel
HARRIET HAGEMAN (*Pro Hac Vice*)
Senior Litigation Counsel
JARED MCCLAIN (*Pro Hac Vice*)
Staff Counsel
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
THE LAW OFFICES OF TERENCE J. SWEENEY, ESQ.
TERENCE J. SWEENEY
44 Fairmount Avenue, Suite 1
Chatham, New Jersey 07928
sweeneylawfirm@optonline.net
(973) 665-0400

*Counsel to Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| MATTHEW JOHNSON; CHARLES KRAVITZ, DAWN JOHANSON-KRAVITZ, and LITTLE HARRY'S LLC; MARGARITA JOHNSON, JOHN JOHNSON, and TWO BEARS PROPERTY MANAGEMENT; and ANDREW VAN HOOK and UNION LAKE ENTERPRISES, LLC, | HON. NOEL L. HILLMAN, U.S.D.J. HON. JOEL SCHNEIDER, U.S.M.J. |
| *Plaintiffs*, | Civil Action No. 1:20-cv-06750-NLH-JS |
| v. | **AMENDED VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| PHILIP D. MURPHY, in his official capacity as Governor of New Jersey; GURBIR S. GREWAL, in his official capacity as New Jersey Attorney General; and JUDITH M. PERSICHILLI, in her official capacity as Commissioner of the New Jersey Department of Health, | **[JURY TRIAL DEMANDED]** |
| *Defendants*. | |

Plaintiffs Matthew Johnson; Charles Kravitz, Dawn Johanson-Kravitz, and Little Harry's LLC; Margarita Johnson, John Johnson, and Two Bears Property Management; and Andrew Van Hook and Union Lake Enterprises, LLC, submit this Verified Complaint for Declaratory Judgment and request for a Permanent Injunction to end Defendant Governor Philip D. Murphy's unlawful and unconstitutional Executive Order 128 ("EO 128" or the "Challenged Order"). The Challenged Order impairs Johnson's right to contract, exceeds the Governor's power, and violates the Constitutions of the United States and New Jersey. For the purposes of receiving service, Governor Murphy and Attorney General Gurbir S. Grewal are both located at 25 Market Street, Trenton, NJ 08625, and Commissioner Judith M. Persichilli is located at 369 South Warren Street, Trenton, NJ 08608. In support of this request Johnson claims and avers as follows:

### INTRODUCTORY STATEMENT

The outbreak of COVID-19 hit New Jersey especially hard. Governor Murphy has responded to the health threat posed by COVID-19 by issuing over 45 executive orders. This action challenges one of them. More specifically, this lawsuit challenges Governor Murphy's April 24, 2020, Executive Order 128, which purports to waive laws governing security deposits for residential leasehold contracts. In addition to unlawfully suspending the applicability of duly enacted laws, the Governor's order modified the rights and obligations of residential landlords and tenants who had mutually and voluntarily entered into contracts that required deposits to secure rental properties against the risk of damage. To make matters worse, Executive Order 128 also *criminalized* adhering to the terms of landlords' then-existing leasehold contracts and to lawfully adopted statutes governing such contracts. In issuing EO 128, the Governor purportedly waived these contracts and the statutory requirements contained therein without the consent of the contracting parties or the state legislature.

Put simply, this case is about the Governor's abuse of power. In excess of any authority granted by the citizens of New Jersey and the New Jersey Legislature, Governor Murphy has interfered

with the contractual rights and obligations of private citizens.  The question at hand is not whether one agrees or disagrees with the Governor's policy prescriptions, or whether they are effective or ineffective in addressing some of the impacts of COVID-19.  This case instead goes to the heart of our constitutional form of government and the separation of powers.  This case focuses explicitly on whether the New Jersey Governor can rely on his own declared public-health emergency to assume authority the legislature never granted to waive or amend provisions in private contracts and to override and amend explicit statutory provisions as he chooses.

Plaintiffs own residential rental properties in Southern New Jersey.  When the Plaintiffs leased those properties, they each negotiated with their tenants to ensure that their tenants each paid a security deposit that would secure and protect the Plaintiffs' rental properties against any damage during the tenancies.  Executive Order 128 interferes with these agreements and nullifies the Plaintiffs' rights and entitlements under the leases that the Plaintiffs privately and voluntarily negotiated with their tenants.  In a time of nationwide economic insecurity, Governor Murphy has unilaterally singled out one type of property owner—residential landlords—and canceled the security that protects their property from physical damage.

Adherence to the rule of law provides New Jerseyans with security during a crisis.  Governor Murphy's Executive Order 128 does not advance or protect the rule of law; it instead undermines property rights and faith in the duly enacted laws by which we are governed.

We have been taught since our very first civics courses in elementary school that our form of government is unique and that no one branch of our government can assume the authority and responsibility of another.  We have also been taught that we have the right to contract with our fellow man, and that courts will enforce such contractual terms as agreed to by the parties.  These foundational truths have held fast during numerous crises throughout our history.  We cannot abandon them now.

All legitimate authority in New Jersey flows from the people, as it is the people who vested the legislative power in the Senate and General Assembly.  The people have never imbued the Governor with the constitutional authority to enact, waive, amend, or repeal laws, and a state of emergency cannot and does not increase the Governor's authority beyond the scope of his power as granted by the Constitutions of the United States and New Jersey and duly enacted state statutes.

Plaintiffs ask this Court to carry out and protect our constitutional framework.  Plaintiffs seek an order from this Court declaring that Governor Murphy does not have the power to issue Executive Order 128 and that he does not have the power to interfere with leasehold contracts or to waive statutory law.  A ruling in the Plaintiffs' favor will restore and protect the rule of law on which New Jersey landlords, tenants, and all New Jerseyans depend.

## JURISDICTION AND VENUE

1.      Pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S. §§ 1983 and 1988, this Court has subject-matter jurisdiction over this action, which involves questions arising under the United States Constitution and seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured thereby.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to the extent a claim may allege or may be construed to allege a claim under New Jersey law.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as the events giving rise to the Plaintiffs' causes of action arose or exist in this District.

## PARTIES

3.      Plaintiff Matthew Johnson is a resident of Vineland, New Jersey.  He owns a residential property in Cherry Hill, New Jersey, which he rents pursuant to the terms of a written lease agreement entered into on October 2, 2018, which replaced the terms of the prior leases the parties had agreed to on October 27, 2017, and July 21, 2014.  (A copy of the Deed dated July 13, 2009, is attached as

Exhibit 1; a copy of the 2014, 2017, and 2018 Lease Agreements are attached as Exhibits 2, 3 and 4 respectively).

4.     Plaintiffs Charles Kravitz and Dawn Johanson-Kravitz are residents of Mullica Hill, New Jersey.  They own and operate Little Harry's LLC, which leases a residential property that the Kravitzes own in Glassboro, New Jersey.  The Kravitzes rented the property pursuant to the terms of a written lease agreement entered into on August 3, 2019.  (A copy of the Deed dated February 11, 2019, is attached as Exhibit 5; and, a copy of the 2019 Lease Agreement is attached as Exhibit 6).

5.     Plaintiffs Margarita Johnson and John Johnson are residents of Vineland, New Jersey. They own and operate Two Bears Property Management and are co-trustees of the Johnson Trust, which owns a residential property in Vineland, New Jersey.  The Johnsons rent the property pursuant to the terms of a written lease agreement entered into on July 31, 2017.  (A copy of the Deed dated October 16, 2019, is attached as Exhibit 7; and a copy of the 2017 Lease Agreement is attached as Exhibit 8).

6.     Plaintiff Andrew Van Hook is a resident of Millville, New Jersey.  He is the managing member of Union Lake Enterprises, LLC, which owns a residential property in Millville, New Jersey. Union Lake Enterprises, LLC rents such residential property pursuant to the terms of a written lease agreement entered into on June 22, 2020, which replaced the terms of the prior leases the parties had agreed to on June 26, 2018.  (A copy of the Deed dated October 20, 2006, is attached as Exhibit 9; a copy of the 2018 Lease Agreement and 2020 Addendum are attached as Exhibits 10 and 11, respectively).

7.     Defendant Philip D. Murphy is the Governor of the State of New Jersey.  He is sued in his official capacity.

8.     Defendant Gurbir S. Grewal is the Attorney General of the State of New Jersey.  He is sued in his official capacity.

9.     Defendant Judith M. Persichilli is the Commissioner of the New Jersey Department of Health.  She is sued in her official capacity.

STATEMENT OF FACTS

**A. Plaintiffs and Their Tenants Voluntarily Contracted for Residential Leases that Required Security Deposits**

**1.  Facts Specific to Plaintiff Matthew Johnson**

10.     Mr. Johnson owns Unit 312 of Barclay Towers Condominiums located in the Township of Cherry Hill in Camden County, New Jersey (the "Barclay Towers Property").  (*See* Exhibit 1).

11.     Since 2014, Mr. Johnson has rented his Property to the "Barclay Tenant"[1] pursuant to a series of residential lease agreements.  (*See* Exhibits 2 and 3).

12.     Mr. Johnson and his Barclay Tenant first executed a lease for the Barclay Towers Property on July 21, 2014, for a term of one year, with such lease to begin on August 1, 2014 (the "2014 Barclay Lease").  (Exhibit 2, ¶ 1).

13.     The 2014 Barclay Lease required the Barclay Tenant to pay a security deposit of $1,200. (Exhibit 2, ¶ 3).  The monthly rent was $800 for the first year of the lease and increased to $900 per month after the first year, on a month-to-month basis, if the tenant chose to remain on the Barclay Towers Property with Mr. Johnson's permission.   (Exhibit 2, ¶¶ 2, 16).

14.     The 2014 Barclay Lease required the Barclay Tenant to pay a security deposit of $1,200 "as security for damage caused to the [property]" during the tenancy.  (Exhibit 2, ¶ 3).

---

[1] To protect the privacy of Mr. Johnson's tenant, who is not a party to this lawsuit, this Complaint will refer to him as the "Barclay Tenant."

15.     The 2014 Barclay Lease worked well for both Mr. Johnson and the Barclay Tenant, and they chose to continue the rental agreement on a month-to-month basis until October 2017.  (*See* Exhibit 3).

16.     Mr. Johnson and the Barclay Tenant updated their lease agreement on October 27, 2017 ("2017 Barclay Lease").  The 2017 Barclay Lease provided for monthly rent of $850 for the first year of the lease and was set to increase to $900 per month, on a month-to-month basis, after the first year, if the Barclay Tenant chose to remain on the Property with Mr. Johnson's permission.  (Exhibit 3, ¶¶ 2, 17).

17.     Like the 2014 Barclay Lease, the 2017 iteration provided for a security deposit. Specifically, the agreement required the Tenant to pay a $600 deposit "as security for any damage caused to the [Barclay Towers Property]" during the tenancy.  (Exhibit 3, ¶ 3).

18.     On October 2, 2018, the parties once again modified the terms of their rental agreement by executing a new lease agreement (the "2018 Barclay Lease").  (*See* Exhibit 4).

19.     The 2018 Barclay Lease currently governs the parties' contractual relationship.

20.     According to the terms of the 2018 Barclay Lease, Mr. Johnson and the Barclay Tenant agreed to certain covenants and obligations:

a.     The Barclay Tenant agreed to lease the Property for one year for $9,900, payable on the first of each month in equal installments of $825.  (Exhibit 4, ¶ 1-2).  This monthly payment of $825 included the cost of utilities.  (Exhibit 4, ¶ 10).

b.     After one year elapsed, the 2018 Lease allowed the Barclay Tenant to remain in possession of the Barclay Towers Property with Mr. Johnson's consent, in which case, under the terms of the lease, a month-to-month tenancy would be created.  (Exhibit 4, ¶ 16).  Once the lease transitioned to month-to-month, the rent would increase to $875 per month and

either party could terminate the 2018 Lease by giving 15 days' written notice.  (Exhibit 4, ¶ 16).

      c.      If the Barclay Tenant failed to comply with any material provision of the 2018 Lease or any statutorily imposed duties, the lease specified that Mr. Johnson could terminate the lease after providing seven days' notice of the Barclay Tenant's non-compliance.  (Exhibit 4, ¶ 20).

      d.      If the Barclay Tenant failed to pay rent for five business days of when due, Mr. Johnson could charge a $25 late fee.  (Exhibit 4, ¶ 21).  If the Barclay Tenant failed to pay rent for more than seven days, the 2018 Lease provides that Mr. Johnson could declare the tenant in default and declare the remaining balance of rent due under the lease to be payable immediately. (Exhibit 4, ¶ 20).

      e.      The 2018 Barclay Lease also included a "Modification" clause, by which the parties "agree[d] that [the lease] contains the entire agreement between the parties and [the lease] shall not be modified, changed, altered or amended in any way except through a written amendment signed by all of the parties [to the lease]."  (Exhibit 4, ¶ 31).

21.      Importantly for this case, the 2018 Barclay Lease also set out the terms governing the parties' rights and obligations with respect to the security deposit due under the lease.  Specifically, Paragraph 3 provides as follows:

> **SECURITY DEPOSIT.**  Upon the due execution of this Agreement, Tenant shall deposit with Landlord the sum of SIX HUNDRED DOLLARS ($600) payable on November 1st, 2018, <u>as security for any damage caused to the [Property] during the term hereof.</u>
> *Interest on Security Deposits.*  In accordance with New Jersey law (NJSA Section 46:8-19), Landlord will pay Tenant interest on Tenant's security deposit, less any service fees charged by the bank or investment company.  Interest will be paid annually on the anniversary of Tenant's lease in case or as a credit towards rent due.  Further, Landlord will annually notify Tenant of certain information concerning the security deposit: the name of the bank where the security deposit is held, the type of account in which the

funds are deposited, and the account's interest rate.  Landlord is prohibited from
increasing the amount of the security deposit by more than ten (10) percent per year.
*Timing of Return of Security Deposit.*  Within thirty (30) days after the end of Tenant's
Lease term, Landlord will return Tenant's security deposit to Tenant, plus any accrued
interest and less any allowed deductions.  Interest and any deductions will be itemized.
Tenant's security deposit or the balance thereof after deductions will be returned to
Tenant by personal delivery or registered or certified mail.

(Exhibit 4, ¶ 3) (underlined emphasis added).

### 2. Facts Specific to the Kravitzes

22.     The Kravitzes own a residential property located at 611 Heston Road in Glassboro,

Gloucester County, New Jersey (the "Glassboro Property").  (*See* Exhibit 5).  The Glassboro Property

is located near Rowan University.

23.     On August 3, 2019, the Kravitzes rented the Glassboro Property to four students at

Rowan University, the "Rowan Tenants,"[2] pursuant to a residential lease agreement (the "Glassboro

Lease").  (*See* Exhibit 6).

24.     According to the terms of the Glassboro Lease, the parties agreed to certain covenants

and obligations:

      a.     The Rowan Tenants agreed to lease the Glassboro Property from August 15,

2019 through June 1, 2020.

      b.     The Rowan Tenants would pay $2,000 per month in rent.

      c.     The lease required the Rowan Tenants to pay a security deposit of $2,000 on

the execution of the lease.  The Kravitzes would "hold the Security Deposit in an interest

bearing account" and "return the Security deposit at the end of th[e] tenancy, less such

---

[2] To protect the privacy of the Kravitzes tenants, who are not parties to this lawsuit, this
Complaint will refer to them collectively as the "Rowan Tenants" and individually as "Mr. Doe(s) 1-
4."

deductions as provided in th[e] Lease" except that "no deduction w[ould] be made for damage due to reasonable wear and tear nor for any deduction prohibited by law."

    d.    The Glassboro Lease also specified that the Kravitzes may charge their tenants "or make deductions from the Security Deposit" to cover the following costs:

    i.    Repair of walls due to plugs, large nails or any unreasonable number of holes in the walls including the repainting of such damaged walls;

    ii.    Repainting requires to repair the results of any other improper or excessive damage by the Tenant;

    iii.    Unplugging toilets, sinks, and drains;

    iv.    Replacing damaged or missing doors, windows, screens, mirrors, or light fixtures;

    v.    Repairing cuts, burns, or water damage to floors, rugs, or other areas;

    vi.    Any other repairs or cleaning due to any damage beyond normal wear and tear;

    vii.    The cost of extermination if the tenants brought or allowed insects into the property;

    viii.    Repairs and replacements required because the tenants left open windows and allowed rain or water damage; and

    ix.    Replacement of locks and/or lost keys if the tenants misplaced their keys;

    x.    Professional carpet cleaning if the tenants have not made arrangements for professional cleaning and repairs

    e.    The Glassboro Lease also specified that the Rowan Tenants "may not use the Security Deposit as payment for Rent."

    f.    The Kravitzes return the Security Deposit "less any proper deductions" "[w]ithin the time period required by law and after termination" of the Glassboro Lease.

g.     The Glassboro Lease made the Rowan Tenants jointly and severally liable "for each other's acts, omission and liabilities" under the lease.

h.     The Glassboro Lease also provided that "[a]ny waiver by the Landlord of any failure by the Tenant(s) to perform or observe the provisions of this Lease will not operate as a waiver of the Landlord's rights under the lease … and will not defeat or affect in any way the Landlord's rights in respect [to] any subsequent default or breach."

### 3. Facts Specific to the Johnsons

25.     In the early 2000s, the Johnsons purchased a residential property located at 728 South 6th Street, Unit A in the City of Vineland, Cumberland County, New Jersey (the "Sixth Street Property"). (*See* Exhibit 7).[3]  The Sixth Street Property is a duplex.

26.     At the time of purchase, the Sixth Street Property was occupied by a tenant, the "Sixth Street Tenant,"[4] who has continued to occupy the unit since that time.

27.     On July 31, 2017, the Johnsons continued the rental relationship with the Sixth Street Tenant and executed a new residential lease agreement (the "Sixth Street Lease").  *See* (Exhibit 8).

28.     According to the terms of the Sixth Street Lease, the parties agreed to certain covenants and obligations:

a.     The Sixth Street Tenant agreed to lease the Sixth Street Property from August 1, 2017, through July 31, 2019.  The Johnsons and the Sixth Street Tenant continue to operate under the terms of the S. 6th St. Lease on a month-to-month tenancy.

b.     The Sixth Street Tenant would pay $820 per month in rent.

---

[3] On October 16, 2019, the Johnsons transferred their ownership interest in the Sixth Street Property into the Johnson Family Trust and retained for themselves a life estate in the property.  The Johnsons are co-trustees of the Johnson Family Trust.

[4] To protect the privacy of the Johnsons' tenant, who is not a party to this lawsuit, this Complaint will refer to her as the "Sixth Street Tenant."

c.      The lease required the Sixth Street Tenant to pay a security deposit of $1,230 on the execution of the lease.  (Exhibit 8, ¶ 5).

d.      The Sixth Street Lease also specified that the Johnsons may charge their tenant for "[t]he cost of all damages; to include materials, labor and any applicable taxes" (Exhibit 8, ¶¶ 16A, 20A).

e.      If the Sixth Street Tenant failed to comply with any material provision of the Sixth Street Lease or any statutorily imposed duties, the lease specified that the Johnsons could terminate the lease after providing seven days' notice of the tenant's non-compliance.  (Exhibit 8, ¶ 20).

f.      If the Sixth Street Tenant failed to pay rent in full by the 20th day of the month, the Sixth Street Lease "[would] be considered terminated, unless a prior written agreement is signed by" the parties.  In the instance of default, the Sixth Street Lease includes provisions making the Sixth Street Tenant responsible for certain costs related to any legal action arising out of a default.  (Exhibit 8, ¶ 36.1.)

29.      The Sixth Street Lease also set out the terms governing the parties' rights and obligations with respect to the security deposit due under the lease.  Specifically, Paragraph 5 provides as follows:

> **SECURITY DEPOSIT.**  On execution of this lease, Lessee deposits with Lessor One Thousand Two Hundred Thirty Dollars ($1230.00), the sum equal to one and one-half (1.5) months rent, receipt of which is acknowledged by Lessor, as security for the faithful performance by Lessee of the terms hereof, to be returned to Lessee, with interest except where required by law, on the full and faithful performance by them of the provisions hereof.

(Exhibit 8, ¶ 5).

30.      The Sixth Street Lease provides that the security deposit "has been placed in a savings account gaining interest." (Exhibit 8, ¶ 19).

12

### 4. Facts Specific to Mr. Van Hook

31.     Mr. Van Hook is the managing member of Union Lake Enterprises, LLC, which owns a residential propriety located at 726 Whitaker Avenue in Millville, Cumberland County, New Jersey (the "Millville Property").  (*See* Exhibit 9).

32.     On June 22, 2018, Union Lake by and through Mr. Van Hook rented the Union Lake Property to the "Millville Tenant"₅ pursuant to a residential lease agreement (the "Millville Lease"). (*See* Exhibit 10).

33.     According to the terms of the Millville Lease, the parties agreed to certain covenants and obligations:

a.     The Millville Tenant agreed to initially lease the Millville Property from August 1, 2018, through June 30, 2020.

b.     The Millville Tenant would pay $1,450 per month in rent.

c.     The lease required the Millville Tenant to pay a security deposit of $2,175 on the execution of the lease "to assure that the [Millville] Tenant performs all of the Tenant's obligations under [the] Lease."

d.     The Millville Lease also specified that the tenant must:

i.     maintain the lawn;

ii.     conduct ordinary maintenance;

iii.     replace the carpet if such action is a necessary result of the Millville Tenant or her pets;

iv.     pay "for all repairs, replacements and damages caused by the act or neglect of the Tenant;"

---

₅ To protect the privacy of Mr. Van Hook's tenant, who is not a party to this lawsuit, this Complaint will refer to her as the "Millville Tenant."

v.   clean the property prior to vacating;

vi.   repair any damage prior to vacating; and,

vii.   return the property "in the same condition as it was at the beginning of the Term, except for normal wear and tear."

e.   After the initial term elapsed, the Union Lake Enterprises by and through Mr. Van Hook and the Millville Tenant executed an addendum to the Millville Lease which extends the terms of the Millville Lease "for an additional twelve (12) months until June 30, 2021." (Exhibit 11).

f.   If the Millville Tenant violated the terms of the Millville Lease, Union Lake Enterprises could terminate the lease through eviction proceedings.  (Exhibit 10, ¶ 12).

g.   If the Millville Tenant failed to pay by the 5th of the month, Union Lake Enterprises could charge a $45 + $5/day late fee.  (Exhibit 10, ¶ 7).

h.   The Millville Lease also includes a provision stating that the "[l]ease can only be changed in writing by an agreement signed" by both parties.   (Exhibit 10, ¶ 32).

34.   The Millville Lease also set out the terms governing the parties' rights and obligations with respect to the security deposit due under the lease.  Specifically, Paragraph 6 provides as follows:

**SECURITY DEPOSIT:** Tenant shall pay to the Landlord the sum of $2,175.00 (the "Security Deposit" which cannot exceed one and one-half months rent) to assure that the Tenant performs all of the Tenant's obligations under this Lease. If the Landlord collects any additional Security Deposit, the additional security collected annually shall not be greater than 10 percent of the current Security Deposit. Landlord shall comply with the Rent Security Deposit Act, N.J.S.A. 46:8-19 et seq. (the "Act"), unless this Lease is for owner occupied Property with not more than two rental units or is a seasonal tenancy of not more than 125 consecutive days. Any attempt to waive the requirements of the Act is prohibited and void as a matter of law.

The Act requires depositing the Security Deposit into a banking institution or investment company in New Jersey and notifying the Tenant in writing of the name and address of the banking institution or investment company, the type of account in which the Security Deposit is deposited or invested (for example, interest bearing or money market), the amount of the Security Deposit, and the current rate of interest for the account within  30 days of each of the following:  (a) the Landlord's  receipt of

the Security Deposit from the Tenant; (b) the Landlord moving the deposit from one institution or fund to another (unless the move is due to a merger, in which case a notice to the Tenant must be within 30 days of receipt of notice by the Landlord of the merger if the merger occurs more than 60 days prior to the annual interest payment); or (c) the transfer or conveyance of ownership or control of the Property. Such notice also must be provided at the time of each annual interest payment. All interest earned on the Security Deposit shall be paid to the Tenant in cash or be credited toward the payment of rent due under this Lease upon the anniversary date of this Lease, the renewal of the Term or on January 31, if the Landlord gives the Tenant written notice that interest will be paid on January31.

The Act also provides that, if the Landlord sells or conveys the Property during the Term of this Lease, the Landlord will transfer the Security Deposit plus the undistributed interest to the new owner. The Landlord shall notify the Tenant of the sale or conveyance, as well as the name and address of the new owner. The notice shall be given by registered or certified mail within five days after conveyance of title. After acquisition of the Property, the new owner shall be liable for investing the Security Deposit, making all interest payments, giving all notices and returning the Security Deposit as required under the Act, even if the Landlord fails to transfer the Security Deposit.

The Landlord shall inspect the Property after the Tenant vacates at the end of the Term. **Within 30 days of the termination of this Lease, the Landlord shall return the Security Deposit plus the undistributed interest to the Tenant, less any charges expended by the Landlord for damages to the Property resulting from the Tenant's occupancy.** The interest and deductions shall be itemized in a statement by the Landlord, and shall be forwarded to the Tenant with the balance of the Security Deposit by personal delivery, or registered or certified mail. **The Security Deposit may not be used by the Tenant for the payment of rent without the written consent of the Landlord.**

(Exhibit 10, ¶ 6) (emphasis added).

## B. COVID-19 Is a Threat to the Health and Welfare of New Jersey Residents

35.     The novel coronavirus COVID-19 is a serious and contagious viral disease spread mainly through close contact from person-to-person. *How to Protect Yourself & Others*, Ctrs. For Disease Ctrl. (Apr. 24, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

36.     The first case of COVID-19 in New Jersey was confirmed on March 4, 2020. *COVID-19 Confirmed Case Summary*, N.J. Dep't of Health 5 (May 27, 2020), *available at*

https://www.nj.gov/health/cd/documents/topics/NCOV/COVID_Confirmed_Case_Summary.pdf.

37.     By March 9, 2020, there were 35 confirmed and presumptive cases of COVID-19 in New Jersey.   Murphy   Exec.   Order   No.   103   (Mar.   9,   2020),   *available   at* https://nj.gov/infobank/eo/056murphy/pdf/EO-103.pdf.

38.     As of June 28, 2020, New Jersey had 171,182 lab-confirmed cases of COVID-19.  *NJ COVID-19 Data Dashboard*, Official Site of the State of New Jersey (June 28, 2020), *available at* https://covid19.nj.gov/#live-updates.

**C.  Governor Murphy Declares a State of Emergency in Response to COVID-19**

39.     On March 9, 2020, Governor Murphy issued Executive Order No. 103, declaring a public health emergency and state of emergency in New Jersey.  Murphy Exec. Order No. 103.

40.     The stated purpose of the Governor's order was "to protect the health, safety and welfare of the people of the State of New Jersey[.]"  *Id.* at 4.

41.     As authority to declare a state of emergency through Executive Order 103, Governor Murphy relied on "the Constitution and statutes of the State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4 and all amendments and supplements thereto[.]"  *Id.*

42.     The Governor's stated justification for the first state of emergency declaration was N.J.S.A. 26:13-1 *et seq.*, the "Emergency Health Powers Act."

43.     The Emergency Health Powers Act permits the Governor, "in consultation with the [Commissioner of Health] and the Director of the State Office of Emergency Management" to "declare a public health emergency."  N.J.S.A. 26:13-3.

44.     A "public health emergency" is "an occurrence or imminent threat of an occurrence" that "is caused or is reasonably believed to be caused by" several biological threats, including " the

appearance of a novel or previously controlled or eradicated biological agent[,]" and "poses a high probability of … a large number of deaths, illness, or injury" or "a large number of serious or long-term impairments" or that "poses a significant risk of substantial future harm to a large number of people[.]"  N.J.S.A. 26:13-2.

45.     Section 13-3 of Title 26 requires any order by the Governor declaring a public health emergency to specify: "(1) the nature of the public health emergency; (2) the geographic area subject to the declaration; (3) the conditions that have brought about the public health emergency to the extent known; and (4) the expected duration of the public health emergency, if less than 30 days."

46.     Any public health emergency "terminate[s] automatically after 30 days unless renewed by the Governor under the same standards and procedures" set out in ¶ 45 of this Complaint.  N.J.S.A. 26:13-3(b).

47.     Once the Governor has declared a public health emergency under 26:13-1 *et seq.*, the Act grants certain specific, health-related authority to the Governor and the Commissioner of the New Jersey Department of Health, *see* N.J.S.A. 26:13-2, including the authority to: (1) investigate the health event, N.J.S.A. 26:13-4, 13-5; (2) establish a registry of available health-care workers, N.J.S.A. 26:13-6; (3) provide for the safe disposition of human remains, N.J.S.A. 26:13-7; (4) "close, compel the evacuation of, or denominate" facilities that "may endanger the public health," N.J.S.A. 26:13-8; (5) dispose of infectious waste, N.J.S.A. 26:13-10; (6) control the supply and distribution of pharmaceutical agents, N.J.S.A. 26:13-11; (7) prevent transmission of the disease, N.J.S.A. 26:13-12; (8) require persons to submit to testing, N.J.S.A. 26:13-13; (9) require the vaccination, treatment, decontamination, isolation, or quarantine of persons, N.J.S.A. 26:13-14, -15; (10) educate the public about the efficacy of vaccines, N.J.S.A. 26:13-23; (11) reinstate the employment of persons who were isolated or quarantined, N.J.S.A. 26:13-16; (12) access and disclose medical records in certain circumstances, N.J.S.A. 26:13-17; (13) disseminate information about food-access programs, N.J.S.A.

26:13-17.1; (14) require the assistance of health-care workers, N.J.S.A. 26:13-18; (15) provide for potassium iodine in case of a radiological emergency, N.J.S.A. 26:13-20; and (16) administer a Biological Agent registry, N.J.S.A. 26:13-22.

48.    In addition to certain powers to control health-care facilities, the Governor or the commissioner may also "procure, by condemnation or otherwise, subject to the payment of reasonable costs" to "construct, lease, transport, store, maintain, renovate or distribute property and facilities as may be reasonable and necessary to respond to the public health emergency[.]" N.J.S.A. 26:13-9. "Such property and facilities include, but are not limited to, communication devices, carriers, real estate, food and clothing." *Id.*

49.    The Governor or the commissioner may also "inspect, control, restrict, and regulate by rationing and using quotas, prohibitions on shipments, allocation or other means, the use, sale, dispensing, distribution or transportation of food, clothing and other commodities, as may be reasonable and necessary to the public health emergency." *Id.*

50.    The Governor or the commissioner also has the authority to restrict the movement of persons "if such action is reasonable and necessary to respond to the public health emergency." *Id.*

51.    Governor Murphy's second justification for issuing the Executive Order is N.J.S.A. 38A:3-6.1, which governs "[a]id to localities in circumstances which threaten or endanger public health, safety, or welfare." This provision authorizes the Governor "to order active duty, with or without pay, in State service, such members of the New Jersey National Guard … to provide aid to localities in circumstances which threaten or are a danger to public health, safety or welfare." *Id.*

52.    Governor Murphy's third justification for issuing the Executive Order is N.J.S.A. 38A:2-4, which authorizes the Governor, "in case of insurrection, invasion, tumult, riot, breach of peace, natural disaster, or imminent danger to public safety," to "order to active duty all or any part of the militia that he may deem necessary."

**D.  Governor Murphy Issued Scores of Executive Orders and Extended the Public Health Emergency Several Times**

53.     Between March 9, 2020, when Governor Murphy declared a state of emergency, and June 26, 2020, Governor Murphy issued another 55 executive orders relating to COVID-19.  *See* Murphy Exec. Order No. 157 (June 26, 2020), *available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-157.pdf.

54.     In one such order, Executive Order 106, Governor Murphy stayed foreclosures and evictions.    Murphy Exec. Order No. 106 (March 19, 2020), *available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-106.pdf.  Specifically, Executive Order 106 stayed enforcement of all judgments for possession, warrants of removal, and writs of possession, except when a court determines that enforcement is necessary in the interest of justice.  *Id.*

55.     Executive Order 106 remains in effect until two months "following the end of the Public Health Emergency or State of Emergency established by Executive Order No. 103 (2020), whichever ends later[.]"  *Id.* at 4.

56.      On April 7, 2020, Governor Murphy announced that the Public Health Emergency declared in Executive Order No. 103 continued to exist.  Murphy Exec. Order No. 119 (April 7, 2020), *available at*  https://nj.gov/infobank/eo/056murphy/pdf/EO-119.pdf.

57.     Governor Murphy subsequently announced on May 6, 2020, that the Public Health Emergency continued to exist.    Murphy Exec. Order 138 (May 6, 2020), *available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-138.pdf.

58.     Once again, on June 4, 2020, Governor Murphy announced that the Public Health Emergency declared in Executive Order 103 continues to exist.  Murphy Exec. Order 151 (June 4, 2020), *available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-151.pdf

**E. The Gubernatorial Power to Issue Executive Orders Does Not Include Power to Interfere with Contract Obligations or to Waive or Amend Laws**

59.     The Governor may issue an executive order only when acting within his authority.  *See* Michael S. Herman, *Gubernatorial Executive Orders*, 30 Rutgers. L.J. 987, 989-90 (1999).

60.     An executive action that goes beyond the Governor's grant of statutory or constitutional authority, such that it is "fundamentally incompatible" with "existing laws and statutes as to impair the 'essential integrity' of the constitutional powers of the Legislature" is invalid.  *Commc'ns Workers of Am., AFL-CIO v. Christie*, 413 N.J. Super. 229, 274–75 (App. Div. 2010).

61.     The New Jersey Constitution vests executive power in the Governor.  N.J. Const. art. V, § 1, ¶ 1.

62.     "[P]lenary law-making authority" is vested in "the State Senate and General Assembly."  *Commc'ns Workers of Am.*, 413 N.J. Super. at 255 (citing N.J. Const. art. IV, § 1, ¶ 1).

63.     Through Article IV, § 1, ¶ 1, "the people vested full sovereign authority in the Legislature, save as otherwise therein provided."  *Gangemi v. Berry*, 25 N.J. 1, 8 (1957).

64.     The legislative authority includes the power to amend or repeal duly enacted laws.  *See Commc'ns Workers of Am.*, 413 N.J. Super. at 274.  The Presentment Clause of the New Jersey Constitution, art. V, § 1, ¶ 14(a), requires not only that the Legislature be part of the law-making process, but sets forth how laws must be passed, amended, and repealed.

65.     The Governor has no authority to waive duly enacted statutes.  *Cf. Commc'ns Workers of Am.*, 413 N.J. Super. at 274 ("It is well settled that administrative regulations adopted by the Executive Branch cannot amend or repeal statutes.").

66.     The New Jersey Constitution provides explicitly for the separation of powers: "The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. *No person or persons belonging to or constituting one branch shall exercise any of the powers properly*

*belonging to either of the others except as expressly provided in this Constitution.*"  N.J. Const. art. III, ¶ 1 (emphasis added).

67.    The Governor's authority to execute the laws and the Legislature's authority to make, amend, and repeal laws must remain separate.

68.    One "main objective" of the separation of powers "is to prevent the concentration of 'unchecked power' in one branch of government."  *Comm'ns Workers of Am.*, 413 N.J. Super. at 257 (quoting *David v. Vesta Co.,* 45 N.J. 301, 326 (1965)).  The separation-of-powers doctrine prevents "one branch of government from claiming power reserved to another[.]"  *Ironbound Health Rights Advisory Comm'n v. Diamond Shamrock Chem. Co.*, 216 N.J. Super. 166, 175 (App. Div. 1987).  "[N]o deviation from … the doctrine of separation of powers will be tolerated" if the deviation "impairs the essential integrity of one of the great branches of government."  *Massett Bldg. Co. v. Bennett*, 4 N.J. 53, 57 (1950).

69.    The separation of powers guards against one branch aggrandizing its own power unilaterally—including when the Governor does so through an executive order.  *Comm'ns Workers of Am.*, 413 N.J. Super. at 258-59.

**F.  Governor Murphy Purported to Unilaterally Alter Private Contractual Relationships and Waive Statutory Law by Executive Decree**

**i.    The Purpose of Executive Order 128 Is to Interfere with Contractual Obligations and Waive Statutory Law**

70.    On April 11, 2020, Governor Murphy stated at a press conference that his office had not considered a "rental freeze" because rental contracts are private contracts and "[t]here are thousands, maybe hundreds of thousands, if not millions of contracts between landlords and renters." "At least in New Jersey," the Governor concluded, "putting a freeze in place is impractical as a legal matter."  NJ.com, *Corona Virus in New Jersey: Update April 11, 2020*, YouTube, at 47:54, *available at* https://www.youtube.com/watch?v=vvDPSxxP65E&feature=youtu.be.

71.     Governor Murphy also encouraged tenants to report their landlords to the state if they are "getting screwed by their landlord." *Id.* at 49:50.

72.     Governor Murphy also acknowledged that the legislature was in session and that his office "continue[s] to have very good communication with the legislature." *Id.* at 49:00.  Despite the legislature being in session, Governor Murphy decided to act unilaterally.

73.     On April 24, 2020, Governor Murphy issued Executive Order 128, which purported to "waive[] provisions of statutory law that prohibit the use of security deposits for rental payments, enabling tenants to instruct landlords to use their security deposits to offset rent or back rent."  Press Release, *Governor Murphy Signs Executive Order Providing Critical Short-Term Support for Renters*, Official Site of the State of New Jersey (Apr. 24, 2020), *available at* https://www.nj.gov/governor/news/news/562020/20200424c.shtml.

74.     In Executive Order 128, Governor Murphy explained that "many New Jerseyans [are] experiencing substantial loss of income as a result of business closures, reduction in hours, or layoffs related to COVID-19," and that "tenants may be suffering from one or more financial hardships that are caused by or related to the COVID-19 pandemic, including but not limited to a substantial loss of or drop in income, and additional expenses such as those relating to necessary health care[.]"  Murphy Exec. Order 128 (April 24, 2020), *available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-128.pdf.

75.     Governor Murphy reasoned that it was "plainly in the public interest" to "enabl[e] individuals to pay portions of their rent with the security deposit they own" to "allow those individuals to mitigate the consequences regarding evictions and accumulation of interest and late fees upon termination of Executive Order No. 106 (2020)" because tenants may face "consequences from a late payment of rent, including interest and late fees, which they may be unable to satisfy in light of their substantial loss of income[.]"  *Id.* at 3.

76.    Specifically, Governor Murphy ordered that a tenant may request in writing that his or her "security deposit governed by the provisions of N.J.S.A. 46:8-19 et seq., as well as the tenant's portions of interest and/or earnings accumulated thereon, shall be applied to or credited towards rent payments due or to become due from the tenant during the Public Health Emergency established in Executive Order No. 103 (2020) or up to 60 days after the Public Health Emergency terminates." *Id.* at 3-4 ¶ 1.

77.    The statutes that Governor Murphy waived apply to leases of residential units used for dwelling purposes. *See* N.J.S.A. 46:8-26, -27.

78.    According to Executive Order 103, "When a tenant applies or credits such deposit, interest, or earnings to pay rent pursuant to Paragraph 1 of this Order, the following additional provisions shall apply *for the duration* of the tenant's current contract, lease, or license agreement:"

> g.    The landlord may recoup from the tenant any monies the landlord expected that would have been reimbursable by the security deposit and interest or earnings thereon, at the time that such reimbursement from the deposit and interest or earnings thereon would have taken place; and
>
> h.    The tenant shall otherwise be without obligation to make any further security deposit relating to the current contract, lease, or license agreement.  If, however, the tenant and landlord extend or renew their contract, lease, or license agreement [after April 24, 2020], then the tenant shall be obligated to replenish the security deposit in full either on the date six months following the end of the Public Health Emergency established by Executive Order No. 103 (2020), which was extended by Executive Order No. 119 (2020), or on the date on which the current contract, lease, or license agreement is extended or renewed, whichever is later.

*Id.* at 4 ¶ 2 (emphasis added).

79.    Under the terms of Executive Order 128, a tenant's "[u]se of a security deposit for the purposes outlined in [Executive Order 128] shall not be considered a violation of N.J.S.A. 46:8-19 et seq." *Id.* at 5 ¶ 3.

80.    Governor Murphy noted in Executive Order 128 that "pursuant to N.J.S.A. 46:8-19, a security deposit and the accumulated interest and earnings on the investment of such deposit remain the property of the tenant[.]" *Id.* at 3.

81.     By so noting, Governor Murphy made clear that he did not consider Executive Order 128 to be authorizing a public taking.

82.     Remarkably, Governor Murphy declared, "Any provisions of N.J.S.A. 46:8-19 et seq. that are not inconsistent with [Executive Order 128] remain in full force and effect." *Id.* at 5 ¶ 3.

83.     By inverse implication, Governor Murphy declared that any provision of N.J.S.A. 46:8-19 *et seq.* that *are* inconsistent with Executive Order 128 are no longer in force and effect until Executive Order 128 terminates.  As a result, not only is Governor Murphy arrogating the power to suspend a statute, but also the power to reimpose the statute's effects at a future point in time.

84.     Executive Order 128 "remain[s] in effect until 60 days following the end of the Public Health Emergency established by Executive Order No. 103 (2020), which was extended by Executive Order No. 119 (2020)." *Id.* at 5 ¶ 5.

85.     Governor Murphy also created criminal penalties for violations of Executive Order 128: "Penalties for violations of [Executive Order 128] may be imposed under, among other statutes, N.J.S.A. App. A:9-49 and -50." *Id.* at 5 ¶ 4.

### ii.    New Jersey Law Requires Landlords to Comply with the Statutes that Governor Murphy Waived

86.     Leaseholds in New Jersey are highly regulated by statute.  In fact, Title 46, Chapter 8, which governs "Leasehold Estates; Landlord and Tenant," contains over 50 separate statutory provisions that set out the rights of landlords and tenants in a leasehold contract.  *See* N.J.S.A. 46:8-1 *et seq.*

87.     Security deposits, specifically, are regulated by N.J.S.A. 46:8-19 *et seq.*, the provisions of which Executive Order 128 purported to suspend to the extent those provisions are inconsistent with the Governor's order.  Murphy Exec. Order 128.

88.     Statutes governing security deposits regulate everything from how a security deposit is paid, maintained, and returned, N.J.S.A. 46:8-19, -21.1; how large of a security deposit a landlord may

require, N.J.S.A. 46:8-21.2; how and with whom the security deposit must be invested and accrue interest, N.J.S.A. 46:8-19; how and when the depositor must pay interest on the deposit, N.J.S.A. 46:8-19, -21.1; how a security deposit should be handled during a foreclosure, bankruptcy, or conveyance of the property, N.J.S.A. 46:8-20, -21; and how the parties can adjudicate their rights regarding security deposits, N.J.S.A. 46:8-21.4, -31, -35, & -41.  Parties to residential leases in New Jersey necessarily account for and rely on these statutory provisions when crafting their contracts—including other provisions of their contracts.

89.     Notably, two separate statutes treat as void and unenforceable any attempt by a landlord or tenant to voluntarily agree to a contract that waives the applicability of any statutory provisions that govern leasehold security deposits.  *See* N.J.S.A. 46:8-24, -36.

90.     Governor Murphy, however, has attempted to do precisely what the New Jersey Statutes prohibit:  waive the applicability of these statutory provisions that govern leasehold security deposits.  Murphy Exec. Order No. 128.

91.     Governor Murphy has no authority to waive state law governing the landlord-tenant relationship.

### iii. Executive Order 128 Interfered with the Plaintiffs' Contractual Relationships

### a. Facts Specific to Mr. Johnson's 2018 Barclay Lease

92.     Mr. Johnson negotiated his 2018 Barclay Lease to include a provision requiring the Barclay Tenant to pay Mr. Johnson a security deposit "as security for any damage caused to the [Property]" during the term of the lease.

93.     Despite the terms of Mr. Johnson's lease, Executive Order 128 allows the Barclay Tenant, at any time, to choose to apply his security deposit to the rent owed on the 2018 Barclay Lease.

94.     If the Barclay Tenant chooses to use the security deposit to pay rent owed on the 2018 Barclay Lease, the security deposit will necessarily be unavailable "as security for any damage caused to the [Property]." Consequently, Executive Order 128 substantially altered the terms of 2018 Barclay Lease and the parties' rights and obligations thereunder.

95.     On March 31, 2020, Mr. Johnson's tenant informed him that he was laid off from his job and would be filing for unemployment benefits with the State. (A copy of the message notifying Mr. Johnson is attached as Exhibit 12).

96.     The Barclay Tenant is increasingly likely to take advantage of the changes Governor Murphy made unilaterally to the terms of the 2018 Lease.

97.     Without a security deposit to insure against any damage the Barclay Property may incur during the nearly six years of the Barclay Tenant's tenancy, Mr. Johnson will be forced to cover the cost of any damage out of his own pocket or bring a costly and timely small-claims action against the Barclay Tenant.

98.     The purpose of the security deposit that Mr. Johnson bargained for and that he and the Barclay Tenant contractually agreed to in the 2018 Barclay Lease was to inure to Mr. Johnson the benefit of avoiding the cost and time associated with repairing any damage that the Barclay Tenant may cause to the Barclay Property during the tenancy.

99.     Through Executive Order 128, Governor Murphy unilaterally altered the rights and obligations of Mr. Johnson and the Barclay Tenant under the 2018 Barclay Lease.

### b. Facts Specific to the Kravitzes' Glassboro Lease

100.    The Kravitzes negotiated the Glassboro Lease to require the Rowan Tenants to pay a security deposit of $2,000 that would cover the cost of "such deductions as provided in th[e] Lease."

101.    The Glassboro Lease listed at least 10 categories of damages for which the Kravitzes could use the security deposit.

102.    The Rowan Tenants vacated the Glassboro Property, and the Kravitzes regained possession on June 1, 2020.

103.    On June 1, 2020, Mr. Doe 1, Mr. Doe 2, and Mr. Doe 3 each handed Mr. Kravitz a letter requesting to use their respective portions of the security deposit ($500 each) to pay rent owed under the Glassboro Lease.  (A copy of the letters are attached as Exhibits 13, 14, and 15, respectively).

104.    The Rowan Tenants caused $1,854.94 in damage to the Glassboro Property.

105.    The purpose of the security deposit that the Kravitzes' bargained for and contractually agreed upon with the Rowan Tenants was to inure to the Kravitzes the benefit of avoiding the cost and time associated with repairing any damage that the Rowan Tenants may have caused to the Glassboro Property during the tenancy.

106.    Had Governor Murphy not unilaterally and unlawfully changed the terms of the Kravitzes' Glassboro Lease, the Rowan Tenants' $2,000 security deposit would have covered the $1,854.94 in damage that the Rowan Tenants caused to the Glassboro Property.

107.    Through Executive Order 128, Governor Murphy unilaterally altered the rights and obligations of the Kravitzes and the Rowan Tenants under the Glassboro Lease.

### c. Facts Specific to the Johnsons' Sixth Street Lease

108.    The Johnsons negotiated the Sixth Street Lease to include a provision requiring a deposit "as security for the faithful performance by Lessee of the terms" of the Sixth Street Lease.

109.    Despite the terms of the Johnsons' lease, Executive Order 128 allows the Sixth Street Tenant, at any time, to choose to apply her security deposit to the rent owed on the Sixth Street Lease.

110.    If the Sixth Street Tenant chooses to use the security deposit to pay rent owed on the Sixth Street Lease, the security deposit will necessarily be unavailable "as security for the faithful performance of the terms" of the Sixth Street Lease.

111.   Consequently, Executive Order 128 substantially altered the terms of Sixth Street Lease and the parties' rights and obligations thereunder.

112.   The Sixth Street Tenant has not paid rent in full for the months of April, May, and June.  She currently owes $6799.50 in unpaid rent.  (A copy of the balance sheet for the Sixth Street Property is attached as Exhibit 15).

113.   Given that the Sixth Street Tenant's unpaid rent is well in excess of the security deposit, the Sixth Street Tenant is increasingly likely to take advantage of the changes Governor Murphy made unilaterally to the terms of the Sixth Street Lease.

114.   Without a security deposit to insure against any damage the Sixth Street Property may incur during the nearly 20 years of the Sixth Street Tenant's tenancy, the Johnsons will be forced to cover the cost of any damage out of their own pocket or bring a costly and timely small-claims action against the Sixth Street Tenant.

115.   The purpose of the security deposit that the Johnsons bargained for and that the Johnsons and the Sixth Street Tenant contractually agreed to in the 2018 Lease was to inure to the Johnsons the benefit of avoiding the cost and time associated with repairing any damage that the Sixth Street Tenant may cause to the Sixth Street Property during the tenancy.

116.   Through Executive Order 128, Governor Murphy unilaterally altered the rights and obligations of the Johnsons and the Sixth Street Tenant under the Sixth Street Lease.

### d. Facts Specific to Mr. Van Hook's Union Lake Lease

117.   Mr. Van Hook negotiated the Millville Lease to include a provision requiring a security deposit that would cover "damages to the Property resulting from the Tenant's occupancy."  (Exhibit 10, ¶ 6).

118.    The Millville Lease, which the parties agreed to freely, also specified that "[t]he Security Deposit may not be used by the Tenant for the payment of rent without the written consent of the Landlord."  (Exhibit 10, ¶ 6).

119.    Despite the terms of Mr. Van Hook's lease, Executive Order 128 allows the Millville Tenant, at any time, to choose to apply her security deposit to the rent owed on the Millville Lease.

120.    If the Millville Tenant chooses to use the security deposit to pay rent owed on the Millville Lease, the security deposit will necessarily be unavailable to cover "damages to the Property resulting from the Tenant's occupancy."  (Exhibit 10, ¶ 6).

121.    And absent Executive Order 128, the terms of the Millville Lease expressly forbid the Millville Tenant from using the security deposit "for the payment of rent without the written consent" of Mr. Van Hook.  (Exhibit 10, ¶ 6).

122.    Consequently, Executive Order 128 substantially altered the terms of the Millville Lease and the parties' rights and obligations thereunder.

### iv. Executive Order 128 Is Beyond Governor Murphy's Authority

123.    As authority for Executive Order 128, Governor Murphy invoked "certain emergency powers" conferred on the Governor of New Jersey by "the Constitution and statutes of the State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. App. A:9-33 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4[.]"

124.    As described above in ¶¶ 43 - 48, N.J.S.A. 26:13-1 *et seq.* gives the Governor certain authority relating to the spread of pathogens and medical treatment in response to a Public Health Emergency.

125.    The specific, enumerated powers granted by N.J.S.A. 26:13-1 *et seq.* do not vest in the Governor the authority to alter the terms of residential leases.  None of these provisions permits the

Governor to waive statutory requirements relating to residential leases based on financial hardship, regardless of whether that financial hardship may result from a public health emergency.

126.     As described in ¶ 51 above, N.J.S.A. 38A:3-6.1 pertains to the Governor's authority to control the New Jersey National Guard.

127.     Governor Murphy's authority to control the New Jersey National Guard has nothing to do with his claimed authority to alter the terms of residential leases or any authority to waive statutory provisions relating to residential leases.

128.     As described in ¶ 52 above, the specific power granted by N.J.S.A. 38A:2-4 pertains to the Governor's authority over the state militia.

129.     The New Jersey Governor's authority to control the state militia has nothing to do with Governor Murphy's claimed authority to waive statutory provisions relating to residential leases or any authority to alter the terms of residential leases.

130.     N.J.S.A. App. A:9-33 *et seq.*, enacted during World Word II, encompasses the Civilian Defense and Disaster Control Act.  N.J.S.A. App. A:9-33.

131.     The purpose of the Civilian Defense and Disaster Control Act is

to provide for the health, safety and welfare of the people of the State of New Jersey and **to aid in the prevention of damage to and the destruction of property** during any emergency herein defined by prescribing a course of conduct for the civilian population of this State during such emergency and by centralizing control of all civilian activities having to do with such emergency under the Governor and for that purpose to give the Governor control over such resources of the State Government and of each and every political subdivision thereof as may be necessary to cope with any condition that shall arise out of such emergency and to invest the Governor with all other power convenient or necessary to effectuate such purpose.

*Id.* (emphasis added).

132.     Assuming the Civilian Defense and Disaster Control Act even applies to the current pandemic, security deposits provided for in residential leasehold contracts *also* exist to aid in the prevention of damage to and the destruction of property.  Yet, contrary to the purpose of the Civilian

Defense and Disaster Control Act, Governor Murphy decided unilaterally to cancel those measures that New Jersey landlords have put in place to protect their property.

133.     Appendix A:9-34 authorizes the Governor "to utilize and employ all the available resources of the State Government and of each and every political subdivision of [New Jersey], whether of men, properties or instrumentalities, and to commandeer and utilize any personal services and any privately owned property necessary to avoid or protect against any emergency subject to the future repayment of the reasonable value of such services and privately owned property" as provided in the subsequent provisions of the Civilian Defense and Disaster Control Act (N.J.S.A. App. A:9-33 *et seq.*).  N.J.S.A. App. A:9-34.

134.     But as mentioned in ¶ 81, Governor Murphy did not consider Executive Order 128 to authorize commandeering or utilizing privately owned property; and there is no indication he intends the State to compensate landlords for any property value lost as a result of Executive Order 128.

135.     Appendix A:9-51(a), which Governor Murphy explicitly referenced in Executive Order 128, authorizes the Governor, whenever the Governor believes that control of a disaster "is beyond the capabilities of local authorities":

      a.     To "assume control of all emergency management operations;"

      b.     to "proclaim an emergency;" and

      c.     to temporarily "employ, take or use the personal services, or real or personal property, of any citizen or resident of [New Jersey], or of any firm, partnership or unincorporated association doing business or domiciled in this State, or of any corporation incorporated in or doing business in this State, or the real property of a nonresident located in this State, for the purpose of securing the defense of the State or of protecting or promoting the public health, safety or welfare; provided, that such personal services or property shall not be employed or used beyond the borders of this State unless otherwise authorized by law."

N.J.S.A. App. A:9-51(a).

136.    If the Governor takes private property or demands personal services pursuant to N.J.S.A. App. A:9-51(a), the State must pay compensation at the prevailing rate.   N.J.S.A. App. A:9-51(b)-(d).

137.    Again, Executive Order 128 makes clear that Governor Murphy does not consider the reallocation of deposits paid as security on residential leases to be a taking that would require compensation.   He is wrong.

138.    Other provisions outlining the Governor's authority under the Civilian Defense and Disaster Control Act are similarly inapplicable to Executive Order 128, most of which deal with the coordination of defense and disaster response between the State and Federal governments and between the State and local, municipal governments.  *See, e.g.*, N.J.S.A. App. A:9-35, -40 through -43.6, -51.6, -51.7, -59, -62.  The Governor may also "require any public official, citizen or resident … to furnish him any information reasonably necessary to enable [the Governor] to carry out the purposes of this act[,]" N.J.S.A. App. A:9-36; and the Governor may appoint deputies or other persons to assist with the purposes of the act.  N.J.S.A. App. A:9-38, -54.

139.    Consistent with the subject matter of the Civilian Defense and Disaster Control Act, the other powers that the Act vests in the Governor relate to military defense.  *See, e.g.*, N.J.S.A. App. A:9-35, -37.   These powers pertain to the issuance of rules associated with blackouts, air raids, recruiting and training emergency response crews, the conduct of civilians "during the threat of an imminence of danger," counteracting sabotage and subversive activities, evacuating residents of threatened districts, and any other matter "that may be necessary to protect the health, safety and welfare of the people or that will aid in the prevention of loss to and destruction of property." N.J.S.A. App. A:9-45.  The Governor may also issue rules regulating vehicles and traffic relating to "any black-

out, air raid, threatened air raid, preparations for emergencies or during the threat or imminences of danger or emergency[.]"  N.J.S.A. App. A:9-47.

140.    None of the authority granted to Governor Murphy by the Civilian Defense and Disaster Control Act, N.J.S.A. App. A:9-34 *et seq.*, encompasses any authority even remotely connected to a power to modify the terms of residential leasehold contracts or to waive the statutory provisions relating to those leases.

141.    Governor Murphy also claimed authority for Executive Order 128 under the New Jersey Constitution.  The New Jersey Constitution mentions the power to waive duly enacted laws only in the context of habeas corpus: "The privilege of the writ of habeas corpus shall not be suspended, unless in case of rebellion or invasion the public safety may require it."  N.J. Const. art. I, ¶ 14.

142.    State constitutions that provide for the suspension of habeas corpus in emergencies are understood to have vested that authority in the legislature.  *See* Philip Hamburger, *Beyond Protection*, 109 COLUM. L. REV. 1823, 1919 (2009); *see also* Amanda L. Tyler, *Habeas Corpus in Wartime: From the Tower of London to Guantanamo Bay* (2017) (chronicling the original meaning of the federal Habeas Corpus Suspension Clause).  In contrast to the legislature, the executive "could not, even during an emergency, seize property" or "constrain the natural liberty of persons who were within the protection of the law, unless [the executive] had legislative authorization."  Hamburger, *supra* ¶ 142 at 1919.

143.    The New Jersey Constitution prohibits interference with contractual obligations: "The Legislature shall not pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made." N.J. Const. article IV, § VII, ¶ 3.

144.    The New Jersey Constitution protects the rights of all persons to acquire, possess, and *protect* property.  N.J. Const. art. I, ¶ 1.

145. As with the other sources of authority that Governor Murphy invoked, the New Jersey Constitution does not authorize the Governor to interfere with contracts. In fact, the Constitution explicitly forbids governmental interference with private contracts. Moreover, the Constitution does not authorize the Governor to waive or suspend statutes or other legal rights.

## G. Plaintiffs Have Experienced, and Will Continue to Experience, Concrete and Particularized Harm as a Direct Result of Governor Murphy's Unilateral Executive Decree

146. As a direct result of Governor Murphy's Executive Order 128, the Plaintiffs have suffered harm and are threatened with additional future harm.

147. Governor Murphy has unilaterally altered the rights, entitlements, and protections of the Plaintiffs under the terms of their respective leases, to which the Plaintiffs and their tenants voluntarily agreed.

148. Plaintiffs relied on the terms of their leases and the security deposits due thereunder to ensure that they could protect their properties against damage during the tenancies. Governor Murphy's ultra vires Executive Order 128 has caused the Plaintiffs to suffer actual harm.

149. The Governor's interference with the Plaintiffs' contractual rights is a substantial impairment.

150. The Contracts Clause of the U.S. Constitution exists to prevent state governments from disrupting private contractual arrangements and from picking winners and losers between parties to a contract. *See Ogden v. Saunders*, 25 U.S. (1 Wheat.) 213, 354-55 (1827). Executive Order 128, however, does just that—it picks Mr. Johnson, and other residential landlords, as losers. "The Contracts Clause restricts the power of the States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).

151. By singling out residential landlords for disfavored treatment, Executive Order 128 has deprived the Plaintiffs of the equal protection of the law and the privileges and immunities

guaranteed by the Fourteenth Amendment to the U.S. Constitution. This loss of their civil liberties is permanent and cannot be mitigated or recovered.

152.    Plaintiffs' damages are not merely hypothetical. The intended result of Executive Order 128 was to alter the terms of residential leases like the Plaintiffs' respective leases. The right to hold a deposit as security against damage was provided for and protected by their contracts, as well as by New Jersey statutory law at the time they each executed their respective leases. But, as of April 24, 2020, when Governor Murphy entered Executive Order 128 without any lawful authority, the Plaintiffs no longer have the security and certainty for which they rightfully contracted. Plaintiffs are now in a worse position than they were before, due solely to an executive order the Governor had no legal power to issue.

153.    Plaintiffs, like all other New Jerseyans, have a right to be governed by laws that are duly enacted through their elected representatives in the New Jersey Legislature. These laws, of course, are subject to the Contracts Clauses of the New Jersey and United States Constitutions.

154.    Governor Murphy's unilateral Executive Order 128 violated the due process rights protected by both the United States Constitution and the New Jersey Constitution by altering the Plaintiffs' private contracts and the laws that govern their leasehold without being adopted pursuant to the proper legislative channels of government.

155.    Plaintiffs have suffered a violation of their procedural and substantive due process rights as a result of the Governor's actions in issuing Executive Order 128.

### COUNT I: VIOLATION OF THE CONTRACTS CLAUSE OF THE UNITED STATES CONSTITUTION EXECUTIVE ORDER 128 IMPERMISSIBLY INTERFERES WITH CONTRACTUAL OBLIGATIONS

156.    Plaintiffs reallege and incorporate by reference the allegations contained in their Introductory Statement and paragraphs 1 through 155, as if fully set forth herein.

157.    Article I, § 10 of the U.S. Constitution forbids States from impairing contractual obligations: "No State shall … pass any Law impairing the Obligation of Contracts[.]"

158.    "The Contracts Clause restricts the power of the States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).

159.    The Founders included the Contracts Clause in the United States Constitution to prevent states from picking winners and losers and allowing the hand-picked winners to avoid their contractual obligations. *See Ogden*, 25 U.S. (1 Wheat.) at 354-55 ("The power of changing the relative situation of debtor and creditor, of interfering with contracts, … had been used to such an excess by the state legislatures, as to break in upon the ordinary intercourse of society, and destroy all confidence between man and man.  This mischief had become so great, so alarming, as not only to impair commercial intercourse, and threaten the existence of credit, but to sap the morals of the people, and destroy the sanctity of private faith.  To guard against the continuance of the evil, was an object of deep interest with all the truly wise, as well as the virtuous, of this great community, and was one of the important benefits expected from a reform of government."); *see also Keystone Bituminous Coal Ass'n v. DeBendicitis*, 480 U.S. 470, 503 n.30 (1987) ("It was made part of the Constitution to remedy a particular social evil—the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts—and thus was intended to prohibit States from adopting as their policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them.") (citations omitted; cleaned up).

160.    Governor Murphy has done in Executive Order 128 exactly what our Founders sought to prevent—destroyed or nullified agreed-upon and bargained-for contract terms.

161.    A state actor violates the Contracts Clause by effecting "a change in state law that has operated as a substantial impairment of a contractual relationship." *Transport Workers Union, Local 290*

36

*v. Se. Pa. Transp. Auth.*, 145 F.3d 619, 621 (3d Cir. 1998) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).

162.    Governor Murphy violated the Contracts Clause because: (1) Plaintiffs had contractual relationships with their respective tenants; (2) Executive Order 128 was a subsequent change in law that impaired the Plaintiffs' contractual relationships; and (3) the impairment was substantial.  *See id.*

163.    Through its unique (and unlawful) nature, Executive Order 128 seeks to change the law—despite the fact that it is nothing more than an executive order and not properly vetted and adopted legislation.

164.    Although Contracts Clause claims typically arise from state legislation, a state cannot avoid a justiciable Contracts Clause claim by also denying the guarantee to a republican form of government.  *See* U.S. Const. art. IV, § 4.  Otherwise, the state could routinely—and without consequence—interfere with the right to contract by ruling through executive fiat as Governor Murphy has here.

165.    Governor Murphy's action is no less violative of the Contracts Clause merely because Executive Order 128 does not totally destroy the Plaintiffs' contracts: "Total destruction of contractual expectations is not necessary" for a court to find that the State substantially impaired a private contract.  *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983) (citing *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 26-27 (1977)).

166.    Courts employ a "legitimate-purpose inquiry" to determine "whether the adjustment of 'the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the [] adoption.'" *Id.* at 412 (quoting *U.S. Trust Co.*, 431 U.S. at 22) (cleaned up).  On this point, courts will defer to the "*legislative* judgment as to the necessity and reasonableness of a particular measure."  *Id.* at 412-13 (quoting *U.S. Trust Co.*, 431 U.S. at 22-23) (emphasis added).  Although deferential, the standard courts apply to Contracts Clause claims

is a "more exacting" review than rational-basis review. *See Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 369 (3d Cir. 2012).

167.    What makes this case unique is that there was no legislative judgment.  Not only does the character of the public purpose—a health emergency—not relate sufficiently to residential leasehold contracts, but the Governor is not authorized to make legislative judgments when he issues executive orders. *See Commc'ns Workers of Am.*, 413 N.J. Super. at 265–66, 272.

168.    In determining whether a state action violated the Contracts Clause, courts look to the industry and whether persons in that industry could have expected further regulation in the area at issue. *Energy Reserves Grp.*, 459 U.S. at 411.

169.    Plaintiffs, along with other residential landlords in New Jersey, could not have expected the Governor to unilaterally waive the application of certain statutory provisions in a heavily regulated area of law.

170.    A security deposit is an integral and widely used feature of residential leasehold contracts.  The security deposit protects the landlord from incurring damage to the property. By allowing a landlord to insure against risk, a security deposit helps facilitate contracts and can even affect the rent that a landlord charges, which of course affects the residential leasing market.

171.    Although a landlord may still resort to the courts to seek reimbursement for damage to his or her property, the time and expense of litigation can often exceed the damage to the property. When a landlord insures against damage to his or her rental property through a security deposit, the tenant may be more careful to avoid damaging the property.  Executive Order 128 "interferes with a [landlord]'s reasonable expectations, and prevents [the landlord] from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822 (cleaned up).  This is exactly what the Contracts Clause forbids.

172.    Accordingly, Executive Order 128 violates the Contracts Clause of the U.S. Constitution and is void.

173.    Plaintiffs have been damaged and continue to be damaged by the Defendants' conduct.  There is no adequate remedy at law, as no damages could compensate Plaintiffs for the deprivation of their constitutional rights, and they will suffer serious and irreparable harm to their constitutional rights unless the Defendants are enjoined from enforcing Executive Order 128.

174.    Plaintiffs are entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

### COUNT II: VIOLATION OF DUE PROCESS
### DENIAL OF RIGHT TO DUE PROCESS | UNITED STATES CONST. AMEND. XIV

175.    Plaintiffs reallege and incorporate by reference the allegations contained in their Introductory Statement and paragraphs 1 through 155, as if fully set forth herein.

176.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits the states from denying due process of law.  U.S. Const. amend. XIV, § 1.

177.    When a change in state law retroactively affects the legitimate expectations and economic rights of its citizens, the inherent unfairness triggers a due-process inquiry.  *See Gen. Motors Corp.*, 503 U.S. at 191.

178.    A state violates the Fourteenth Amendment's guarantee of procedural due process when it diverges from established procedures in a way that deprives an individual of a property right.  *See Reich v. Beharry*, 883 F.2d 239, 242-43 (3d Cir. 1989).

179.    A state violates substantive due process by arbitrarily or capriciously depriving a person of a substantive right.  *Id.* at 244.

180.    Plaintiffs have a fundamental right to contract, protected by the United States Constitution.

181.    Without following the state's established procedures, Governor Murphy's ultra vires order deprived the Plaintiffs of their right to contract and the property interests they had in those contracts without due process of law.

182.    Governor Murphy also deprived the Plaintiffs of their right to be heard, as guaranteed by the Due Process Clause of the Fourteenth Amendment.  Typically, a citizen is heard during the lawmaking process through his or her elected representative.  *See* U.S. Const. art. IV, § 4 (guaranteeing each state will maintain a republican form of government).  Governor Murphy circumvented the established (and constitutionally guaranteed) legislative process, however, and created law outside the democratic process.  By doing so, Governor Murphy again denied the Plaintiffs due process of law.

183.    Executive Order 128 purports to penalize non-compliance with the Governor's Order pursuant to the Civilian Defense and Disaster Control Act, N.J.S.A. App. A:9-49 and -50.  But, as discussed throughout, that Act does not authorize the Governor to issue Executive Order 128.  Without a lawful source of authority to issue the order, the Governor cannot rely on N.J.S.A. App. A:9-49 and -50 to criminalize the failure to comply with his unlawful order.  Any prosecution based on the failure to abide by an unlawful order violates due process.  Nor does a landlord have to violate the EO 128 in order to challenge the unlawful and unconstitutional criminal penalties contained in it.

184.    Plaintiffs suffered damage and will continue to suffer damage by the Defendants' conduct.  There is no adequate remedy at law, as there are no damages that could compensate the Plaintiffs for the deprivation of their constitutional rights, and they will suffer serious and irreparable harm to their constitutional rights unless the Defendants are enjoined from enforcing Executive Order 128.

185.    Plaintiffs are entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

## COUNT III: VIOLATION OF EQUAL PROTECTION
### DENIAL OF EQUAL PROTECTION OF THE LAW | UNITED STATES CONST. AMEND. XIV

186.    Plaintiffs reallege and incorporate by reference the allegations contained in their Introductory Statement and paragraphs 1 through 155, as if fully set forth herein.

187.    The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "This is essentially a direction that all persons similarly situated should be treated alike." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

188.    By granting special relief to residential tenants, Executive Order 128 singles out landlords of residential leases to suffer an extra loss as a result of the COVID-19 pandemic. *See* N.J.S.A. 46:8-26, -27 (explaining that the act applies to rental properties used for dwelling purposes).

189.    Although courts traditionally defer to the policy judgments of the legislature when analyzing an equal protection claim, *see Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018), such deference is inappropriate given this case of executive fiat. The Governor cannot rely on public-policy rationale in the same way the legislature can. *Cf. Commc'ns Workers of Am.*, 413 N.J. Super. at 265–66, 272 ("We cannot accord deference to EO 7's unilateral attempt to exercise the Legislature's powers, where the Legislature has not ceded those powers to the Executive.").

190.    Regardless, there is no rational basis to support Executive Order 128. *See Newark Cab Ass'n*, 901 F.3d at 156. The bases that Governor Murphy asserted in support of Executive Order 128 are wholly arbitrary and irrational. *See id.* The Governor's order purports to respond to a health pandemic and does so by telling owners of private residential property that their leasehold contracts are void. The connection between the stated rationale and the decision to treat residential landlords differently under the law is beyond tenuous.

191.     Plaintiffs have been damaged and continue to be damaged by the Defendants' conduct.  There is no adequate remedy at law, as no damages could compensate the Plaintiffs for the deprivation of their constitutional rights, and they will suffer serious and irreparable harm to their constitutional rights unless the Defendants are enjoined from enforcing Executive Order 128.

192.     Plaintiffs are entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

### COUNT IV: VIOLATION OF PRIVILEGES OR IMMUNITIES
### DENIAL OF PRIVILEGES OR IMMUNITIES | UNITED STATES CONST. AMEND. XIV

193.     Plaintiffs reallege and incorporate by reference the allegations contained in their Introductory Statement and paragraphs 1 through 155, as if fully set forth herein.

194.     The Privileges or Immunities Clause of the Fourteenth Amendment provides that no state "shall abridge the privileges or immunities of citizens of the United States."  U.S. Const. amend. XIV, § 1.

195.     Governor Murphy denied the Plaintiffs the privileges and immunities protected by the United States Constitution.  Namely, Executive Order 128 denies the Plaintiffs' right to contract freely and to protect their property.

196.     Plaintiffs have been damaged and continue to be damaged by the Defendants' conduct.  There is no adequate remedy at law, as no damages could compensate the Plaintiffs for the deprivation of their constitutional rights, and they will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from enforcing Executive Order 128.

197.     Plaintiffs are entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

## COUNT V: VIOLATION OF THE CONTRACTS CLAUSE OF THE NEW JERSEY CONSTITUTION
## EXECUTIVE ORDER 128 IMPERMISSIBLY INTERFERES WITH CONTRACTUAL OBLIGATIONS

198.    Plaintiffs reallege and incorporate by reference the allegations contained in their Introductory Statement and paragraphs 1 through 155, as if fully set forth herein.

199.    The New Jersey Constitution forbids the state from passing any "law impairing the obligation of contract[] or depriving a party of any remedy for enforcing a contract which existed when the contract was made." N.J. Const. art. IV, § VII, ¶ 3.

200.    The Contracts Clause of the New Jersey Constitution provides a "similar, parallel prohibition" as its counterpart in the United States Constitution. *In re Recycling & Salvage Corp.*, 246 N.J. Super. 79, 100 (App. Div. 1991). "These two constitutional provisions are construed and applied in the same way to provide the same protection." *Id.*

201.    The Governor may never legislate through executive fiat. *See Commc'ns Workers of Am.*, 413 N.J. Super. at 265–66, 272. Moreover, the Governor certainly cannot use executive fiat to decree laws that the Legislature is not itself competent to enact.

202.    Executive Order 128 violates the Contracts Clause of the New Jersey Constitution and is void.

203.    Plaintiffs have been damaged and continue to be damaged by the Defendants' conduct. There is no adequate remedy at law, as no damages could compensate the Plaintiffs for the deprivation of their constitutional rights, and they will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from enforcing Executive Order 128.

204.    Plaintiffs are entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

### COUNT VI: VIOLATION OF PROCEDURAL DUE PROCESS
### DENIAL OF RIGHT TO DUE PROCESS | N.J. CONST. ART. I

205.    Plaintiffs reallege and incorporate by reference the allegations contained in their Introductory Statement and paragraphs 1 through 155, as if fully set forth herein.

206.    The first paragraph of the first article of the New Jersey Constitution guarantees that all persons "have certain natural and unalienable rights" including the right of "acquiring, possessing, and protecting property[.]"  N.J. Const. art. I, ¶ 1.

207.    "Established procedures lie at the heart of due process and are as important to the attainment of ultimate justice as the factual merits of a cause."  *Band's Refuse Removal, Inc. v. Borough of Fair Lawn*, 62 N.J. Super. 522, 553 (App. Div. 1960), *supplemented,* 64 N.J. Super. 1 (App. Div. 1960).

208.    Governor Murphy's Executive Order 128, which nullifies contractual terms, makes law, and criminalizes otherwise lawful behavior through executive decree violates the Plaintiffs' right to due process under the New Jersey Constitution.

209.    Governor Murphy has also violated the Plaintiffs' right to due process by interfering with their right to protect their property through a private contract.

210.    Executive Order 128 violates the Plaintiffs' right to due process because it deprives them of their right to protect their property.  N.J. Const. art. I, ¶ 1.

211.    Plaintiffs have been damaged and continue to be damaged by the Defendants' conduct.  There is no adequate remedy at law, as no damages could compensate the Plaintiffs for the deprivation of their constitutional rights, and they will suffer serious and irreparable harm to their constitutional rights unless defendants are enjoined from enforcing Executive Order 128.

212.    Plaintiffs are entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

COUNT VII: UNLAWFUL WAIVER OF LAW
NEITHER STATUTE NOR CONSTITUTION AUTHORIZES GOVERNOR MURPHY TO WAIVE STATUTORY PROVISIONS

213. Plaintiffs reallege and incorporate by reference the allegations contained in their Introductory Statement and paragraphs 1 through 155, as if fully set forth herein.

214. Governor Murphy has no authority to waive duly enacted statutes. *Commc'ns Workers of Am.*, 413 N.J. Super. at 274 ("It is well settled that administrative regulations adopted by the Executive Branch cannot amend or repeal statutes.").

215. The Presentment Clause, N.J. Const. art. V, § 1, ¶ 14(a), requires that "[t]he Legislature, given its constitutionally delegated realm of authority … ha[s] to be part of th[e] law-making process." *Commc'ns Works of Am.*, 413 N.J. Super. at 272.

216. Executive Order 128 is predicated on Governor Murphy's assertion that he has statutory authority under the Emergency Health Powers Act, N.J.S.A. 26:13-1 *et seq.*; the Civilian Defense and Disaster Control Act, N.J.S.A App. A:9-33 *et seq.*; and the New Jersey Constitution to do what he has done. He does not.

217. As explained above, the Emergency Health Powers Act gives the Governor certain, specific, enumerated powers relating to health care and stopping the spread of pathogens. These powers have nothing to do with the waiver of security deposits for residential leases. *See supra* ¶¶ 42 – 50.

218. Similarly, the statutory provisions authorizing the Governor to control the New Jersey National Guard and state militia have nothing to do with the authority Governor Murphy claims in Executive Order 128 to alter the term of residential leases, nor do they authorize the Governor to waive statutory provisions relating to residential leases. *See supra* ¶¶ 51 – 52.

219. The Civilian Defense and Disaster Control Act vests no power in Governor Murphy to issue Executive Order 128.

220.    The specifically enumerated powers granted by the Civilian Defense and Disaster Control Act deal with the military defense, coordination between governments, and the taking of private property.  *See supra* ¶¶ 130 – 140.

221.    No provision of the Civilian Defense and Disaster Control Act comes close to encompassing the authority to alter the obligations of parties to residential leases or to suspend the applicability of laws.

222.    Without a statutory grant of authority, Governor Murphy fares no better in relying on the New Jersey Constitution.  No constitutional provision empowers the Governor to suspend the statutory provisions regulating security deposits.

223.    To the contrary, the New Jersey Constitution forbids the Governor from doing so.

224.    The New Jersey Constitution forbids the suspension of habeas corpus, which indicates that the Governor is without power to suspend laws.

225.    State constitutions, like the New Jersey Constitution, that provide for the suspension of habeas corpus in emergencies are understood to have vested that authority in the legislature.  *See* Hamburger, *supra* ¶ 142 at 1919; *see also* Tyler, *supra* ¶ 142.  In contrast to the legislature, the executive "could not, even during an emergency, seize property" or "constrain the natural liberty of persons who were within the protection of the law, unless [the executive] had legislative authorization." Hamburger, *supra* ¶ 142 at 1919.

226.    The New Jersey Constitution forbids the Legislature from passing any "law impairing the obligation of contract[] or depriving a party of any remedy for enforcing a contract which existed when the contract was made."  N.J. Const. art. IV, § VII, ¶ 3.  The Governor, who has no legislative authority, cannot use an executive fiat to accomplish legislative ends that the duly elected members of the Senate and General Assembly are constitutionally forbidden from enacting.

227.    With no applicable grant of statutory authority to suspend laws or alter contractual obligations, Governor Murphy cannot invoke a general constitutional authority to do that which he is otherwise without authority to do.  *See Home Bldg & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425 (1934) ("Emergency does not create power.  Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved.").

228.    Because Governor Murphy could not lawfully waive the application of N.J.S.A. 46:8-19 or the private leasehold contracts negotiated in reliance on those provisions, Executive Order 128 is void ab initio and must fail.

229.    Plaintiffs are entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

## COUNT VIII: VIOLATION OF THE SEPARATION OF POWERS
## EXECUTIVE ORDER 128 VIOLATES N.J. CONST. ART. III, § 1

230.    Plaintiffs reallege and incorporate by reference the allegations contained in their Introductory Statement and paragraphs 1 through 155, as if fully set forth herein.

231.    The New Jersey Constitution vests executive power in the Governor, N.J. Const. art. V, § 1, ¶ 1., and vests "plenary law-making authority" in "the State Senate and General Assembly." *Commc'ns Workers of Am.*, 413 N.J. Super. at 255 (citing N.J. Const. art. IV, § 1, ¶ 1).  Through this constitutional provision, "the people vested full sovereign authority in the Legislature, save as otherwise therein provided." *Gangemi*, 25 N.J. at 8-9.

232.    One legislative authority is the power to amend or repeal duly enacted laws.  *See Commc'ns Workers of Am.*, 413 N.J. Super. at 274.

233.    The New Jersey Constitution provides explicitly for the separation of powers.  N.J. Const. art. III, ¶ 1.

234.    When one branch aggrandizes its own power unilaterally—including when the Governor does so through an executive order—New Jersey courts apply a strict standard of review. *Commc'ns Workers of Am.*, 413 N.J. Super. at 258-59.

235.    A clear indication that the Governor has acted beyond his statutory grant of authority is when the statutory schemes that he invokes as the source of his authority are detailed and numerous but omit the specific type of action the Governor attempts to take. *See id.* at 271 (reasoning that the Legislature's "omission of labor organizations and collective bargaining agreements" was "self-evident" from the statutory scheme).

236.    The courts must hold invalid an executive action that goes beyond the Governor's grant of authority, such that it is "fundamentally incompatible" with "existing laws and statutes as to impair the 'essential integrity' of the constitutional powers of the Legislature." *Id.* at 274.

237.    Governor Murphy has unilaterally waived or modified numerous validly enacted laws without legislative authorization.

238.    Thus, Governor Murphy's unilaterally waiving or amending of valid legislative enactments violated the separation of powers, so his actions are void ab initio and must fail.

239.    Plaintiffs are entitled to a declaratory judgment and injunctive relief invalidating and restraining enforcement of Executive Order 128.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief against Defendants:

A.    Issuance of a declaratory judgment that Executive Order 128 violates the Contracts Clause of the United States Constitution by interfering with the contractual rights and obligations of residential landlords and tenants in New Jersey.

B.      Issuance of a declaratory judgment that the statutory and constitutional sources of authority that Governor Murphy invoked in enacting Executive Order 128 do not empower the Governor to waive or modify laws or contracts relating to residential leases.

C.      Issuance of a declaratory judgment that Executive Order 128 violated the Plaintiffs' right to due process.

D.      Issuance of a declaratory judgment that Executive Order 128 denied the Plaintiffs the equal protection of the law.

E.      Issuance of a declaratory judgment that Executive Order 128 denied the Plaintiffs the privileges and immunities guaranteed to citizens of the United States.

F.      Issuance of a declaratory judgment that Executive Order 128 violates the Contracts Clause of the New Jersey Constitution by interfering with the contractual rights and obligations of residential landlords and tenants in New Jersey.

G.      Issuance of a declaratory judgment that Executive Order 128 violates the separation of powers by waiving or amending law.

H.      Issuance of a declaratory judgment that Executive Order 128 is void ab initio.

I.      Issuance of permanent injunctive relief prohibiting Governor Murphy, Attorney General Grewal, and Commissioner Persichilli from enforcing Executive Order 128.

J.      For an award for all reasonable attorneys' fees incurred herein, as applicable, pursuant to 42 U.S.C. § 1988.

K.      For costs of this suit incurred herein, as applicable.

L.      For such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs Matthew Johnson; Charles Kravitz, Dawn Johanson-Kravitz, and Little Harry's LLC; Margarita Johnson, John Johnson, and Two Bears Property Management; and Andrew Van Hook and

Union Lake Enterprises, LLC hereby demand a trial by jury on all issues triable by jury in the above-entitled action.

Dated:  September 24, 2020                    Respectfully Submitted,

*Kara Rollins*
_____

KARA ROLLINS (Attorney ID 107002014)
Litigation Counsel
HARRIET HAGEMAN (*Pro Hac Vice*)
Senior Litigation Counsel
JARED MCCLAIN (*Pro Hac Vice*)
Staff Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone:      (202) 869-5210
Facsimile:       (202) 869-5238
Kara.Rollins@ncla.legal
THE LAW OFFICES OF TERENCE J. SWEENEY, ESQ.
TERENCE J. SWEENEY
44 Fairmount Avenue, Suite 1
Chatham, New Jersey 07928
sweeneylawfirm@optonline.net
(973) 665-0400

*Counsel to Plaintiffs*

## <u>VERIFICATION</u>

I, Matthew Johnson, am a plaintiff in this proceeding.  I have read this complaint and hereby verify that the contents are true and correct to the best of our knowledge, information, and belief, this 30th day of June 2020.


_Matthew Johnson_
Matthew Johnson

## VERIFICATION

We, Charles Kravitz and Dawn Johanson-Kravitz, the owners of Little Harry's LLC, are plaintiffs in this proceeding.  On behalf of ourselves and our business, we have read this complaint and hereby verify that the contents are true and correct to the best of our knowledge, information, and belief, this 30th day of June 2020.


_____
Charles Kravitz


_____
Dawn Johnson-Kravitz

## **VERIFICATION**

We, Margarita and John Johnson, the co-trustees of the Johnson Family Trust, doing business as Two Bears Property Management, are plaintiffs in this proceeding. On behalf of ourselves and our business, we have read this complaint and hereby verify that the contents are true and correct to the best of our knowledge, information, and belief, this 30th day of June 2020.

Margarita Johnson

John Johnson

**VERIFICATION**

I, Andrew Van Hook, the managing member of Union Lake Enterprises, LLC, am a plaintiff in this proceeding.  On behalf of myself and my business, I have read this complaint and hereby verify that the contents are true and correct to the best of our knowledge, information, and belief, this 30th day of June 2020.

Andrew Van Hook