UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| MATTHEW JOHNSON et al., <br><br> Plaintiffs, <br><br> v. <br><br> PHILIP D. MURPHY, in his official capacity as Governor of New Jersey; GURBIR S. GREWAL, in his official capacity as New Jersey Attorney General; and JUDITH M. PERSICHILLI, in her official capacity as Commissioner of the New Jersey Department of Health, <br><br> Defendants. | HON. NOEL L. HILLMAN, U.S.D.J. <br> HON. JOEL SCHNEIDER, U.S.M.J. <br><br> Civil Action No. <br> 1:20-cv-06750-NLH-JS <br><br><br> Motion Returnable: November 2, 2020 |

---

BRIEF IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

---

Jeremy M. Feigenbaum
State Solicitor
   Of Counsel and On the Brief

Stuart M. Feinblatt
Assistant Attorney General
   Of Counsel and On the Brief

Heather Lynn Anderson
Rachel Simone Frey
Tim Sheehan
Deputy Attorneys General
   On the Brief

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
R. J. Hughes Justice Complex
25 Market Street
P.O. Box 106
Trenton, New Jersey  08625
*Attorney for Defendants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………….....ii

PRELIMINARY STATEMENT……………………………………………………...1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY…..…....4

STANDARD FOR MOTION TO DISMISS…………………………………...13

ARGUMENT………………………………………………………………...14

POINT I

PLAINTIFFS' STATE LAW THEORIES AND CAUSES OF
ACTION ARE BARRED BY SOVEREIGN IMMUNITY………....……14

POINT II

EXECUTIVE ORDER 128 IS A PERMISSIBLE EXERCISE OF THE
POLICE POWERS UNDER THE CONTRACTS CLAUSE…..………..18

A. EO 128 Does Not Substantially Impair Plaintiffs'
Contractual Rights…………………………………………………...19

B. EO 128 Reasonably Furthers the State's Legitimate
Purpose………………………….......................................................27

C. In the Alternative, As Other Courts Have Held, Plaintiffs'
Contract Clause Claim Is Not Cognizable Under
§1983…………………...33

POINT III

PLAINTIFFS' REMAINING CLAIMS LACK MERIT………………..35

CONCLUSION…..………………………………………………………40

# TABLE OF AUTHORITIES

**Cases**

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ................................18

*Alvin v. Suzuki*, 227 F.3d 107 (3d Cir. 2000).........................................................37

*Am. Express Travel Related Servs. v. Sidamon-Eristoff*, 669 F.3d 359 (3d. Cir. 2012) ............................................................................................................. 19, 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................14

*Auracle Homes, LLC v. Lamont*, 2020 WL 4558682
 (D. Conn. Aug. 7, 2020) .......................................................................... 16, 20, 24

*Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249 (3d Cir. 2010) ........................35

*Brontel, Ltd. v. City of N.Y.*, 571 F. Supp. 1065 (S.D.N.Y. 1983) .........................23

*Brownstone Arms v. Asher*, 121 N.J. Super. 401 (Cty. D. Ct. 1972).......................25

*Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362 (2d Cir. 2006) ........................ 18, 29

*Carter v. Greenhow*, 114 U.S. 317 (1885)..............................................................34

*Crosby v. City of Gastonia*, 635 F.3d 634 (4th Cir. 2011) ............................... 33, 34

*Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411 (3d Cir. 2001) ...............14

*Elmsford Apartment Assocs., LLC v. Cuomo*, 2020 WL 3498456
 (S.D.N.Y. June 29, 2020)............................................................................. passim

*Farmer v. Philadelphia Elec. Co.,* 329 F.2d 3 (3d Cir. 1964)................................27

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993)) ...........................................39

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ....................................14

*Gateway Apartments, Inc. v. Mayor & Township Council of Nutley*, 605 F. Supp. 1161 (D.N.J. 1985) .............................................................................23

*Haddad v. Kassas*, 2012 WL 5632735 (N.J. Sup. Ct. App. Div. 2012)..................22

*HAPCO v. City of Phila.*, 2020 WL 5095496 (E.D. Pa. Aug. 28, 2020).......... 24, 31

*Hartman v. Acton*, 2020 WL 1932896 (S.D. Ohio Apr. 21, 2020) .........................37

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) .......................... 30, 31

*Ieradi v. Mylan Labs, Inc.*, 230 F.3d 594 (3d Cir. 2000).......................................13

*In re Abbott*, 956 F.3d 696 (5th Cir. 2020) ...........................................................16

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997)...............14

*In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314 (3d Cir. 2002)...................................13

*In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262 (3d Cir. 2016) .............12

*In re PennEast Pipeline Co., LLC*, 938 F.3d 96 (3d Cir. 2019) ..............................15

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982)...............................................................................................12

*Kaminski v. Coulter*, 865 F.3d 339 (6th Cir. 2017) .......................................... 33, 34

*King v. Christie*, 981 F. Supp. 2d 296 (D.N.J. 2013) .............................................16

*L.A. v. Hoffman*, 144 F. Supp. 3d 649 (D.N.J. 2015) .............................................39

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982)...........................................37

*Matsuda v. City of Honolulu*, 512 F.3d 1148 (9th Cir. 2008) .................................18

*Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008) ................................38
*Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Castille*,
  799 F.3d 216 (3d Cir. 2015)....................................................................38

*Nicholas v. Pa. State Univ.*, 227 F.3d 133 (3d Cir. 2000) ........................36

*Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237 (3d Cir. 1987).......... 27, 29

*Pa. Fed'n of Sportsmen's Clubs v. Hess*, 297 F.3d 310 (3d Cir. 2002) .................15

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)...........................16

*Pension Benefit Gaur. Corp. v. White Consol. Indus.*, 998 F.2d 1192
  (3d Cir. 1993)...........................................................................................13

*Philips v. Cty of Allegheny*, 515 F.3d 224 (3d Cir. 2008).........................14

*Pryor v. NCAA*, 288 F.2d 548 (3d. Cir. 2002) .........................................13

*Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533 (2002) ...............16

*Rogin v. Bensalem Twp.*, 616 F.2d 680 (3d Cir. 1980)............................36

*S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) .......34

*Saenz v. Roe*, 526 U.S. 489 (1999) .........................................................38

*Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639 (3d Cir. 1995). .......38

*SH3 Health Consulting, LLC v. St. Louis Cty. Exec.*, 2020 WL 2308444
  (E.D. Mo. May 8, 2020);................................................................ 36, 38

*South Hamilton Associates v. Morristown*, 99 N.J. 437 (1985) .............30

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) ...............................................34

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*,

560 U.S. 702 (2010) ............................................................................35

*Sveen v. Melin*, 138 S. Ct. 1815 ................................................ 18, 19, 27

*Troy, Ltd. v. Renna,* 727 F.2d 287 (3d Cir. 1984) ...................................... 22, 23, 27

*UA Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003)...............36

*United States v. Fla. E. C. R. Co.*, 410 U.S. 224 (1973)...........................................37

*United States v. Florida E. C. R. Co.*, 410 U.S. 224 (1973)....................................37

*United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Virgin Islands*, 842 F.3d 201 (3d Cir. 2016) ........ passim

*Watters v. Board of School Directors of City of Scranton*, 2020 WL 5626539 (3d Cir. Sept. 21, 2020) ............................................................................33

## **Statutes**

42 U.S.C. § 1983 ................................................................................ 33, 34

N.J. Stat. Ann. § 46:8-1..............................................................................21

N.J. Stat. Ann. § 46:8-19.1.........................................................................22

N.J. Stat. Ann. § 46:8-21.1.........................................................................22

N.J. Stat. Ann. § 46:8-21.2.........................................................................21

N.J. Stat. Ann. §§ 26:13-1..........................................................................5

N.J. Stat. Ann. App. §§ A:9-33...................................................................5

## **Rules**

Federal Rule of Civil Procedure 12(b)(1) ...................................................13

## **PRELIMINARY STATEMENT**

COVID-19, and the enormous public health and economic crises it has caused, need no introduction. New Jersey has felt the effects of this pandemic acutely. The virus has caused over 14,000 deaths in New Jersey, and there have been over 200,000 confirmed cases in the state. And the virus, along with the response it has required, has led to an economic catastrophe too. To protect the lives of its residents and curtail the spread of the disease, New Jersey, like other states and like countries all across the world, took unprecedented measures to limit person-to-person contact, including through requiring the closure of a vast number of businesses where the population congregates. Out of necessity, and through no fault of their own, that meant over a million New Jersey residents were suddenly without employment, and those lucky enough to still have a job often nevertheless suffered a substantial loss in income. These residents face the challenges of finding a way to support themselves and their families and maintain stable housing amidst the uncertainty that surrounds COVID-19—challenges that will likely continue into the future.

To confront this once-in-a-century public health and economic calamity, New Jersey took a series of temporary but important steps to help its residents make ends meet. In particular, the State has announced a comprehensive range of measures to address the crisis's impact on the ability of homeowners to pay their mortgages, and of tenants to pay their rent, including funding for landlords whose tenants have

1

missed rent payments, a new mortgage relief program, and the postponement of evictions. The Governor also issued Executive Order 128, which temporarily allows the State's residential tenants to use their security deposit towards rent. That change is a modest one: tenants are still liable to pay all rents due, tenants are still liable for damage to the property that any security deposit would cover, and if a tenant's lease is renewed, she must replenish that security deposit in full. But for those tenants who cannot pay their bills during this crisis, the Executive Order provides necessary relief to ensure that they can go another month while still putting food on their families' tables and paying for necessary expenses, including medical bills. And by helping its residents avoid mounting rental debt and late fees, the State helped reduce the risk of a wave of evictions when this ongoing public health emergency ends.

Plaintiffs want this Court to step in and strip the State of its power to take this temporary and limited step to protect its residents from crushing debt and economic insecurity in the midst of a pandemic. But as every court to consider the question to date has held, Plaintiffs' claims fall far short. Plaintiffs' primary federal claim argues that the State cannot temporarily allow residents to use their security deposit without contravening landlord-tenant agreements, and that the Contracts Clause stands in the way. That is wrong: the Contracts Clause does not stop states from taking temporary measures to benefit the general public as they address the fallout from an emergency. Instead, the Contracts Clause is triggered only by a state law that has a "substantial"

impairment on contracts, and a temporary rule that expands the permissible uses of a security deposit, while leaving tenants liable both for rent and for damages, cannot qualify. Still more, under the Contracts Clause, a state law is valid if it reasonably advances an important public interest. It is hard to imagine a more important public purpose than addressing the economic needs of the populace in an emergency, and avoiding a wave of evictions that would otherwise follow.

Nor do any of Plaintiffs' remaining claims fare better. What Plaintiffs seem to really want is a ruling from this Court that the Governor overstepped his authority under *state* law in addressing this emergency. This is why four of Plaintiffs' claims allege violations of New Jersey constitutional and statutory law, and why even their federal law claims are infused with arguments about the Governor's power to take this action under New Jersey's statutes. But, of course, the State maintains sovereign immunity in federal court against state law claims, so they have no place here. Nor do Plaintiffs get further by challenging this reasonable economic measure on Due Process, Equal Protection, and Privilege or Immunities grounds. It thus comes as no surprise that other federal courts have rejected analogous arguments.

The Constitution allows New Jersey to take this temporary measure to protect its residents in the midst of this unprecedented, widespread crisis. This Court should join the other judges to address these issues and reject Plaintiffs' claims.

## **COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY**[1]

### A.    **COVID-19's Spread and New Jersey's Emergency Response.**

Coronavirus disease 2019 ("COVID-19") is a contagious, and at times fatal, respiratory disease caused by the "severe acute respiratory syndrome coronavirus 2" virus, or "SARS-CoV-2." Symptoms of the illness include fever, cough, and shortness of breath, which may appear in as few as two or as many as 14 days after exposure. *See, e.g.,* Centers for Disease Control and Prevention ("CDC"), Coronavirus Disease 2019 – Frequently Asked Questions, available at https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited September 30, 2020). The pernicious disease spreads "from person to person, mainly through respiratory droplets produced when an infected person coughs, sneezes or talks."   https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last visited September 30, 2020). And it can spread even though the COVID-19 carrier may be asymptomatic or have only mild, cold-like symptoms, and thus be unaware that they are infected. *Id.*

As state and federal officials have recognized, COVID-19 represents a public health emergency unprecedented in modern times. On January 31, 2020, the United States declared a public health emergency in light of COVID-19. *See* U.S. Dep't of Health and Human Services, Determination that a Public Health Emergency Exists

---

[1] The Statement of Facts and Procedural History are combined for convenience.

4

(Jan. 31, 2020). On March 13 and on March 18, 2020, President Trump declared an emergency under Sections 201 and 301 of the National Emergencies Act, 50 U.S.C. § 1601-1651, and under Sections 401 and 501 of the Stafford Act on March 13, 42 U.S.C. § 5121-5207. These declarations remain in effect today.

As of the filing of this brief, worldwide 33,700,008 confirmed COVID-19 cases have been reported, and at least 1,008,874 lives have been lost. John Hopkins University, Coronavirus Resource Center, available at https://coronavirus.jhu.edu/ (last visited September 30, 2020). The United States unfortunately remains at the center of the pandemic, with more confirmed cases (7,191,406) and deaths (206,005) than in any other nation. *Id.* Its impact in New Jersey was, from the onset, especially acute: there have been 204,563 confirmed cases and 14,326 deaths in New Jersey alone. *See* N.J. COVID-19 Information Hub, available at https://covid19.nj.gov (last visited September 30, 2020).

In response to the pandemic, Governor Phil Murphy exercised his powers under the Disaster Control Act ("DCA"), N.J. Stat. Ann. App. §§ A:9-33 to -63, and the Emergency Health Powers Act ("EHPA"), N.J. Stat. Ann. §§ 26:13-1 to -31, and declared a public health emergency and a state of emergency on March 9, 2020. *See* N.J. Exec. Order 103. Relying on that authority, the Governor adopted a series of measures to limit the spread of COVID-19 in New Jersey and to save lives.

Of the more than five dozen orders that the Governor has issued in response to COVID-19, Executive Orders 104 and 107 are especially relevant. Among other things, the former mandated the closure to the public of schools, casinos, racetracks, gyms, restaurants and bars (except takeout and delivery), and entertainment centers across the state. *See* N.J. Exec. Order 104 ("EO 104") (Mar. 16, 2020). EO 107 went further, closing all non-essential businesses to the public, including retail businesses, personal care services, and recreational businesses. *See* N.J. Exec. Order 107 ("EO 107") (Mar. 21, 2020). EO 107 also required that New Jersey residents, with limited exceptions, remain at their residence. *Id.* These orders remained in effect for months, and even now, a wide range of business establishments that present a risk of COVID-19 spread remain subject to capacity restrictions. These orders are consistent with the actions of the vast majority of governors across the nation, and they were based on the consistent recommendations of public health experts.

## B.    Economic Impact of COVID-19.

The need for social distancing, and the related closures, had an immediate and ongoing impact on the national economy. Indeed, during the second quarter of this year, Gross Domestic Product ("GDP") fell by 32.9% on an annualized basis, a rate "unprecedented in its speed and breathtaking in its severity." Ben Casselman, *The U.S. Economy's Contraction in the Second Quarter was the Worst on Record*, N.Y. TIMES (July 30, 2020), available at https://www.nytimes.com/live/2020/07/30/

business/stock-market-today-coronavirus#the-us-economys-contraction-in-the-second-quarter-was-the-worst-on-record. That dramatic fall was one of the steepest in modern American history, comparable to the collapse that occurred during the Great Depression and the demobilization after World War II. *Id.*

At the same time, unemployment has skyrocketed. While the unemployment rate in New Jersey hovered around 3.7% for the first three months of the year, it rose to 16.3% in April and stayed in that range in May, June, July and August. *See* U.S. Dep't of Labor, Bureau of Labor Statistics, "Economy at a Glance - New Jersey," available at https://www.bls.gov/eag/eag.nj.htm (last visited September 30, 2020). The number of individuals who claimed weekly benefits between March 15 and June 27 was over one million, by far the largest volume served by the New Jersey Labor Department in such a short time period. *See* N.J. Dep't of Labor & Workforce Dev.: Unemployment Payments to NJ Workers Exceed $9B (July 2, 2020), available at https://www.nj.gov/labor/lwdhome/press/2020/20200702_paymentsupdate.shtml. As of this August, 13,300 New Jersey workers had exhausted their unemployment benefits completely. *See* N.J. Dep't of Labor & Workforce Dev.: NJ Sees 41% Drop in New Unemployment Apps. (Aug. 6, 2020), available at https://www.nj.gov/labor/lwdhome/press/2020/20200806_paymentsupdate.shtml.

C.     **New Jersey's Economic Response and Executive Order 128.**

Recognizing that the pandemic and economic crisis presented new challenges for homeowners and renters, the State took a number of measures to help mitigate the risk of housing insecurity. With respect to homeowners, in March the Governor announced a statewide Residential Mortgage Relief program, in which over 175 state and national financial institutions—including banks, credit unions, and mortgage companies—agreed to provide a 90-day grace period for mortgage payments, waive mortgage-related late fees, and start no new foreclosure sales during that period. *See* N.J. Dep't of Banking & Ins., COVID-19 & Residential Mortgage Relief, available at https://www.state.nj.us/dobi/covid/mortgagerelief.html (last accessed September 30, 2020). For landlords, the Governor announced the Small Landlord Emergency Grant Program, a 25 million dollar grant program under which small residential rental property owners could be reimbursed for lost rent revenue due to COVID-19 between April and July 2020. *See* N.J. Housing & Mortgage Finance Agency, "Small Landlord Emerg. Grant Program," available at https://www.nj.gov/dca/hmfa/rentals/sleg/index.shtml (last accessed September 30, 2020).

The Governor also issued two Executive Orders that affect renters, to address their challenges making rent payments given the unanticipated and sharp loss of jobs and income. First, on March 19, 2020, the Governor issued Executive Order 106 to place a temporary emergency moratorium on evictions. The Governor identified that

8

"many New Jerseyans are or will be experiencing substantial loss of income as a result of business closures, reductions in hours, or layoffs related to COVID-19, impeding their ability to keep current on rent and mortgage payments." N.J. Exec. Order 106 ("EO 106"). Serious consequences would inexorably follow: "removals of residents pursuant to evictions or foreclosure proceedings can increase the risk to those residents of contracting COVID-19, which in turn increases the risks to the rest of society and endangers public health." *Id.*; *see also id.* (adding that "housing security and stability are important to public health, particularly as homelessness can increase vulnerability to COVID-19").

As a result, the Governor suspended removal actions resulting from eviction proceedings in the State until two months after the ongoing emergency has ended. *See id.* (establishing that while EO 106 is in effect, "[a]ny lessee, tenant, homeowner or any other person shall not be removed from a residential property as the result of an eviction or foreclosure proceeding"). But the Governor qualified the reach of EO 106 in two important and relevant ways. The Order first made clear that despite the evictions moratorium, "This Order does not affect any schedule of rent that is due." *Id.* Moreover, although there was a time-limited pause on actual eviction, "eviction and foreclosure proceedings may be initiated or continued during the time this Order is in effect." *Id.*; *see also* N.J. Supreme Court, *Notice & Order – COVID-19 – Fourth Omnibus Order On Court Operations & Legal Practice* ¶ 4 (June 11, 2020),

9

available at https://www.njcourts.gov/notices/2020/n200612a.pdf (noting that while landlord/tenant cases were placed on hold at the beginning of the pandemic, courts began again processing landlord/tenant matters on June 15, 2020).

As this crisis worsened in New Jersey, the Governor issued Executive Order 128 to help renters still struggling despite EO 106. In explaining his decision to take further action, the Governor concluded that "tenants may be suffering from one or more financial hardships that are caused by or related to the COVID-19 pandemic, including but not limited to a substantial loss of or drop in income, and additional expenses such as those relating to necessary health care." N.J. Exec. Order 128 ("EO 128"); *see also id.* (noting, "as of April 13, 2020, there were 856,528 unemployment claims filed by New Jerseyans over the previous five weeks"). The Governor noted that these tenants, who were largely protected from removal, would still be subject to eviction proceedings, and thus there was an "increased risk" of mass evictions all across the state "no later than two months after the end of the" emergency. *Id.* Still more, he explained, "individuals may face other consequences from a late payment of rent, including interest and late fees, which they may be unable to satisfy in light of their substantial loss of income, as well as negative credit reports that may affect their ability to find housing options in the future." *Id.*

After making these findings, the Governor identified a temporary way to help tenants make the rent payments they owed to landlords. As the Governor explained,

under New Jersey law, "a security deposit and the accumulated interest and earnings on the investment of such deposit remain the property of the tenant." *Id.* (citing N.J. Stat. Ann. § 46:8-19). While security deposits were highly regulated by New Jersey law, including the purposes for which they could be used, the Governor noted that "enabling individuals to pay portions of their rent with the security deposit they own will allow those individuals to mitigate the consequences regarding evictions and accumulation of interest and late fees upon termination of Executive Order No. 106 (2020)." *Id.* The Governor thus amended the state rules governing security deposits to allow New Jersey tenants to use "a security deposit governed by the provisions of N.J. Stat. Ann. § 46:8-19 et seq., as well as the tenant's portion of the interest and/or earnings accumulated thereon … towards rent payments due." *Id.*

The Executive Order, however, also made clear that landlords should not be made financially worse off by this change. And so the Governor qualified the Order in three ways. First, EO 128 established that "[t]he landlord may recoup from the tenant any monies the landlord expended that would have been reimbursable by the security deposit and interest or earnings thereon, at the time that such reimbursement from the deposit and interest or earnings thereon would have taken place." *Id.* In other words, the landlord was legally entitled to precisely the same money from the tenant for any damages as before. Second, EO 128 also established that tenants "shall be obligated to replenish the security deposit in full" if they renew the lease. *Id.* And

third, EO 128 was time-limited to address the concerns of making rent payments and homelessness during and right after the emergency: it only applied to payments "due to become due from the tenant during the Public Health Emergency … or up to 60 days after the Public Health Emergency terminates." *Id.*

## D.     Plaintiffs' Lawsuit.

Plaintiffs are six individuals and three businesses who own properties in New Jersey that they lease to residential tenants. *See* Dkt. 15 ("Amended Complaint"), ¶¶ 3-6. Plaintiffs allege that their tenants paid security deposits of varying amounts in connection with their leases, and some Plaintiffs allege their tenant has requested to apply the deposit to unpaid rent.[2] *See id.*, ¶¶ 18, 24(c), 28(c), 33(c).

On June 2, 2020, about five weeks after EO 128 took effect, Plaintiff Matthew Johnson filed a complaint seeking a declaratory judgment and injunctive relief. *See* Dkt. 1. Plaintiff Johnson's Complaint alleged that the State's emergency orders to respond to COVID-19, in particular EO 128, violate the Federal and State Contracts Clause (Counts I and V), Federal and State Substantive and Procedural Due Process (Counts II and VI), Federal Equal Protection (Count III), Privilege & Immunities

---

[2] Given the limited facts Plaintiffs provide about their respective tenants' requests to apply a security deposit to unpaid rent, it is unclear that any Plaintiff has suffered an Article III injury-in-fact. *See In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016) (discussing elements of Article III standing). Therefore, the State reserves the right to contest Plaintiffs' standing should the Court allow any of their claims to proceed and should further factual development be had. *See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

(Count IV), and other provisions of New Jersey state law (Counts VII and VIII). *Id.* On June 30, 2020, Plaintiff Johnson filed an amended complaint adding eight new plaintiffs. *See* Dkt. 24. This Court granted Plaintiffs' motion for leave to file the Amended Complaint on September 23, 2020. Dkt. 23.

## <u>STANDARD FOR MOTION TO DISMISS</u>

Under Federal Rule of Civil Procedure 12(b)(6), a court may grant a motion to dismiss when a complaint fails to state a claim upon which relief can be granted. In deciding a motion to dismiss, a court may consider the complaint, *Pension Benefit Gaur. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993), and any documents "referred to in the plaintiff's complaint and are central to the claim." *Pryor v. NCAA*, 288 F.2d 548, 560 (3d. Cir. 2002). The court may also consider matters of public record, which include "published reports of administrative bodies" and any publicly available records whose accuracy cannot be reasonably questioned. *Pension Ben. Guar. Corp.*, 998 F.2d at 1997; *see also, e.g., In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (considering "stock price data compiled by the Dow Jones news service"); *Ieradi v. Mylan Labs, Inc.*, 230 F.3d 594, 598 n.2 (3d Cir. 2000) (taking judicial notice of publicly filed documents).

While courts must accept as true the factual allegations in the complaint, *see Philips v. Cty of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008), they do not "credit a complaint's 'bald assertions' or 'legal conclusions.'" *In re Burlington Coat Factory*

*Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997). To the contrary, the reviewing court looks to see whether the pleadings and legal conclusions "are supported by factual allegations," and then determines whether those allegations, if true, "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). As the Third Circuit put it, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

Finally, if a state defendant has sovereign immunity relating to any claims in the complaint, the court must dismiss them under Rule 12(b)(1). *See Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 420 (3d Cir. 2001).

## ARGUMENT

## I.   PLAINTIFFS' STATE LAW THEORIES AND CAUSES OF ACTION ARE BARRED BY SOVEREIGN IMMUNITY.

Plaintiffs base much of their legal theory in this case on New Jersey law. First, Plaintiffs allege that EO 128 violates a smorgasbord of New Jersey constitutional and statutory provisions. *See* Amended Complaint, Count V (violation of contractual rights under N.J. constitution); *id.*, Count VI (violation of due process under N.J. constitution); *id.*, Count VII (violation of N.J. statutes); *id.*, Count VIII (violation of N.J. separation of powers). Second, even Plaintiffs' federal claims are infused with arguments regarding state law. Count II alleges a violation of the federal Due Process Clause based on allegations that the Governor issued EO 128 "[w]ithout following

the state's established procedures" and in violation of a state statute. *Id.*, ¶¶ 181-83. Plaintiffs' Contracts Clause claim is based in part on allegations that the Governor unlawfully "unilaterally waive[d] the application of certain statutory provisions," and that EO 128 is "not properly vetted and adopted" pursuant to state rules. *Id.*, ¶¶ 163, 169. And Plaintiffs' Equal Protection claim is premised on the allegation that the Governor improperly exercised legislative power. *Id.*, ¶ 189.

None of the state law claims are properly before this Court, however, because of New Jersey's sovereign immunity. It is black letter law that "States are not subject to suit in federal court unless they have consented to suit." *In re PennEast Pipeline Co., LLC*, 938 F.3d 96, 103 (3d Cir. 2019). Plaintiffs cannot point to any exception that would allow their state law causes of action to proceed. While litigants can seek injunctive relief in federal court to prevent violations of *federal* law by state officials, *Pa. Fed'n of Sportsmen's Clubs v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002), no such exception exists for claims under *state* law. Instead, as this Court has held repeatedly, a plaintiff suing in federal court "may not bring state law claims—including state constitutional claims—against the State regardless [of] the type of relief it seeks," including relief against a state official acting in his official capacity. *King v. Christie*,

15

981 F. Supp. 2d 296, 310 n.12 (D.N.J. 2013) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984)). These claims must be dismissed.[3]

Nor can such allegations regarding state law compliance play any role in this Court's evaluation of the federal law claims. Under *Pennhurst*, federal courts may not grant any relief based on arguments that state officials failed "to conform their conduct to state law." 465 U.S. at 106; *see also In re Abbott*, 956 F.3d 696, 721 (5th Cir. 2020) ("[T]o the extent the TRO might be construed to order relief on a claim that state officials failed to conform their actions to state law, the TRO would violate *Pennhurst*."). While this Court has jurisdiction to review the federal law claims, the state law arguments, which lack merit, must play no role in the analysis.

That is why two other federal courts recently refused to entertain allegations that analogous executive orders were in violation of the respective states' laws. *See Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-4062, 2020 WL 3498456, at *6 (S.D.N.Y. June 29, 2020) (reviewing order that temporarily permits tenants to apply their security deposit to unpaid rent, and rejecting challenge that the order violated New York law); *Auracle Homes, LLC v. Lamont*, No. 20-829, 2020 WL 4558682, at *12 (D. Conn. Aug. 7, 2020) (rejecting challenge that analogous Connecticut order

---

[3] Plaintiffs urge this Court to hear these claims under the doctrine of supplemental jurisdiction, but it is again well established that "supplemental jurisdiction does not authorize district courts to exercise jurisdiction over claims against nonconsenting states." *King*, 981 F. Supp. 2d at 310 n.12; *see also, e.g., Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 540-41 (2002) (same).

violated state law under Eleventh Amendment). As *Elmsford* explained, regardless of whether the "Governor has overstepped his authority under [state law], curing those alleged harms would require this Court to ignore the doctrine of state sovereign immunity and principles of federalism." *Elmsford*, 2020 WL 3498456, at *6. This Court must thus reject the state law claims and any federal theory that endeavors to shoehorn alleged violations of state law into federal court.

## II.   EXECUTIVE ORDER 128 IS A PERMISSIBLE EXERCISE OF THE POLICE POWER UNDER THE CONTRACTS CLAUSE.

Plaintiffs' primary federal claim, that EO 128 violates the Contracts Clause of the U.S. Constitution, falls short. As federal courts have held time and again, while "the Clause speaks in absolute terms, it is not 'the Draconian provision that its words might seem to imply.'" *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Virgin Islands*, 842 F.3d 201, 210 (3d Cir. 2016) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978)). Rather, the Clause "'does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public,' even though contracts previously entered into may be affected." *Id.* (citation omitted). Simply put, "the Contract Clause 'does not trump the police power of a state to protect the general welfare of its citizens.'" *Id.* (quoting *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006)); *see also Matsuda v. City of Honolulu*, 512 F.3d 1148, 1152 (9th Cir. 2008) (noting "the Supreme Court

17

has construed this prohibition narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively").

EO 128, which reflects New Jersey's use of its police power to temporarily protect its residents during a public health and economic crisis, passes muster. As a matter of hornbook law, a court can invalidate a law under the Contracts Clause only if a challenger can satisfy a two-step test. *See Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). First, the challenger needs to show that "the law has operated as a *substantial impairment* of a contractual relationship." *United Steel*, 842 F.3d at 210 (emphasis added). Where there has been no such impairment, the inquiry is at an end, and the law withstands such challenge. But even if there has been such impairment, the court assesses the "means and ends" of the rule, and the court asks "whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen*, 138 S. Ct. at 1822. So long as the law does so, it must again be upheld under the Contracts Clause. In this case, Plaintiffs' argument fails at both of these steps: EO 128 does not substantially impair their contractual rights, and even if it did, it reasonably advances a significant public purpose.

## A. EO 128 Does Not Substantially Impair Plaintiffs' Contractual Rights.

As the Supreme Court has held, whether a law operates to substantially impair a contractual relationship depends on "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents

the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822; *see also Am. Express Travel Related Servs. v. Sidamon-Eristoff*, 669 F.3d 359, 369 (3d. Cir. 2012). These factors cut squarely against Plaintiffs.

> #### i.   EO 128 Does Not Undermine The Parties' Reasonable Expectations.

In determining whether a contract has been substantially impaired, this Court must assess "'the legitimate expectations of the contracting parties,' and whether the modification imposes an obligation or liability that was unexpected at the time the parties entered into the contract and relied on its terms." *Sidamon-Eristoff*, 669 F.3d at 369 (citation omitted). One of the most important "factor[s] in determining the substantiality of any contractual impairment is whether the parties were operating in a regulated industry." *Id.* That is because when a party enters into an industry that is regulated heavily, any reasonable party would foresee that changes in the regulation can affect its future contractual relationship. *Id.*; *see also, e.g., Elmsford*, 2020 WL 3498456, *13 (noting that "a long line of cases teaches that the foreseeability of an impairment on contractual rights, and therefore the extent to which such impairment qualifies as substantial, is affected by whether the relevant party operates in a heavily regulated industry"). As one scholar put the point, "[p]arties should understand that changes in laws are likely within contexts subject to existing regulations, and such changes are therefore unlikely to violate the Contracts Clause." William J. Rich, *Modern Constitutional Law* §17:27, at 693-94 (3d ed. 2011). Simply put, such "past

regulation puts industry participants on notice that they may face further government intervention in the future," *Elmsford*, 2020 WL 3498456, *13, and the risk of that regulatory activity is priced into the contracting process, *id.* at *12.

This doctrine undermines Plaintiffs' claims considerably because there can be no dispute that residential leases are "heavily regulated." *Id.*; *Auracle Homes*, 2020 WL 4558682, *17 (same). Indeed, Plaintiffs' own Amended Complaint concedes as much. Dkt. 24, ¶¶ 86-88. The Legislature has adopted detailed statutes governing residential leases, covering items as diverse as rent payments and recourse to state court. *See* N.J. Stat. Ann. §§ 46:8-1 to -51. As most relevant here, security deposits are especially highly regulated, even within that broader context of landlord-tenant relationships. There is a specific statute, the Security Deposit Act ("SDA"), that lays out how much a security deposit must be, who possesses it, where it must be kept, how it must accrue interest, and for what purposes it may be used. *Id.* §§ 46:8-19 to -26. The SDA sets forth that while the landlord may demand the provision of such a security deposit, the money deposited "shall continue to be the property of the person making such deposit." *Id.* § 46:8-19. Not only does New Jersey govern ownership of a security deposit, but it also governs its amount: the "owner or lessee may not require more than a sum equal to 1 ½ times 1 month's rental according to the terms

of contract, lease, or agreement as a security for the use or rental of real property used for dwelling purposes." *Id.* § 46:8-21.2.[4]

New Jersey law further regulates the uses of the security deposit, and when it must be returned to the owner. Landlords are required to return security deposits, plus accrued interest, to tenants within thirty days after the end of a lease. *See id.* § 46:8-21.1. Interest earnings and deductions taken for damages or unpaid rent must be itemized and delivered in writing. *Id.* Those deductions are for "damages caused by a tenant to an apartment beyond normal wear and tear," a concept that generates a great deal of litigation in the state courts. *See, e.g., Haddad v. Kassas*, No. A-5934-10T2, 2012 WL 5632735, *6 (N.J. Sup. Ct. App. Div. 2012). State law also sets forth that, whatever the landlord's reason, no deductions may be taken from a tenant who remains in possession of the residential property. N.J. Stat. Ann. § 46:8-21.1. From start to finish, New Jersey law, rather than contract, dictates how security deposits function. It would not be reasonable for a landlord, who enters this heavily regulated market, to conclude that he would be free from legal changes in the future.

---

[4] Still more, New Jersey law establishes where the money may be deposited to ensure it bears interest for the tenant, *see id.* § 46:8-19(a)-(b), the content and timing of the notice a landlord provides the tenant regarding those accounts, *see id.* § 46:8-19(c), and the way tenants can credit the interest on their security deposit to payments of their rent, *see id*. If a landlord fails to invest the deposit or pay interest to the tenant as required, the tenant may apply the security deposit plus accrued interest to rent, and no further deposit is required. *See id.* § 46:8-19(c). The law even authorizes the Commissioner of Banking and Insurance to issue further regulations to govern the computation of the interest that is due. *See id.* § 46:8-19.1.

The decisions of the Third Circuit and this Court make clear how important this history of extensive regulation is to the Contracts Clause analysis. In *Troy, Ltd. v. Renna,* 727 F.2d 287 (3d Cir. 1984), the plaintiffs had entered into a contract to sell property they had been leasing to tenants, some of whom were over sixty-two and fell into a category of statutory tenants protected by New Jersey's anti-eviction laws. *Id.* at 293. Under previous law, the plaintiffs properly served three-year notices of eviction on all the statutorily protected tenants, but subsequently New Jersey anti-eviction law changed and plaintiffs were prevented from evicting the tenants. *Id.* at 294. The court dismissed the Contracts Clause claims, reasoning that the retroactive application of New Jersey's anti-eviction law caused no substantial impairment to the plaintiffs' contractual rights because "New Jersey had already placed significant limitations upon the rights of owners of multiple dwellings to define the landlord tenant relationship solely in terms of contract." *Id.* at 297; *see also, e.g., Gateway Apartments, Inc. v. Mayor & Township Council of Nutley*, 605 F. Supp. 1161, 1173 (D.N.J. 1985) (finding ordinance requiring landlords to pass along tax court victory proceeds to tenants did not substantially impair their contractual relationship in part because rent was "already highly regulated"); *Brontel, Ltd. v. City of N.Y.*, 571 F. Supp. 1065, 1072 (S.D.N.Y. 1983) ("It is well established that [New York] City's rent control laws do not unconstitutionally impair contract rights.").

22

As both courts to consider this question have held, the above analysis sharply undermines Plaintiffs' claims of any substantial impairment. In rejecting a challenge to a Connecticut order that similarly permitted tenants to credit their security deposit towards rent during this emergency, the court highlighted that "Plaintiffs operate in a heavily regulated industry," and that the security deposit order therefore "could not operate as a substantial impairment of Plaintiffs' contractual rights" because it could not have been "wholly unexpected government legislation" as a matter of black letter law. *Auracle Homes*, 2020 WL 4558682, *17. To be more precise, the court went on, because Connecticut law already established that the deposit still belonged to the tenant, "modification of statutorily permissible uses of security deposits thus cannot amount to a substantial impairment of Plaintiffs' rights." *Id.* That ruling built upon another decision, upholding New York's analogous order, which had made the same point. *See Elmsford*, 2020 WL 3498456, *13 (after detailing regulation of security deposits, finding "the foreseeability of additional regulation allows states to interfere with both past and future contracts," and thus that "the Contracts Clause also permits states to modify and abrogate existing contract terms long since agreed to"); *see also HAPCO v. City of Phila.*, No. 20-3300, 2020 WL 5095496, *7 (E.D. Pa. Aug. 28, 2020) (also relying on *Elmsford* to reject Contracts Clause challenge to Philadelphia law allowing tenants to pay rent past due without late fees because "residential leases have been heavily regulated for many years" by local ordinances). Simply, an order

that "modifies aspects of the statutory scheme relating to permissible uses of security deposits … should have come as a no surprise to the landlord Plaintiffs, and thus could not amount to a substantial impairment of their rights." *Elmsford*, 2020 WL 3498456, *13. Because security deposits in New Jersey are also heavily regulated, the same result is proper in this analogous lawsuit.

### ii.  EO 128 Allows Plaintiffs To Safeguard And Reinstate Their Rights.

Contrary to Plaintiffs' claims, *see* Amended Complaint, ¶171, EO 128 allows Plaintiffs to safeguard and reinstate the rights security deposits seek to protect. When balanced against the limited imposition on Plaintiffs' reasonable expectations, there is only one proper conclusion: EO 128 works no substantial impairment.

EO 128 leaves Plaintiffs with ways to safeguard or reinstate the rights that a security deposit is meant to protect. The interests for which the deposit could be used are to meet costs if "the tenant defaults in the payment of rent, causes damage to the premises, or breaches any covenants in the lease." *Brownstone Arms v. Asher*, 121 N.J. Super. 401, 404 (Cty. D. Ct. 1972). But the Governor has made clear that none of his measures "affect any schedule of rent that is due." N.J. Exec. Order. 106. And EO 128 still allows the landlord to "recoup from the tenant any monies the landlord expended that would have been reimbursable by the security deposit and interest or earnings thereon, at the time that such reimbursement from the deposit and interest or earnings thereon would have taken place." In other words, while tenants can credit

a deposit to their rent, they will still owe money for repairs at the appropriate time. These Orders thus "do[] not displace the civil remedies always available to landlords seeking to recover the costs of repairs or unpaid rents still owed at the end of a lease term," and do not cause substantial impairment. *Elsmford*, 2020 WL 3498456, *14; *see also id.* ("emphasiz[ing] that nothing in the Order diminishes the tenant's rental obligation by even a nickel"). And, of course, these changes are temporary: EO 128 provides that any tenant that renews her lease must pay back the full amount of the security deposit at the time of the renewal or sixty days after the ongoing emergency ends, yet another way in which Plaintiffs' rights are protected.

Although Plaintiffs might argue they are without protection for the temporary period of the emergency because they might be required to bring legal action against tenants, rather than deduct unpaid rent or costs for damages from a security deposit, *Elsmford* rightly rejected that response out of hand. As the court noted, although it was true that a landlord might have to "obtain a judgment for the amount expended in repairs," this "whole scheme is no different than what actually happens in the real world, where tenants routinely forfeit their security deposit by allowing it to 'cover the last month's rent' on a lease." *Id.* Said another way, "[t]he landlord can collect all he is owed at the end of the day by the simple expedient of going to some court when the courts are fully reopened. The fact that landlords would prefer not to avail themselves of their legal remedies—because it is often not worth the trouble to

25

pursue a deadbeat tenant—does not mean that the state has impaired their contractual rights." *Id.* At bottom, the availability of court remedies shows there are ways for Plaintiffs to safeguard or reinstate their rights, even during the temporary period EO 128 is in effect. EO 128 works no substantial impairment.

### B. EO 128 Reasonably Furthers The State's Legitimate Purposes.

While the lack of a substantial impairment is enough to foreclose the Contracts Clause claim, there is a second, independently sufficient reason that it fails: EO 128 reflects "an appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen*, 138 S. Ct. at 1822. In conducting this means-end analysis, "the State is ordinarily entitled to deference in its legislative judgment."[5] *United Steel*, 842 F.3d at 213; *see also, e.g., Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237, 1249 (3d Cir. 1987) (agreeing that "[c]ourts are required to defer to the legislature's judgment concerning the necessity and reasonableness of economic and social legislation"); *Troy, Ltd.,* 727 F.2d at 298 (noting that courts "are admonished not to substitute [their] views for those of the legislature" and that "in this sphere of economic and social regulation [courts] 'properly defer to the legislative judgment as to the necessity and reasonableness of' the Act"); *Elmsford*, 2020 WL 3498456,

---

[5] Executive Orders have the effect of a legislative statute for the purposes of federal constitutional review. *See Farmer v. Philadelphia Elec. Co.,* 329 F.2d 3, 7 (3d Cir. 1964); *National Association of Theatre Owners v. Murphy*, No. 20-8298, 2020 WL 5627145, *7 (D.N.J. Aug. 18, 2020).

*12 (holding that if a "challenged law only impairs private contracts … courts must accord [it] substantial deference").[6] The State's decision in this case is well justified, especially in light of the deference it is owed.

Begin with the legitimate public purposes that animate New Jersey's action, which are amply described by EO 128 itself. For one, the Executive Order endeavors to mitigate the temporary economic harms that individuals are experiencing through no fault of their own: "tenants may be suffering from one or more financial hardships that are caused by or related to the COVID-19 pandemic, including but not limited to a substantial loss of or drop in income." N.J. Exec. Order 128 (describing rise in unemployment). Although tenants may not be *evicted*, the inability to pay rent could exacerbate such harms, "including interest and late fees, which they may be unable to satisfy in light of their substantial loss of income, as well as negative credit reports that may affect their ability to find housing options in the future." *Id.* The State thus found that it had an interest in providing support to struggling tenants in the middle of an unprecedented emergency, much like the State was also doing for homeowners and landlords under separate programs.

---

[6] Of course, the rule is different when the State is one of the contracting parties, since "complete deference to a legislative assessment of reasonableness and necessity is not appropriate [when] the State's self-interest is at stake." *United Steel*, 842 F.3d at 212. Said another way, the Contracts Clause "affords States a wide berth to infringe upon private contractual rights when they do so in the public interest rather than sel." *Elmsford*, 2020 WL 3498456, *12. This case involves only private contracts.

But the public purposes go further than that, too. Although tenants are largely not subject to removal during the emergency, the Governor recognized that because their rent due would continue piling up, and because eviction *proceedings* continue throughout the crisis, there remained a substantial risk of a wave of evictions across the state happening "no later than two months after the end of the" emergency, when the moratorium under EO 106 ended. *Id.* And given the public health risks associated with homelessness, the State had compelling reasons to want to avoid that scenario from taking place. Further, the State recognized that when residential tenants make rent payments (and thus avoid fees, negative credit reports, and an eviction when the moratorium ends), it also becomes harder for them to fund their other "expenses such as those relating to necessary health care," which would have serious consequences in the middle of a public health pandemic. *Id.*

Since there can therefore be no dispute that EO 128 is aimed at "the remedying of a broad and general social or economic problem," it is necessarily based on a legitimate public purpose. *Nieves*, 819 F.2d at 1249. Indeed, the purpose described above is especially compelling: "courts have often held that the legislative interest in addressing a fiscal emergency is a legitimate public interest." *Buffalo Teachers*, 464 F.3d at 367. In one of the Supreme Court's seminal cases involving the Contracts Clause, it upheld a federal statute impairing mortgages in light of the Depression-era exigencies, reasoning that "an emergency existed … which furnished a proper

28

occasion for the exercise of the reserved power of the state to protect the vital interests of the community," and that this "emergency which threatened 'the loss of homes and lands which furnish those in possession the necessary shelter and means of subsistence' was a 'potent cause' for the enactment of the statute." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444, 445 (1934); *cf. also, e.g., South Hamilton Associates v. Morristown*, 99 N.J. 437 (1985) (finding rent control law had sufficient purpose since it addressed "the existence of some housing emergency or exorbitant rental increases that created hardship on tenants and adversely affected the health, safety, and general welfare of the citizens"). So too here.

Because the purposes are clearly legitimate, the only question this Court must address is whether New Jersey acted "reasonably" here in seeking to remedy those economic and social policy problems—an evaluation, as noted above, on which the State gets considerable deference. The answer is clear once again: the State was free to conclude that EO 128 reflects an appropriately tailored way to promote its goals of helping the populace avoid crushing debt and long-term financial consequences during this economic crisis, avoiding a wave of evictions the moment its moratorium ends, and protecting the population's related public health needs. Indeed, a number of features of the law show that allowing tenants to use their security deposit towards their rent is appropriately tailored to the problem the State was confronting.

Most strikingly, EO 128 is a *temporary* measure put in place as a result of the unprecedented health and economic crises caused by COVID-19. This Executive Order only permits this use of the security deposit during the emergency and for two months after, and it also requires the replenishment of the deposit upon renewal of the lease. The temporary nature of these rules is an especially powerful sign that the order is tailored to the emergency, and in particular to the risk of a wave of evictions as soon as the moratorium ends. *See Blaisdell*, 290 U.S. at 441 (observing the State's decision to exercise its police power to respond to emergencies will not likely violate Contracts Clause if "the relief afforded was temporary and conditional"); *HAPCO*, 2020 WL 5095496, *10 (relying on *Blaisdell* to uphold Philadelphia's COVID-19 renter protections in part because it is "temporary legislation").[7]

Even beyond its temporary nature, EO 128 is modest in its scope. As detailed repeatedly above, tenants owe precisely the same rent, and landlords can recoup the same money for damages that the tenant has caused. The only change is that, in light of this unprecedented economic uncertainty—where joblessness fluctuates month to month as the virus spreads and states like New Jersey have been forced to respond—

---

[7] It also bears mention that a number of other states likewise allowed their residents to pay for rent using security deposits during this crisis. *See, e.g.,* Conn. Exec. Order 7X (Apr. 10, 2020) (allowing renters to apply a security deposit to rent), N.Y. Exec. Order 202.28 (May 7, 2020) (same). That, too, offers evidence that New Jersey's approach here is a reasonable one, tailored to the common and temporary economic and health harms these states are currently confronting.

EO 128 helps tenants pay their rent *now*, even if they will still be on the hook for the same costs later. And the method the State adopted was itself a logical one: tenants are simply being given greater control over the security deposit that *they still own* as a matter of law. Plaintiffs might dislike the method that New Jersey has chosen, but the Contracts Clause "does not require courts … to sit as superlegislatures, choosing among various options proposed by plaintiffs." *United Steel*, 842 F.3d at 213. The State took both careful and measured steps to help residents through the worst of the ongoing crisis and its action therefore withstands constitutional scrutiny.

Finally, the fact that EO 128 is just one part of the State's broader efforts to help homeowners, landlords, and tenants alike through this economic crisis further demonstrates the reasonableness of its approach. As part of its emergency response, the State took steps to ensure that homeowners are not subject to foreclosure during this emergency, *see* N.J. Exec. Order 106 (staying "enforcement of all judgments for possession, warrants of removal, and writs of possession"), which helps residential landlords; to work with financial institutions on a 90-day grace period for mortgage payments and waiver of mortgage-related late fees; and to establish a grant program for small residential rental property owners who lost rent revenue due to COVID-19. As *Elmsford* held, the State's programs "provide[] even more protection for the landlord Plaintiffs than they enjoyed prior to the emergency, because they are also temporarily protected from foreclosure of their properties to the extent that their

properties are is subject to a mortgage, which the landlords may have difficulty paying if tenants are defaulting on their rent." 2020 WL 3498456, *13. This provides still more reason to find the State's actions were appropriate and reasonable.

In short, the temporary modification of the New Jersey law governing security deposits during this emergency did not work a substantial impairment on Plaintiffs' contracts, and even if it did, it is amply justified as a reasonable means of addressing the sweeping economic and public health harms confronting the populace.

### C. In The Alternative, As Other Courts Have Held, Plaintiffs' Contracts Clause Claim Is Not Cognizable Under § 1983.

As the Third Circuit recently recognized, there is currently a split between the circuits as to whether Contracts Clause claims are even cognizable under 42 U.S.C. § 1983. *See Watters v. Board of School Directors of City of Scranton*, No. 19-3061, 2020 WL 5626539, *4, n.2 (3d Cir. Sept. 21, 2020). Although this Court need not address this issue if it correctly dismisses the Contracts Clause claim for either or both of the reasons given above, *see id.*, the better reading of § 1983 and the Supreme Court's decisions shows conclusively that Plaintiffs' claim is not cognizable.

As the Sixth Circuit and the Fourth Circuit have held, private plaintiffs cannot pursue claims for violations of the Contracts Clause under § 1983. *See Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017) (concluding that "an alleged Contracts Clause violation cannot give rise to a cause of action under § 1983"); *Crosby v. City of Gastonia*, 635 F.3d 634, 640 (4th Cir. 2011) (same). As the Sixth Circuit laid out,

§ 1983 only provides for a private right of action to challenge "deprivation[s] of any rights, privileges, or immunities secured by the Constitution and laws." That means not every alleged violation suffices, and "the only on-point Supreme Court decision suggests that the Contracts Clause does not protect an individual constitutional right enforceable under § 1983, but is rather a structural limitation placed upon the power of the States." *Kaminski*, 865 F.3d at 347.

Indeed, in *Carter v. Greenhow*, 114 U.S. 317 (1885), the Court rejected the argument that a violation of the Contracts Clause reflected a cognizable deprivation of a constitutional right for these purposes. *See id.* at 322 (reasoning that "so far as [the Clause] can be said to confer upon or secure to any person any individual rights, [it] does so only indirectly and incidentally"); *Kaminski*, 865 F.3d at 347 (discussing *Carter*). If an individual believes that his contractual rights have been abrogated, the remedy is not to sue a state, but to file a private suit "to have a judicial determination declaring the nullity of the attempt to impair its obligation in a suit to vindicate his rights under a contract." *Kaminski*, 865 F.3d at 347 (quoting *Carter*, 114 U.S. at 322*); see also Crosby*, 635 F.3d at 640 (holding a private cause of action is "limited to the discrete instances where a state has denied a citizen the opportunity to seek adjudication through the courts"). Although Plaintiffs might prefer to sue the State

33

directly in federal court, "it is [the Court's] prerogative alone to overrule one of its precedents." *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3 (1997)).[8]

## III.   PLAINTIFFS' REMAINING CLAIMS LACK MERIT.

Plaintiffs also fail to state a claim for violations of substantive or procedural due process (Count II), the Equal Protection Clause (Count III), or the Fourteenth Amendment Privileges or Immunities Clause (Count IV). As set forth below, there are multiple independently sufficient grounds to reject the due process claims, while Counts III and IV fail because EO 128 easily clears rational basis review.

There are a number of dispositive flaws with Plaintiffs' due process challenge. For the purpose of this claim, Plaintiffs rely on a "right to contract," the same interest addressed by their Contracts Clause claim. Am. Compl. ¶ 180. But if "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 721 (2010); *see Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (same). That is dispositive: because their claim also sounds in the Contract Clause,

---

[8] The one circuit decision to the contrary is *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003). But that brief ruling held only that § 1983 provides a private cause of action based on a Contracts Clause violation in which the State or a political subdivision impairs its contractual obligation with a private party. This case deals exclusively with private contracts.

if that claim proves unsuccessful, Plaintiffs have no right to repackage it under the guise of due process. *See Elmsford*, 2020 WL 3498456, *15 (rejecting analogous procedural due process claim on this basis).

In any event, the substantive and procedural due process claims fail on their own terms. As courts have recognized, "[t]o establish a violation of substantive due process, a plaintiff has to show that the official's conduct was conscience-shocking, *and* that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty." *SH3 Health Consulting, LLC v. St. Louis Cty. Exec.*, No. 20-605, 2020 WL 2308444, *9 (E.D. Mo. May 8, 2020); *see also Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000) (same). That is a high bar to meet: only "the most egregious official conduct" will shock the conscience and merit federal court intervention. *UA Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003). EO 128 simply allows tenants to apply their security deposit to unpaid rent, and it is directly related to the State's goal of limiting the impact of the economic emergency on its residents, preventing a wave of evictions due to the loss of income, and addressing the other harms—including public health harms—that flow from the crisis. And the State did so in ways that showed care for the interests of landlords, who remain entitled to rent and damages, and who benefit from the other emergency programs that the State has

established. This Order, a temporary and measured response to this crisis, in no way shocks the conscience. Plaintiffs' substantive due process claim thus fails.

Plaintiffs' procedural due process claim fares no better. For one, EO 128 is a rule of general applicability, which courts have repeatedly held are not subject to the same due process constraints applicable to individualized orders. *See, e.g., Rogin v. Bensalem Twp.*, 616 F.2d 680, 693 (3d Cir. 1980) (noting that a rule granting every person affected by a general law procedural due process rights to receive "hearings, opportunity for confrontation and response, clear standards, an impartial arbiter, and possibly judicial review would be inconsistent with the structure of our system of government"); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982) (finding that a law of general applicability does not violate procedural due process because "legislative determination provides all the process that is due"); *United States v. Fla. E. C. R. Co.*, 410 U.S. 224, 245-46 (1973) (finding no due process right is triggered by agency action applicable "across the board to all common carriers" if "no effort was made to single out any particular railroad for special consideration based on its own peculiar circumstances"). There was no procedural right to a hearing for every single landlord before the Governor issued his generally applicable EO 128.[9]

_____

[9] In evaluating and rejecting a due process challenge to another Governor's COVID-related orders, a court recently explained why this rule makes sense. *See Hartman v. Acton*, 20-1952, 2020 WL 1932896, *8 (S.D. Ohio Apr. 21, 2020) (explaining that if a law is generally applicable, "a hearing is not required at all" because "the law's generality provides a safeguard that is a substitute for procedural protections"). Still

In any event, "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). Plaintiffs could have appealed EO 128 to the Appellate Division of the New Jersey Superior Court, including to assert their constitutional claims, but decided not to avail themselves of this option. *See SH3 Health Consulting*, 2020 WL 2308444, *9 (finding post-deprivation remedies for a Governor's COVID-19 orders constitute sufficient process). The Appellate Division is in fact a *more* appropriate venue for raising Plaintiffs' state constitutional claims. *See* Part I, *supra* (explaining that New Jersey's sovereign immunity precludes federal courts from granting relief for officials' alleged violations of state law). As Plaintiffs failed to avail themselves of these options, their procedural due process claim falls short.

Turning to Counts III and IV, Plaintiffs' Equal Protection and Privileges or Immunities challenges fail because EO 128 satisfies rational basis review. *See Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Castille*, 799 F.3d 216, 220 (3d Cir. 2015) (noting that where a law neither burdens fundamental rights nor establishes a suspect classification, Equal Protection and Privileges or Immunities

---

more, "[t]he fact that an agency's order 'may in its effects have been thought more disadvantageous by some ... than by others does not change its generalized nature.'" *Id.* (quoting *United States v. Florida E. C. R. Co.*, 410 U.S. 224, 246 (1973).

claims are subject to rational basis).[10] This test is satisfied if "the state identifies a legitimate state interest that the legislature rationally could conclude was served by the statute." *Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 645 (3d Cir. 1995). Particularly "[i]n areas of social and economic policy," a law will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *L.A. v. Hoffman*, 144 F. Supp. 3d 649, 675 (D.N.J. 2015) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Plaintiffs thus "have the burden to negat[e] every conceivable basis which might support" EO 128. *Id.*

EO 128 easily withstands this review. Assuming Plaintiffs are contrasting the Order's treatment of landlords of residential tenants with commercial landlords, the State had good reasons to distinguish between the two. First, EO 128 was animated in part by the State's desire to avoid a wave of evictions occurring two months after the emergency ends. Residential and commercial tenants are not similarly situated when it comes to the consequences of evictions, which have significant public health impacts on individuals who are rendered homeless—a justifiable basis to treat their landlords differently for the purpose of temporary rent relief. Other consequences of

---

[10] The Fourteenth Amendment Privileges or Immunities Clause is particularly inapt, as Plaintiffs do not allege that EO 128 burdens the "right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State." *Saenz v. Roe*, 526 U.S. 489, 502 (1999); *see Merrifield v. Lockyer*, 547 F.3d 978, 983-84 (9th Cir. 2008) (noting the "[Supreme] Court has not found other economic rights protected by [the Privileges or Immunities] clause").

failures to pay rent—*e.g.,* negative credit reports—operate differently for residential and commercial tenants too. Companies are often still able to obtain lines of credit, get new leases, and run businesses despite prior financial difficulties, which may not be true for poor residents. Finally, the provisions of the SDA only apply to residential tenants and landlords, meaning commercial tenants do not have a security deposit that is carefully regulated by state law, another reason EO 128's modifications to that law only applied to residential tenants. At bottom, the State's efforts to preserve housing stability in light of the health and economic risks associated with evictions are not "so attenuated as to render the distinction arbitrary or irrational."

In short, the State has a strong interest in mitigating the impact on its tenants of this unprecedented economic recession. It was reasonable for the Governor to find that EO 128 advances this interest by helping residential tenants avoid incurring debt and late fees, and reducing the evictions that will occur when the emergency ends. The State acted all the more reasonably given the modest impact of EO 128: tenants are still liable for all rent due and damage to the property, and if a lease is renewed, the tenant is responsible to replenish the security deposit in full. For these reasons, Plaintiffs cannot disprove all conceivable bases for EO 128.

## <u>CONCLUSION</u>

This Court should dismiss Plaintiffs' Amended Complaint in its entirety.


                              Respectfully submitted,

                              GURBIR S. GREWAL
                              ATTORNEY GENERAL OF NEW JERSEY


                    By:    <u>/s/ Stuart M. Feinblatt</u>
                           Stuart M. Feinblatt
                           Assistant Attorney General

Dated: September 30, 2020