# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

NEW CIVIL LIBERTIES ALLIANCE
KARA ROLLINS (Attorney ID 107002014)
Litigation Counsel
HARRIET HAGEMAN (*Pro Hac Vice*)
Senior Litigation Counsel
JARED MCCLAIN (*Pro Hac Vice*)
Litigation Counsel
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210

*Counsel to Plaintiffs*

| | |
|---|---|
| MATTHEW JOHNSON, *et al.*, | HON. NOEL L. HILLMAN, U.S.D.J. |
| | HON. JOEL SCHNEIDER, U.S.M.J. |
| *Plaintiffs*, | |
| v. | Civil Action No. |
| | 1:20-cv-06750-NLH-JS |
| PHILIP D. MURPHY, *et al.*, | |
| *Defendants*. | |

# PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES...........................................................................ii

BACKGROUND ...........................................................................................1

STANDARD OF REVIEW .............................................................................6

ARGUMENT ................................................................................................8

    I.   THE ELEVENTH AMENDMENT DOES NOT BAR CONSIDERATION OF GOVERNOR MURPHY'S *ULTRA VIRES* ACTION ........................................8

    II.  EO 128 VIOLATES THE CONTRACTS CLAUSE.....................................10

      A.  This Court Has Jurisdiction to Consider Contracts Clause Challenges .........11

      B.  The Original Understanding of the Contracts Clause .................................13

      C.  EO 128 Does Not Survive the Supreme Court's Two-Step Test...................19

        1.  EO 128 Substantially Impairs Plaintiffs' Contracts........................20

        2.  EO 128 Is Not Tailored to Meet Its Stated Justification .............................25

          a.   Governor Murphy's Unilateral Judgment Deserves No Deference .......26

          b.   Governor Murphy Targeted a Single Group for Relief............................29

          c.   EO 128 Is Not Tailored to Its Public Purpose ..........................................31

    III.   EO 128 VIOLATES PLAINTIFFS' RIGHT TO DUE PROCESS OF LAW.................36

    IV.   EO 128 DENIES PLAINTIFFS EQUAL PROTECTION OF THE LAWS .................38

CONCLUSION ...........................................................................................40

# TABLE OF AUTHORITIES

## Federal Cases

*Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812 (7th Cir. 2019) ..............26

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) .............................. 10, 19, 26, 30

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359
   (3d Cir. 2012)........................................................................................ 20, 22, 26, 27

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015) .............................12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)......................................................................7

*Ass'n of Equip. Mfgs. v. Burgum*, 932 F.3d 727 (8th Cir. 2019) ....................... 26, 27, 29, 30

*Baptiste v. Kennealy*, 2020 WL 5751572 (D. Mass. Sept. 25, 2020) ...................................28

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................... 6, 7

*Bronson v. Kinzie*, 42 U.S. (1 How.) 311 (1843)......................................16, 21, 31

*Carter v. Greenhow*, 114 U.S. 317 (1885).......................................................... 11, 12

*Chapman v. Houston Welfare Rights*, 441 U.S. 600 (1979)........................................12

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ..................................38

*Commc'ns Workers of Am., ALF-CIO v. Christie*, 413 N.J. Super. 229
   (App. Div. 2010) ....................................................................................... 9, 27, 28, 39

*Connelly v. Lane Const. Corp.*, 809 F.3d 780 (3d Cir. 2016) ......................................6

*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001).....................................................12

*Crozier v. Johnson & Johnson Consumer Cos., Inc.*, 901 F. Supp. 2d 494 (D.N.J. 2012) ... 6, 7

*Dennis v. Higgins*, 498 U.S. 439 (1991) ...................................................... 11, 12

*East New York Savings Bank v. Hahn*, 326 U.S. 230 (1945)..........................................28

*Edwards v. Kearzey*, 96 U.S. 595 (1877) .........................................................passim

*Elliott v. Bd. of Sch. Trs. of Madison Consol. Schs.*, 876 F.3d 926 (7th Cir. 2017)................22

*Elmsford Apartment Associates, LLC v. Cuomo*, 2020 WL 3498456
   (S.D.N.Y. June 29, 2020) .....................................................................................10

*Energy Reserves Grp. v. Kansas Power & Light Co.*, 459 U.S. 400 (1983) .................... 21, 29

*Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842 (8th Cir. 2002) .................................29

*Ex parte Young*, 209 U.S. 123 (1908)......................................................................8

*Gen. Motors Corp. v. Romein*, 503 U.S. 181 (1992) ......................................9, 20, 36

*Green v. Biddle*, 21 U.S. (8 Wheat.) 1 (1823) ..............................................21, 24, 36

*Hafer v. Melo*, 502 U.S. 21 (1991) ........................................................................8

*Hague v. Comm. For Indus. Org.*, 307 U.S. 496 (1939) .............................................12

*HAPCO v. City of Phila.*, 2020 WL 5095496 (E.D. Pa. Aug. 28, 2020)...........................28

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1936)............................................passim

*Keystone Bituminous Coal Ass'n v. DeBendicitis*, 480 U.S. 470 (1987) ...................................14

*Kulwicki v. Dawson*, 969 F.2d 1454 (3d Cir. 1992).......................................................... 6, 9

*Lum v. Bank of Am.*, 361 F.3d 217 (3d Cir. 2004) ...............................................................7

*McCracken v. Hayward*, 43 U.S. (2 How.) 608 (1844)......................................................17

*McDonald v. City of Chi.*, 561 U.S. 742 (2010) ...............................................................40

*McGrath v. R.I. Ret. Bd.*, 88 F.3d 12 (1st Cir. 1996).......................................................29

*Newark Cab Ass'n v. City of Newark*, 901 F.3d 146 (3d Cir. 2018).................................39

*Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213 (1827).......................................................13

*Pascarella v. Swift Transp. Co.*, 643 F. Supp. 2d 639 (D.N.J. 2009) ............................ 8, 9

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)....................................9

*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 47 U.S. 717 (1984)..................... 36, 37

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008) ..............................................8

*Porto Pavino, LLC v. Legacy Cold Storage, LLC*, 447 F. Supp. 3d 182 (D.N.J. 2020)..........7

*Reich v. Beharry*, 883 F.2d 239 (3d Cir. 1989) .................................................................37

*Reynolds v. McArthur*, 27 U.S. (2 Pet.) 417 (1829) .........................................................15

*Shelby Cty. v. Holder*, 570 U.S. 529 (2013) .....................................................................17

*Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873)......................................................40

*Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122 (1819) ......................................... 16, 17

*Sveen v. Melin*, 138 S. Ct. 1815 (2018) ...................................................................passim

*Thompson v. Real Estate Mortg. Network, Inc.*, 106 F. Supp. 3d 486 (D.N.J. 2015) .............6

*Transp. Workers Union of Am., Local 290 v. Southeastern Pa. Transp. Auth.*, 145 F.3d 619
   (3d Cir. 1998)............................................................................................................20

*U.S. Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union v. Gov't of V.I.*,
   842 F.3d 201 (3d Cir. 2016) .......................................................................................26

*U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1 (1977)...................................................passim

*W.B. Worthen Co. ex rel. Bd. of Comm'rs of Sch. Imp. Dist. No. 513 of Little Rock, Ark. v.
   Kavanaugh*, 295 U.S. 56 (1935).............................................................................passim

*Watters v. Bd. of Sch. Directors of City of Scranton*, 400 F. Supp. 3d 117 (M.D. Pa. 2019) ..20

*Wood v. Showers*, 822 F. App'x 122 (3d Cir. 2020) .........................................................7

## Constitutional Provisions

U.S. Const. amend. XIV, § 1 ...........................................................................................38

U.S. Const. art. I, § 10...................................................................................................14

U.S. Const. art. IV, § 4..................................................................................................37

## Statutes

42 U.S.C. § 1983 ................................................................................ 11, 12

N.J.S.A. 46:8-1 ........................................................................................2

N.J.S.A. 46:8-19 .................................................................................. 5, 22

N.J.S.A. 46:8-24 ......................................................................................2

N.J.S.A. 46:8-26 ....................................................................................39

N.J.S.A. 46:8-27 ....................................................................................39

N.J.S.A. 46:8-36 ......................................................................................2

## Rules

Fed. R. Civ. P. 12(b)(6) ......................................................................... 6, 7

## Executive Orders

Murphy Exec. Order 106 (March 9, 2020) .............................................4

Murphy Exec. Order 128 (April 24, 2020) ..................................... 4, 5, 33

Murphy Exec. Order 191 (Oct. 24, 2020) ..............................................4

## Books

Laurence Tribe, American Constitutional Law (2d ed. 1988) .........................30

Max Farrand, THE RECORDS OF THE FEDERAL CONVENTION OF 1787
(1911) ...............................................................................................15

## Other Authorities

Douglas W. Kmiec & John O. McGinnis, *The Contract Clause: A Return to the Original Understanding*, 14 Hastings Const. L. Q. 525 (1987) ......................................15

Kristen E. Broady, Wendy Edelberg, & Emily Moss, *An Eviction Moratorium Without Rental Assistance Hurts Smaller Landlords, Too*, Brookings Institute (September 21, 2020) ................................................................................................35

NJ.com, *Corona Virus in New Jersey: Update April 11, 2020*, YouTube ..............................2

Press Release, *Governor Murphy Signs Executive Order Providing Critical Short-Term Support for Renters*, Official Site of the State of New Jersey (Apr. 24, 2020)..............................3

State of California, *Tenant, Homeowner, and Small Landlord Relief and Stabilization Act of 2020* ..................................................................................................35

The COVID-19 panedemic has affected all New Jerseyans. Housing providers and tenants alike have lost income and struggled to make ends meet. The parties' main disagreement is whether the existence of a pandemic empowers the Governor of New Jersey to unilaterally rewrite residential leases to the detriment of housing providers while criminalizing the use of security deposits for which housing providers and tenants freely contracted. The Supreme Court has been clear on this point: "Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425 (1936). No state law authorized Governor Murphy to issue Executive Order 128 ("EO 128"), and the United States Constitution forbids it.

The founders, who were no strangers to national emergency and public-health crises, were acutely concerned with state governments' undermining economic stability by intervening in private contractual relationships to relieve debtors of their obligations at creditors' expense. To prevent such abuse by state governments, the founders adopted the Contracts Clause, which prohibits states from retroactively impairing contractual rights. EO 128 violates that core constitutional tenet and cannot stand.

## BACKGROUND

New Jersey Governor Philip D. Murphy has estimated that "[t]here are thousands, maybe hundreds of thousands, if not millions of contracts between landlords and renters." *See* ECF No. 24 at ¶ 70 ("Am. Compl.") (quoting NJ.com, *Corona Virus in New Jersey: Update April 11, 2020*, YouTube, at 47:54). These contracts

commonly incorporate some of the more than 50 statutory provisions that govern the rights of housing providers and tenants. *See* Am. Compl. at ¶ 24 (citing N.J.S.A. 46:8-1 *et seq*). Another common feature of residential leases is a requirement that tenants pay a security deposit, which several statutes specifically regulate. *See* N.J.S.A. 46:8-19 *et seq.* Under these laws, parties to a residential lease cannot waive the applicability of any statutory provisions that govern security deposits. *See* N.J.S.A. 46:8-24, -36. Like Plaintiffs, housing providers statewide have contracted to secure their property with a financial deposit worth up to one-and-one-half months' rent. *See* Am. Compl. ¶¶ 21-34.

Plaintiffs' respective contracts provided that their tenants must pay security deposits as a condition of the lease. Specifically, Matthew Johnson contracted for a deposit of $600 "as security for any damage caused to the [Barclay Property] during the term" of the lease. *Id.* ¶ 21. The Kravitzes contracted for a security deposit that would allow them to cover the costs of repairing, replacing, or painting over damage to the Glassboro Property. *Id.* ¶ 24. Importantly, the Glassboro Lease explicitly prohibited the Rowan Tenants from "us[ing] the Security Deposit as payment for Rent." *Id.* The Johnsons also contracted for a deposit. The Sixth Street Lease required the tenant to pay one-and-one-half months' rent ($1,230) as a deposit to be returned with interest *only* "on the full and faithful performance" by the Sixth Street Tenant as of the provisions of the lease. *Id.* ¶ 29. And Mr. Van Hook's Millville Lease required the Millville Tenant to pay one-and-one-half months' rent ($2,175) "to assure that the [Millville] Tenant performs all of the Tenant's obligations under [the] Lease." *Id.* ¶ 33.

That lease permitted Mr. Van Hook to deduct from the security deposit "any charges expended … for damages to the Property [,]" *id.* ¶ 34, and expressly prohibited the Millville Tenant from using the security deposit "for the payment of rent without the written consent of the Landlord." *Id.* These provisions of the Millville Lease, like all other provisions of the parties' contract, "c[ould] only be changed in writing by an agreement signed" by both parties; "[a]ny attempt to waive the requirements of the [Rent Security Deposit] Act is prohibited and void as a matter of law." *Id.* ¶¶ 33-34.

Plaintiffs relied on the terms of their respective leases and the security deposits due thereunder when they agreed to lease their private property. *Id.* ¶ 148. The purpose of the security deposit that Plaintiffs bargained for—and to which their tenants contractually agreed—was to grant Plaintiffs the benefit of avoiding the cost and time associated with repairing any damage that the tenants may cause to their properties during the tenancies. *See id.* ¶¶ 98, 105, 115.

Despite the New Jersey legislature being available, on April 24, 2020, Governor Murphy unilaterally issued EO 128, purporting to "waive[] provisions of statutory law that prohibit the use of security deposits for rental payments, enabling tenants to instruct landlords to use their security deposits to offset rent or back rent." Press Release, *Governor Murphy Signs Executive Order Providing Critical Short-Term Support for Renters*, Official Site of the State of New Jersey (Apr. 24, 2020). He explained that "tenants may be suffering from one or more financial hardships that are caused by or related to the COVID-19 pandemic, including but not limited to a substantial loss of

or drop in income, and additional expenses such as those relating to necessary health care[.]" Murphy Exec. Order 128 (April 24, 2020). According to Governor Murphy, it was "plainly in the public interest" to "enabl[e] individuals to pay portions of their rent with the security deposit they own" to "allow those individuals to mitigate the consequences regarding evictions and accumulation of interest and late fees upon termination of Executive Order No. 106" because tenants may face "consequences from a late payment of rent, including interest and late fees, which they may be unable to satisfy in light of their substantial loss of income[.]" *Id.* at 3.

EO 128 mandated that housing providers, upon a tenant's written request, must credit a security deposit "towards rent payments due or to become due from the tenant during the Public Health Emergency established in Executive Order No. 103 (2020) or up to 60 days after the Public Health Emergency terminates."[1] *Id.* at 3-4 ¶ 1. "When a tenant applies or credits such deposit, interest, or earnings to pay rent," the housing provider cannot recoup that money and "[t]he tenant shall otherwise be without obligation to make any further security deposit" for the duration of the lease. *Id.* at 4 ¶ 2. Even if the parties then extend or renew the lease, the tenant does not have to replenish the security deposit until *six months* from when Governor Murphy declares an end to the public health emergency. *Id.* Through EO 128, Governor Murphy unilaterally

---

[1] Governor Murphy extended the Public Health Emergency for another 30 days on October 24, 2020. *See* Murphy Exec. Order 191 (Oct. 24, 2020).

altered Plaintiffs' rights and protections under the terms of their respective leases, to which Plaintiffs and their tenants voluntarily agreed. Am. Compl. ¶ 147.

Governor Murphy also voided duly enacted law. In acknowledgment that EO 128 conflicted with existing New Jersey law, duly enacted by the legislature, Governor Murphy declared unilaterally through EO 128 that a tenant's "[u]se of a security deposit for the purposes outlined in [Executive Order 128] shall not be considered a violation of N.J.S.A. 46:8-19 et seq." Murphy Exec. Order 128 at 5 ¶ 3. He further decreed that any provisions of N.J.S.A. 46:8-19 *et seq.* that are inconsistent with EO 128 are no longer in force and effect until EO 128 terminates, which will not be until 60 days after Governor Murphy declares that the Public Health Emergency has ended. *Id.* at 5 ¶ 5. Even more troubling, Governor Murphy unilaterally proclaimed that any housing providers who abide by New Jersey statutory law and the terms of their binding leasehold contracts, would be subject to criminal penalties. *Id.* at 5 ¶ 4.

Altering the terms of residential leases was the intended result of EO 128. Both statutory law and Plaintiffs' own freely negotiated contracts secured Plaintiffs' rights to hold a deposit as security. Plaintiffs fully expected at the time they negotiated their contracts and decided to lease their private property that these security deposits would remain in place and legally valid. But Governor Murphy unlawfully stripped Plaintiffs of their right to security deposits. EO 128 substantially altered the terms of the leases and the parties' rights and obligations thereunder. Without a security deposit to insure against any damage to their properties, Plaintiffs will be forced to cover the cost of any

damage out of their own pockets or bring time-consuming small-claims actions rather than relying upon the security deposits for which they contracted. EO 128 substantially diminished the rights that Plaintiffs contracted to secure.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure "demand 'only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)) (cleaned up). Under Rule 12(b)(6), the moving party "bears the burden of showing that no claim has been stated." *Thompson v. Real Estate Mortg. Network, Inc.*, 106 F. Supp. 3d 486, 489 (D.N.J. 2015).

Reviewing courts must "accept[] all well-pleaded allegations in the complaint as true and view[] them in the light most favorable to the plaintiff[.]" *Crozier v. Johnson & Johnson Consumer Cos., Inc.*, 901 F. Supp. 2d 494, 499 (D.N.J. 2012). "[T]he plaintiff[s] must be given the benefit of every favorable inference to be drawn" from the allegations in their complaint. *Kulwicki v. Dawson*, 969 F.3d 1454, 1462-63 (3d Cir. 1992). Generally, the court "'may not consider matters extraneous to the pleadings' unless the pleadings reference documents 'integral to or explicitly relied upon in the complaint[.]'" *Crozier*, 901 F. Supp. 2d at 500 (citation omitted). Although the court may consider "exhibits attached to the complaint, matters of public record, and documents that form the basis

of a claim[,]" *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004), the court should not stray from those matters referenced in the complaint or conduct its own searching inquiry into public records—especially at the 12(b)(6) stage, which focuses on the four corners of the complaint.[2] *Cf. Wood v. Showers*, 822 F. App'x 122, (3d Cir. 2020) (Rendell, J., dissenting) ("[T]he District Court went well beyond its gatekeeping role in conducting independent internet research without notice to the parties[.]").

After reviewing the complaint and drawing all inferences in the plaintiffs' favor, the court may dismiss the complaint *only* if the plaintiffs have "failed to set forth fair notice of what the claim is and the grounds upon which it rests that make such a claim plausible on its face." *Twombly*, 550 U.S. at 555. "A complaint will survive a motion to dismiss if it contains sufficient factual matter to 'state a claim to relief that is plausible on its face[]'" and provides more than "'labels and conclusions or a formulaic recitation of the elements of a cause of action[.]'" *Crozier*, 901 F. Supp. 2d at 499 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)). "The question before the Court is not whether the plaintiff[s] will ultimately prevail." *Porto Pavino, LLC v. Legacy Cold Storage, LLC*, 447 F. Supp. 3d 182, 192 (D.N.J. 2020). Indeed, the rules do not even require a probability of success but simply "more than a mere possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556. Further, before dismissal, "a district court must permit a

---

[2] Nor is it appropriate for proposed *amici curiae* to supplement the record at the motion-to-dismiss stage, as attempted here, through their own searching inquiry of public records. *See* ECF Nos. 27-3, 27-4, 27-5 (Proposed *Amici curiae* Br. Exhs. A – C).

curative amendment, unless an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

## ARGUMENT

### I. THE ELEVENTH AMENDMENT DOES NOT BAR CONSIDERATION OF GOVERNOR MURPHY'S *ULTRA VIRES* ACTION

Defendants suggest that the Eleventh Amendment bars this Court's consideration of their violations of state law—even as those state-law violations relate to Plaintiffs' federal-law claims. *See* ECF No. 26-1 at 16 ("Defs.' Mot. to Dismiss Br."). But Defendants overstate the law. Consistent with the Eleventh Amendment, Plaintiffs can maintain a lawsuit "against state officials for injunctive and declaratory relief to prevent ongoing or threatened violations of federal law." *Pascarella v. Swift Transp. Co.*, 643 F. Supp. 2d 639, 648 (D.N.J. 2009) (citing *Ex parte Young*, 209 U.S. 123 (1908)). The "Eleventh Amendment does not bar federal section 1983 action against state officials in their official capacity for conduct undertaken as part of their state jobs and duties." *Id.* (citing *Hafer v. Melo*, 502 U.S. 21, 31 (1991)). Absent a waiver of sovereign immunity, the Eleventh Amendment prohibits a federal court from ordering a state official to comply with state law or ordering "purely retroactive relief against a state official, even where federal law is implicated." *Id.* Plaintiffs' federal claims do not "morph into one[s] under state law merely because [those claims] involve[] questions regarding the state administrative and statutory procedures in place[.]" *Id.* That a federal claim "hinges

upon a property or liberty interest created in part by a state regulation or policy statement does not make the cause of action any less federal in nature." *Id.*

A federal court does not "surrender the duty to exercise [its] own judgment" merely because an issue underlying a Contracts Clause inquiry "turns on issues of general or purely local law." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 187 (1992). The court's authority and duty to act is buttressed when state officials have violated the federal constitution while acting contrary to state law. An action alleging state officials have acted *ultra vires*—without a proper delegation of power or without "any authority whatever"—is not an action against the state for purposes of the Eleventh Amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 n.11 (1984) (citations omitted). At the motion-to-dismiss stage, Plaintiffs need only allege "any set of facts … that would support a denial of immunity." *Kulwicki*, 969 F.2d at 1462-63 (citation omitted). Plaintiffs have surpassed their pleading obligation.

Defendants violated several provisions of the federal constitution and they did so, in part, by disregarding state law. Am. Compl. ¶¶ 59-69, 123-45. The New Jersey Governor has no power under state law to waive duly enacted statutes. *Cf. Commc'ns Workers of Am., ALF-CIO v. Christie*, 413 N.J. Super. 229, 274 (App. Div. 2010) ("It is well settled that administrative regulations adopted by the Executive Branch cannot amend or repeal statutes.").

Plaintiffs' allegations are distinguished from those in *Elmsford Apartment Associates, LLC v. Cuomo*, in which the plaintiffs conceded that New York Governor

Andrew Cuomo's COVID-19-related executive order was not "itself, unconstitutional." 2020 WL 3498456, *6 (S.D.N.Y. June 29, 2020) (quoting the plaintiffs' admission to explain why the *Pennhurst* exception allowing a federal court to "intervene when a state official 'may be said to act *ultra vires*'" was not applicable to their case). Because Plaintiffs allege that Governor Murphy's EO 128 was *ultra vires*, this Court can consider Defendants' disregard of New Jersey law while assessing Plaintiffs' federal claims. Defendants' disregard of and failure to follow New Jersey law in issuing EO 128 implicates several of Plaintiffs' federal claims, including whether this Court should defer to Governor Murphy's judgment in adopting EO 128. *See infra* Section II.C.2.a.

In short, Defendants' refusal to waive sovereign immunity does not affect Plaintiffs' federal claims. It merely prevents this Court from providing relief on state-law claims. This Court can still consider that Defendants' actions were *ultra vires* under state law while determining that Defendants violated the federal constitution.

## II.   EO 128 VIOLATES THE CONTRACTS CLAUSE

Defendants would have this Court believe that the Contracts Clause is dead letter—that once a state regulates an industry, the state can then retroactively impair contracts in that sector as if such regulations defeat any legitimate expectation against government intervention in private contracts. Defendants are wrong. "[T]he Contract[s] Clause remains part of the Constitution. It is not a dead letter." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978).

Plaintiffs had a legitimate expectation that security deposits would protect their leases. Governor Murphy unilaterally destroyed that expectation and diminished the value of the contracts that Plaintiffs and their tenants negotiated. History shows that the very purpose of the Contracts Clause was to stop state action like EO 128. And the Supreme Court has interpreted that clause's original public meaning as requiring vacatur of such laws.

## A.  This Court Has Jurisdiction to Consider Contracts Clause Challenges

Defendants wrongly argue that federal courts lack jurisdiction to consider challenges brought under the Contracts Clause unless the state is a party to the contract at issue. *See* Mot. to Dismiss Br. at 32-34. Section 1983 provides individuals with a private right of action against persons acting under color of state law for "the deprivation of *any* rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983 (emphasis added).  The rights that give rise to an action under § 1983 are to be "liberally and beneficently construed." *Dennis v. Higgins*, 498 U.S. 439, 443 (1991) (citation omitted). The Contracts Clause provides one such "right[], privilege[], or immunit[y]." *See* 42 U.S.C. § 1983.

Contrary to the Supreme Court's instructions, Defendants put forward a narrow reading based on a single case from 1885 in which a resident of Virginia sued the Treasurer of Virginia for not honoring a contract the state had entered into that allowed taxes to be paid by coupon. *See Carter v. Greenhow*, 114 U.S. 317, 318-19 (1885). The Court explained that the Contracts Clause provided individuals with "a right to have a

judicial determination declaring the nullity of [a state's] attempt to impair [a contractual] obligation[,]" but reasoned that the plaintiff did not allege a violation of that right. *Id.* at 322. Instead, the plaintiff had alleged an action in contract against the state.

The Supreme Court has emphasized repeatedly that *Carter* is limited to its facts. In holding that there is a private right of action for violations of the Supremacy Clause, the Court in *Chapman v. Houston Welfare Rights* explained that the plaintiff in *Carter*, as "a matter of pleading," sought to redress rights under a contract with the state, not rights secured by the Contracts Clause. 441 U.S. 600, 613 n.29 (1979) (cleaned up); *Hague v. Comm. For Indus. Org.*, 307 U.S. 496, 527 (1939) (plurality) (same). The Court in *Dennis v. Higgins* also recognized that *Carter* should be given "a narrow reading" because the case hinged on the plaintiff pleading an action in contract rather than a constitutional deprivation. 498 U.S. 439, 451 n.9 (1991) (finding a private right of action under § 1983 for violations of the Commerce Clause).

In addition to jurisdiction pursuant to § 1983, "federal courts may in some circumstances grant injunctive relief against" federal officials violating federal law. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (same). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 135 S. Ct. at 1384. Whether relying on § 1983 or its inherent equity jurisdiction, this Court can consider and decide Plaintiffs' Contracts Clause claim.

12

## B. The Original Understanding of the Contracts Clause

A contract is only as good as a party's ability to enforce its obligations. Contracts being fundamental to the health of the economy, our ability to trust in the enforceability of contracts affects not only the parties to a contract but our entire community. "The power of changing the relative situation of debtor and creditor, of interfering with contracts, … touches the interest of all, and controls the conduct of every individual in those things which he supposes to be proper for his own exclusive management[.]" *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 354-55 (1827) (Marshall, C.J.).

Following the revolution, the several states were little more than a loose conglomerate, united only nominally under the Articles of Confederation. Unanswerable to a federal government, state legislatures interfered with private contracts to such an extent "that the confidence essential to prosperous trade had been undermined and the utter destruction of credit was threatened." *Blaisdell*, 290 U.S. at 427. "[W]idespread distress … and the plight of debtors had called forth in the States an ignoble array of legislative schemes for the defeat of creditors and the invasion of contractual obligations." *Id.* And state legislatures frequently "yielded to the necessities of their constituents, and passed laws" that relieved debtors of their contractual obligations. *Edwards v. Kearzey*, 96 U.S. 595, 605 (1877).

The states' interference with contracts "destroyed public credit and confidence" and "insured and aggravated the ruin of the unfortunate debtors for whose temporary relief they were brought forward." *Id.* Paternalistic state legislatures offered short-term

13

relief to favored constituents while destroying future credit in the process. *See id.* The states' "mischief had become so great, so alarming, as not only to impair commercial intercourse, and threaten the existence of credit, but to sap the morals of the people, and destroy the sanctity of private faith." *Ogden*, 25 U.S. at 354-55.

The delegates to the federal convention of 1787 set out to create a more robust social compact that would include a prohibition against state interference with contracts. *See Edwards*, 96 U.S. at 606. "To guard against the continuance of the evil [of state interference with contracts] was an object of deep interest with all the truly wise, as well as the virtuous, of this great community, and was one of the important benefits expected from a reform of the government." *Ogden*, 25 U.S. at 355. The framers drafted the new Constitution "[t]o meet these evils in their various phases." *Edwards*, 96 U.S. at 606; *see also Keystone Bituminous Coal Ass'n v. DeBendicitis*, 480 U.S. 470, 503 n.30 (1987) (same). Specifically, Article I, § 10 prohibits the states from passing "any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts." The latter prohibition, now known as the Contracts Clause, "applies to *any* kind of contract." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018) (emphasis added).

In choosing the terms of the Contracts Clause, "the framers were absolute." *Id.* at 1827 (Gorsuch, J. dissenting) ("[T]he framers knew how to impose more nuanced limits on state power" and did so in other provisions of "[t]he very section of the Constitution where the Contracts Clause is found"). "They took the view that treating existing contracts as 'inviolable' would benefit society by ensuring that all persons could

count on the ability to enforce promises lawfully made to them—even if they or their agreements later prove unpopular with some passing majority." *Id.* (citations omitted). James Madison argued that any "'inconvenience' of a categorical rule would, on the whole, 'be overbalanced by the utility of it.'" Douglas W. Kmiec & John O. McGinnis, *The Contract Clause: A Return to the Original Understanding*, 14 Hastings Const. L. Q. 525, 560 & n.24 (1987) (quoting Max Farrand, 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, 439 (1911)). Anything less absolute would be prone to "[e]vasions … devised by the ingenuity of Legislatures." Farrand, at 440.

Madison argued similarly in his public advocacy for ratification. Laws impairing contractual obligations "were not only forbidden by the Constitution," he explained, "but were 'contrary to the first principles of the social compact, and to every principle of sound legislation.'" *Edwards*, 96 U.S. at 606 (quoting Federalist 44). According to Madison, the Contracts Clause would prevent legislation that retroactively displaced contractual rights. Kmiec, 14 Hastings Const. L. Q. at 532; *see also Reynolds v. McArthur*, 27 U.S. (2 Pet.) 417, 434 (1829) ("[L]aws by which human action is to be regulated, look forwards, not backwards[.]"). The states "chose to ratify the Constitution—categorical Clause and all." *Sveen*, 138 S. Ct. at 1827 (Gorsuch, J., dissenting).

"The treatment of the malady was severe, but the cure was complete." *Edwards*, 96 U.S. at 606. After the Contracts Clause restored public confidence in government, "[c]ommerce and industry awoke," and "[p]ublic credit was reanimated. The owners of

15

property and holders of money freely parted with both, well knowing that no future law could impair the obligation of the contract." *Id.* at 606-07 (citation omitted).

The Supreme Court recognized early on that the original meaning of the Contracts Clause was "to establish a great principle, that contracts should be inviolable[.]" *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 205 (1819) (Marshall, C.J.). Acknowledging the categorical prohibition against retroactive interference with contracts, Chief Justice John Marshall wrote that the Court should give the Clause its "full and obvious meaning" because the Constitution's plain text should give way to "extrinsic circumstances" only if "the absurdity and injustice of applying the provision to the case[] would be so monstrous[] that all mankind would, without hesitation, unite in rejecting the application." *Id.* at 202-03, 205-06. Throughout the Nineteenth Century, the Supreme Court continued to "carry out the intent of the contracts and the intent of the Constitution[,]" reasoning that "[t]he obligation of the former is placed under the safeguard of the latter." *Edwards*, 96 U.S. at 607; *see also Bronson v. Kinzie*, 42 U.S. (1 How.) 311, 318 (1843) ("[I]t would but ill become this court, under any circumstances, to depart from the plain meaning of the words used" in the Contracts Clause.).

But in 1934, the Court seemingly departed from the original understanding of the Contracts Clause based on the specific facts at issue in *Blaisdell*, announcing: "It is no answer to … insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time." 290 U.S. at 442-43.

The effect of *Blaisdell*, however, should not be overstated.[3] That case concerned "the measure of control which the state retains over *remedial* processes[.]" *Id.* at 434 (emphasis added). And at that time, dating back to *Sturges*, 17 U.S. at 206-07, the Court had always distinguished between laws affecting contractual obligations and laws affecting the remedies that states provide for breach of contract. While the Contracts Clause prohibited regulations that retroactively impaired contractual rights or obligations, *see, e.g.*, *McCracken v. Hayward*, 43 U.S. (2 How.) 608, 612 (1844), states typically remain "free to regulate the procedure in its courts even with reference to contracts already made … , and moderate extensions of time for pleading or for trial will ordinarily fall within the power so reserved."[4] *W.B. Worthen Co. ex rel. Bd. of Comm'rs of Sch. Imp. Dist. No. 513 of Little Rock, Ark. v. Kavanaugh*, 295 U.S. 56, 60 (1935).

---

[3]*Blaisdell* does not control this case because this case involves a contractual obligation and *Blaisdell* dealt only with laws affecting contractual remedies. *See infra* Section II.C.2.c. Also, EO 128 does not satisfy the three criteria for the limited exception announced in *Blaisdell*.  But to the extent *Blaisdell* could be construed to defeat Plaintiffs' claim, Plaintiffs preserve a challenge to the continued viability of *Blaisdell*. The *Blaisdell* Court's explicit rejection of the Contracts Clause's original understanding diverges from both the Court's historical precedent and modern understanding of constitutional interpretation. That a strong Contracts Clause is unnecessary because the Clause had already restored public trust in contracts.  But that is "like throwing away your umbrella in a rainstorm because you are not getting wet." *Shelby Cty. v. Holder*, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting).

[4] The Court would not, however, "sanction a distinction between the right and the remedy, which would render [the] provision illusive and nugatory[.]" *Bronson*, 42 U.S. at 318. A state cannot alter a remedy so severely as to effectively destroy a party's rights or relieve a party's obligations, or from altering it in a way that impairs the contract "by burdening the proceedings with new conditions and restrictions, so as to make the remedy hardly worth pursuing." *Id.* at 317; *see also Edwards*, 96 U.S. at 602 (unlimited discretion to modify contractual remedies is "the power to destroy").

17

Today, "the remedy/obligation distinction" is little more than a useful heuristic to approximate "the result of a more particularized inquiry into the legitimate expectations of the contracting parties." *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.17 (1977). A contracting party is more likely to expect (and price in) that a state might retroactively alter contractual remedies than that it might retroactively alter contractual obligations. *See id.* Reasonable modification of contractual remedies "is much less likely to upset expectations than a law adjusting the express terms of an agreement." *Id.* This historical distinction still applied more formalistically when the Court decided *Blaisdell*, which considered only the State's authority to alter the means of enforcing a contract. *See* 290 U.S. at 439; *see also Sveen*, 138 S. Ct. at 1830 (Gorsuch, J., dissenting) (observing that *Blaisdell* and the nineteenth century cases on which the Court relied "involved statutes involving contractual *remedies*"). The decision in *Blaisdell*, then, had nothing to say about state interference with contractual *obligations*, which is at issue here.

Despite the Court's rhetoric in *Blaisdell* distancing the decision from the original understanding of the Contracts Clause, the decision is limited in two important ways. *First*, the Court did not consider a state's retroactive alteration of contractual obligations, meaning that state laws that retroactively alter a parties' rights or obligations under a contract likely violate the Contracts Clause. *See U.S. Tr.*, 431 U.S. at 19 n.17. *Blaisdell* did not, therefore, overrule or abrogate the century and a half of precedent that preceded it. To the contrary, the Supreme Court's most recent Contracts Clause decision took care to note that the statute at issue "stack[ed] up well against laws that

18

th[e] Court upheld against Contracts Clause challenges as far back as the early 1800s." *Sveen*, 138 S. Ct. at 1822. *Second*, laws that substantially impair contractual remedies remain unconstitutional except in the specific circumstances outlined in *Blaisdell*.

These limitations make *Blaisdell* inapposite to this case. EO 128 rewrites the very terms of Plaintiffs' contracts and impairs the rights granted thereunder, and the order exceeds the "limited and temporary interpositions" that *Blaisdell* allows for contractual remedies. EO 128 is precisely the type of state action the framers designed the Contracts Clause to prohibit and the type that the Supreme Court has historically struck down.

## C. EO 128 Does Not Survive the Supreme Court's Two-Step Test

The Supreme Court applies a two-step approach to Contracts Clause challenges, asking: (1) "whether the state law has 'operated as a substantial impairment of a contractual relationship'" and (2) "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1821-22 (citations omitted). The first step informs the state's burden at the second step. "The severity of the impairment measures the height of the hurdle the state legislation must clear." *Allied Structural*, 438 U.S. at 245. A severe impairment "will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Id.* But even when the impairment is less severe, a court will not sustain an unreasonable regulation "simply because the [creditors'] rights were not totally destroyed." *U.S. Tr.*, 431 U.S. at 27.

## 1. EO 128 Substantially Impairs Plaintiffs' Contracts

The first "inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Romein*, 503 U.S. at 186. Typically, the first two components resolve easily and the court focuses on the severity of the impairment. *See id.* The same is true here. Plaintiffs' leases are contracts that EO 128 impaired. The remaining determination under the first step is the severity of the impairment.

To determine whether an impairment was substantial, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights. *Sveen*, 128 S. Ct. at 1822. The Court "look[s] to 'the legitimate expectations of the contracting parties,'" to assess whether, "at the time the parties entered into the contract and relied on its terms," they would have expected the modification that the State has imposed on the parties' obligations under the contract. *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 369 (3d Cir. 2012) (quoting *U.S. Tr.*, 431 U.S. at 19 n.17). If the law at issue has "substantially thwarted" the plaintiffs' "legitimate expectations," then it has substantially impaired the contract. *Watters v. Bd. of Sch. Directors of City of Scranton*, 400 F. Supp. 3d 117, 133 (M.D. Pa. 2019) (quoting *Transp. Workers Union of Am., Local 290 v. Southeastern Pa. Transp. Auth.*, 145 F.3d 619, 622 (3d Cir. 1998)), *aff'd*, 975 F.3d 406 (3d Cir. 2020). "Total destruction of contractual expectations is not necessary for a finding of substantial impairment." *Energy Reserves*

*Grp. v. Kanasas Power & Light Co.*, 459 U.S. 400, 411 (1983). It is enough that the change in law "lessen[s] the value of the contract." *Edwards*, 96 U.S. at 607; *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 75-76 (1823) ("[C]onditions and restrictions tending to diminish the value and amount of the thing recovered, impairs [the plaintiff's] right to, and interest in, the property."). An impairment "is made the more evident" if the contract contains "an express covenant" permitting the action that the law now prohibits. *Bronson*, 42 U.S. at 320-21.

Plaintiffs explicitly contracted for security deposits as a condition of their leases. *See* Am. Compl. ¶¶ 21-34. As the Millville Lease explained, the security deposit was "to assure that the Tenant performs all of the Tenant's obligations under [the] Lease." *Id.* ¶ 33. The Glassboro and Millville Leases both specified that the tenants could not use their security deposit toward rent payments. *Id.* at ¶¶ 24, 34. And the Sixth Street Lease stated explicitly that the Johnsons would return the security deposit *only* "on the full and faithful performance of the lease." *Id.* ¶ 29. Not only were terms like these set out in Plaintiffs' leases, but the Millville Lease prohibited any attempts to change the terms of the lease or to waive the requirements of applicable statutory law. *Id.* ¶¶ 33-34. By negating the effect—and criminalizing the enforcement—of these express covenants, Defendants substantially impaired Plaintiffs' contracts. *See Bronson*, 42 U.S. at 320-21.

That security deposits and leaseholds are regulated means that Plaintiffs could have anticipated some future legislation to impact their leases; but it does not mean they could have ever anticipated that the Governor would nullify their security deposits. *See*

21

*Elliott v. Bd. of Sch. Trs. of Madison Consol. Schs.*, 876 F.3d 926, 936 (7th Cir. 2017). Although courts will deem parties in a regulated industry to have reasonably expected that their industry will be "subject to further legislation" and "changes in the regulation that may affect [their] contractual relationships[,]" *Am. Exp. Travel*, 669 F.3d at 369, whether those parties anticipated "*retroactive application* to impair existing contract rights and reliance interests is another question." *Elliott*, 876 F.3d at 936. So, although Defendants are correct that residential leases are regulated, they overstate the effect of those regulations on Plaintiffs' legitimate expectations.

At the time Plaintiffs and their tenants negotiated their leases, New Jersey statutory law included several provisions that strictly governed, among other things, how a security deposit is paid, maintained, and returned; how large of a security deposit the contract may require; and how the parties can adjudicate their rights regarding security deposits. N.J.S.A. 46:8-19 *et seq.*. Plaintiffs, as parties to residential leases in New Jersey, necessarily accounted for and relied on these statutory provisions when crafting their contracts—including how they relate to other provisions of their contracts. Through EO 128, Governor Murphy unilaterally and retroactively waived the effect of *all* laws governing security deposits. This order did not merely subject Plaintiffs to a tad bit more regulation—it unwound years of legislation, reliance interests, and contractual expectations with one lawless stroke of the pen. No reasonable landlord in New Jersey could have expected the Governor to criminalize the lawful holding and use of a residential security deposit.

22

*Sveen* typifies a situation in which a change in law does not disturb the contracting party's reasonable expectation. 128 S. Ct. at 1822. In upholding changes to the presumption under Minnesota law regarding whether an insurance-policy holder intended to retain their ex-spouse as a beneficiary, the Court relied on three aspects, taken together, that demonstrated the law was consistent with the claimants' expectations: (1) "the statute [wa]s designed to reflect a policyholder's intent—and so to support, rather than impair the contractual scheme"; (2) "the law [wa]s unlikely to disturb any policyholder's expectations because it does no more than a divorce court could always have done"; and (3) "the statute supplie[d] a mere default rule, which the policyholder c[ould] undo in a moment." *Id.* On the first point, the Court reasoned that, the law was "unlikely to upset a policyholder's expectations at the time of contracting … because an insured cannot reasonably rely on a beneficiary designation remaining in place after a divorce." *Id.* at 1823. The reason the policyholder lacked any real reliance interest, the Court reasoned, was because the equitable "power of divorce courts over insurance policies … affects whether a party can reasonably expect a beneficiary designation to survive a marital breakdown." *Id.*

The reasoning in *Sveen* echoed that in *Blaisdell*, which also relied on the fact that the legislature did no more than "courts of equity have exercised jurisdiction" to do. 290 U.S. at 446. Unlike in *Sveen* and *Blaisdell*, a court in equity could not simply rewrite the express terms of a contract to reapportion security deposits toward rent owed under a residential lease—especially absent even the slightest showing of need or inability to

23

pay. *See Kavanaugh*, 295 U.S. at 63 (distinguishing *Blaisdell* because "[t]here has been not even an attempt to assimilate what was done by this decree to the discretionary action of a chancellor in subjecting an equitable remedy to an equitable condition"). When a state merely alters a contractual provision in a way that a court in equity could have done in the same circumstances, there is less reason to believe that the new law undermined a contracting party's reasonable expectation. In the present case, no court in equity would invalidate basic terms of a residential lease. Plaintiffs had no reason ever to expect the State of New Jersey—whether through legislation, a court's equitable decree, or executive fiat—would criminalize their ability to assert their rights relating to their security deposits under their respective contracts.

EO 128 also diminished the value of Plaintiffs' contracts and impaired their rights thereunder. *See Green*, 21 U.S. at 75-76. Plaintiffs' leases included provisions for security deposits to help secure the value of their real property and to ensure the tenants would comply with their contractual obligations. By allowing a housing provider to insure against risk and avoid small-claims litigation to seek reimbursement for property damage or other minor breaches, a security deposit facilitates the making of contracts. The deposit can decrease the rent that the housing provider requires because the housing provider assumes less risk. *See* Am. Compl. ¶ 170. Without a security deposit, Plaintiffs lose the right to protect their property interests that they contracted for *ex ante*, thereby diminishing the value of their contracts. *Green*, 21 U.S. at 75-76

24

(diminishing the value of what the plaintiff contracted for substantially impairs the contract).

The lack of a security deposit also changes the parties' incentives. In *Kavanaugh*, decided the term after *Blaisdell*, the Supreme Court struck down a series of state laws that declared an emergency and effectively created a six-and-a-half-year period during which the holder of a mortgage could not recover possession of a property from a delinquent owner. 295 U.S. at 59-61. The Court reasoned, "Under the statutes in force at the making of the contract, the property owner was spurred by every motive of self-interest to pay his assessments if he could, and to pay them without delay." *Id.* at 60. But under the statute at issue, the property owner "ha[d] every incentive to refuse to pay a dollar, either for interest or for principal." *Id.* at 60-61. So too here. The security deposits for which Plaintiffs contracted created an incentive for the tenants to comply with the terms of their leases and maintain the condition of Plaintiffs' properties. But EO 128 created "every incentive" for the tenants to move their deposit toward their rent and defeat the leverage and security for which Plaintiffs had contracted. *See id.*

Because EO 128 has altered express terms of Plaintiffs' contracts, changed the incentive structure that those contracts put in place, lessened the value of the contracts, and diminished Plaintiffs rights thereunder, the impairment is substantial.

## 2.  EO 128 Is Not Tailored to Meet Its Stated Justification

Given how substantially EO 128 impaired Plaintiffs' contracts, Defendants must clear an even higher hurdle to survive scrutiny under the second step. *See Allied*

*Structural*, 438 U.S. at 245. To make that showing, Defendants must prove that the impairment it inflicted on Plaintiffs' contracts was "both necessary and reasonable to meet the purpose advanced by the [state] in justification." *U.S. Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union v. Gov't of V.I.*, 842 F.3d 201, 211 (3d Cir. 2016). The Court's review is "more exacting than the rational basis standard applied in the due process analysis." *Am. Exp.*, 669 F.3d at 369; *see also Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 823 (7th Cir. 2019) ("There is no presumption of legislative validity under the Contracts Clause, and it demands more than a legitimate end and a rational means.") (citing *Am. Exp.*); *Ass'n of Equip. Mfgs. v. Burgum*, 932 F.3d 727, 735 (8th Cir. 2019) ("[T]he Court [] has made clear that the Contract[s] Clause provides greater protection for contractual rights than the 'less searching' rational basis standard applied under the Due Process Clauses."). The state must "demonstrate more than a conceivable or incidental public purpose for impairing the obligation of contracts." *Burgum*, 932 F.3d at 734. An impairment is unreasonable when "an evident and more moderate course would serve [the state's] purposes equally well." *U.S. Tr.*, 431 U.S. at 21; *see also Allied Structural*, 438 U.S. at 247 (analyzing whether an impairment "was necessary to meet an important general social problem").

### a. Governor Murphy's Unilateral Judgment Deserves No Deference

Typically, Contracts Clause claims challenge state laws adopted through the proper legislative channels consistent with the republican form of government that the Constitution guarantees. But EO 128 was implemented by executive fiat. Without

statutory authority to do so, Governor Murphy unilaterally waived state laws that had been duly adopted through the legislative process. The lawlessness of Governor Murphy's action implicates this Court's analysis under the Contracts Clause.

Although "courts *may* 'defer to legislative judgment as to the necessity and reasonableness of a particular measure.'" *Am. Exp.*, 669 F.3d at 368-69 (quoting *U.S. Tr.*, 431 U.S. at 19 n.17) (emphasis added), such deference is inappropriate here because there was no legislative judgment. *Cf. Commc'ns Workers*, 413 N.J. Super. at 265-66, 272 ("We cannot accord deference to EO 7's unilateral attempt to exercise the Legislature's powers, where the Legislature has not ceded those powers to the Executive."). Federal courts do not owe state lawmakers deference as of right. Rather, deference flows from federal courts' trust in the decisions reached through the considered judgment of the legislative process.

Take *Blaisdell* for instance. The Court's deference in *Blaisdell* "did not rest on a mere assertion of conceivable public purpose; the Court cited legislative findings, supported by an adequate factual basis, that documented the existence of an economic emergency." *Burgum*, 932 F.3d at 732; *see also Keystone Bituminous*, 480 U.S. at 486 & n.14 (upholding a contractual impairment where "the legislative purposes set forth in the statute were genuine, substantial, and legitimate"). Similarly, in *East New York Savings Bank v. Hahn*, the Court deferred to the judgment of the New York legislature, which it seems "show[ed] the empiric process of legislation at its fairest: frequent reconsideration, intensive study of the consequences of what ha[d] been done,

27

readjustment to changing conditions, and safeguarding the future on the basis of responsible forecasts." 326 U.S. 230, 234 (1945). The legislature "was not even acting merely upon the pooled general knowledge of its members" but also "was advised by those having special responsibility to inform it[.]" *Id.* By contrast, the Court in *Kavanaugh* (the term after *Blaisdell*) refused to defer to the legislature. *See* 295 U.S. at 60. According to the Court, the law "le[d] to the conviction that the framers of the amendments have put restraint aside. With studied indifference to the interests of the mortgagee or to his appropriate protection they have taken from the mortgage the quality of an acceptable investment for a rational investor." *Id.*

EO 128 stands in stark contrast to the cases in which courts defer to legislative judgment. *Cf. HAPCO v. City of Phila.*, 2020 WL 5095496, at *8-10 (E.D. Pa. Aug. 28, 2020) (relying on legislative findings about the housing emergency that COVID-19 has caused and the city's need to address the emergency). There was no studied legislative judgment because Governor Murphy took from the legislature its right to effect laws. New Jersey law does not authorize the Governor to make legislative judgments when he issues executive orders. *See Comm'ns Workers*, 413 N.J. Super. at 265-66, 272.

As the U.S. District Court for the District of Massachusetts recently observed in another COVID-related case, "the degree of deference" should "be influenced by the extent to which" the legislative process met the standard of lawmaking recognized in *East New York Savings Bank. Baptiste v. Kennealy*, 2020 WL 5751572, at *19 (D. Mass. Sept. 25, 2020). The process here was a far cry from that standard. In usurping the

legislative process, Governor Murphy showed a "studied indifference" to housing providers, who had been depending on their security deposits to protect their property and contractual rights as they began suffering under the crush of the pandemic . *See Kavanaugh*, 295 U.S. at 60. His unauthorized unilateral judgment deserves no deference.

### b. Governor Murphy Targeted a Single Group for Relief

Defendants have not carried their burden of proving that EO 128 has a "significant and legitimate public purpose." *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 859 (8th Cir. 2002) (setting out the state's burden of proof); *see also Energy Reserves Grp.*, 459 U.S. at 411-12 (discussing the State's need to justify its purpose behind the regulation). A law impairing contractual rights must benefit the public generally rather than just a discrete group. *Energy Reserves Grp.*, 459 U.S. at 412. "[A] state must do more than mouth the vocabulary of the public weal in order to reach safe harbor." *McGrath v. R.I. Ret. Bd.*, 88 F.3d 12, 16 (1st Cir. 1996). Laws with incidental public benefits will run afoul of the Contracts Clause if the benefit is targeted at a specific constituency. *See, e.g.*, *Burgum*, 932 F.3d at 733 ("The law primarily benefits a particular economic actor in the farm economy—farm equipment dealers. Even if the law indirectly might benefit farmers and rural communities, the Contract Clause demands more than incidental public benefits."); *Janklow*, 300 F.3d at 861 ("It is clear that the only real beneficiaries under the Act are the narrow class of dealers of agricultural machinery.").

"Since *Blaisdell*, the Court has reaffirmed that the Contract[s] Clause prohibits special-interest redistributive laws, even if the legislation might have a conceivable or

incidental public purpose." *Burgum*, 932 F.3d at 732 (citation omitted). In *Allied Structural*, for instance, the Court struck down a law altering pensions, which seemed generally applicable on its face. 438 U.S. at 238. On closer inquiry, the Court determined that the law could "hardly be characterized … as one enacted to protect a broad societal interest rather than a narrow class." *Id.* at 248-49. The law "applie[d] only to private employers who" met certain extremely specific requirements. *Id.* at 248. This targeted relief failed to satisfy the broad public purpose required by the Contracts Clause.

EO 128 fails to serve a general public purpose. While it purports to be in the public interest, EO 128 benefits only one group: residential tenants. Although the global pandemic has impacted all New Jerseyans, and housing providers and tenants alike are suffering, Governor Murphy singled out a favored group for a benefit at the expense of a disfavored group. That the public happens to be made up of more tenants than housing providers does not mean that EO 128 benefits the broader public generally. Political favoritism at the expense of a disfavored group is the exact behavior the framers drafted the Contracts Clause to prevent. *See* Laurence Tribe, American Constitutional Law, § 9-8, p. 613 (2d ed. 1988) (The Contracts Clause serves to protect minority rights "from improvident majoritarian impairment.").

That there is an ongoing emergency does not transform a law targeting a single group into one for a general public purpose, either. An emergency does not grant states authority to disregard the Contracts Clause. *Blaisdell*, 290 U.S. at 425 ("Emergency does not increase granted power or remove or diminish the restrictions imposed upon power

granted or reserved."). The Framers were acutely aware of economic crises when drafting the Constitution and its Contracts Clause. "Between the close of the war of the revolution and the adoption of [the Constitution], unprecedented pecuniary distress existed throughout the country." *Edwards*, 96 U.S. at 604. And many (if not most) Contracts Clause cases have considered legislation enacted in the face of crises. *See, e.g.*, *Blaisdell*, 290 U.S. at 466 (recognizing *Bronson* struck down a law passed in response to an emergency what "was quite as serious as that which the country [] faced during the past three years [of the Great Depression]"). Even in cases in which states have declared an emergency endangering public health and safety and have invoked the public welfare, the Court has not hesitated to strike laws impairing contractual rights. *See, e.g.*, *Kavanaugh*, 295 U.S. at 60. This Court should not hesitate to do so here.

### c. EO 128 Is Not Tailored to Its Public Purpose

The *Blaisdell* decision is instructive on how narrowly tailored a law must be toward advancing the stated public interest. *Blaisdell* reiterated that the Contracts Clause does not "prevent limited and temporary interpositions with respect to the enforcement of contracts if made necessary by a great public calamity such as fire, flood, or earthquake … [or] by other and economic causes." *Id.* at 439-40. But the Court identified three conditions that have relieved such laws from tension with the Contracts Clause. Those laws (1) have provided only "temporary and conditional" relief, (2) that was "sustained because of an emergency," and (3) have provided for reasonable compensation while the law impaired creditor's rights. *Id.* at 441-42 ("[P]rovision was

made for reasonable compensation to the landlord during the period he was prevented from regaining possession."). The foreclosure moratorium at issue in *Blaisdell*, for instance, was in place for the duration of an emergency "and in no event beyond May 1, 1935," two years after its issuance. *Id.* at 416. The law also provided that the moratorium applied only if a local court, on application of the mortgagor, deemed it "just and equitable." *Id.*; *cf. Kavanaugh*, 295 U.S. at 63 (distinguishing *Blaisdell* because there was "not even an attempt to assimilate what was done by [the law at issue] to the discretionary act of a chancellor in subjecting an equitable remedy to an equitable condition"). Moreover, the mortgagor had to "pay the rental value of the premises as ascertained in judicial proceedings." *Blaisdell*, 290 U.S. at 445. Although the law diminished the mortgagors' contractual remedies temporarily, they were compensated in the meantime and could eventually enforce their rights. This was a sensible solution, the Court reasoned in part, because the mortgagees were "predominantly corporations such as insurance companies, banks, and investment and mortgage companies." *Id.* at 445-46.

There is no similar tailoring here. For one, EO 128 has no temporal limit. The order is set to remain in effect until 60 days following the conclusion of the current state of emergency. But the duration of the emergency is not fixed in time and could extend indefinitely.[5] Beyond that, EO 128 inexplicably extends for an extra 60 days

---

[5] The Governor has extended the emergency eight times. *See* Exec. Order 191.

beyond the emergency. Compare the indefinite nature of EO 128 with the law in *Blaisdell*, which had a fixed term even if the emergency continued longer and, in any case, did not extend for any extra period beyond the emergency. *See* 290 U.S. at 416. The unlimited duration of EO 128 is particularly difficult to consider "temporary" given the fixed and limited term of Plaintiffs' leases. *See* Am. Compl. ¶¶ 20, 24, 28, 33. A law that applies for 18 months is not "temporary" in relation to a contract with a one-year term; instead, the law is a permanent change to the contract.

Nor is EO 128 tailored to specific needs it purports to serve. One major indication of the order's overly broad scope is the fact that EO 128 purports to respond to an economic emergency and relied on statutory provisions that authorize the Governor to issue orders relating specifically to containing the spread of pathogens and controlling the New Jersey National Guard. *See* Am. Compl. ¶¶ 41-52, 123-40.

The order contains no means test or mechanism by which the relief it offers is limited to tenants who "*may* be suffering from one or more financial hardships that are caused by or related to the COVID-19 pandemic[.]" Murphy Exec. Order 128 (emphasis added). Take the Kravitzes' tenants for instance. The Kravitzes leased the Glassboro Property to four students, the Rowan Tenants. Am. Compl. ¶¶ 22-23. The term of the lease ran through the end of the 2019-20 school year, ending June 1, 2020. *Id.* ¶ 24. Without any indication that their finances or health had been at all impacted by the pandemic, the Rowan Tenants gave Mr. Kravitz letters invoking EO 128 rather than paying their final month's rent. *Id.* ¶ 103. Faced with criminal penalties if they

asserted their contractual rights, the Kravitzes complied with EO 128. The Rowan Tenants caused $1,854.59 in damage to the Glassboro Property, all of which the security deposit would have been covered if Defendants had not impaired the Kravitzes' contract. *Id.* ¶ 104. It is reasonable to assume that the Rowan Tenants might have repaired the damage on their own (or at least cleaned the carpet) had Governor Murphy not unilaterally adjusted the incentive structure established by the Kravitzes' contract.

Governor Murphy's diminishing the value of the Kravitzes contract was not an "equitable remedy to an equitable condition." *Kavanaugh*, 295 U.S. at 63. No court in equity could have or would have relieved the Rowan Tenants of their contractual obligation as Governor Murphy did through EO 128. *See Blaisdell*, 290 U.S. at 416. But under the terms of EO 128—unlike the law at issue in *Blaisdell*—no court in equity must grant such relief because Governor Murphy failed to narrowly tailor EO 128. *See id.*

Plaintiffs are not "predominantly corporations, such as insurance companies, banks, and investment and mortgage companies." *Id.* at 445-46. Plaintiffs are simply property owners renting their homes. Most of the Plaintiffs own only a single rental unit. Their "chief concern" is not simply protecting a financial investment but protecting their private property. *Cf. id.* at 446. They depend on the security deposit to protect against physical damage likely to occur when they lease their property.[6] *See* Am.

---

[6] That two Plaintiffs might be eligible for some sort of deferral on their mortgage payments does not lessen Plaintiffs need for or right to the security deposit for which they contracted to protect their contractual and property rights. Proposed *Amici Curiae* Br. (ECF No. 27-2) at 10 n.31.  A mortgage payment deferral does not stop interest

Compl. ¶ 21. EO 128 criminalized their ability to assert the rights for which they freely contracted and which had been secured by statute.

It is not difficult to conceive of ways to tailor a law more closely to EO 128's stated purpose.[7] *See U.S. Tr.*, 431 U.S. at 21 (opining that an impairment is unreasonable when "an evident and more moderate course would serve [the state's] purposes equally well"). The appropriate way to tailor a law providing emergency relief is a policy choice best left to the legislative branch, but EO 128 fails by any measure to limit its relief in a way that might further the stated public purpose while protecting contractual rights.

---

from accruing on the owner's debt. And unlike in *Blaisdell*, the interest does not accrue in Plaintiffs' favor. *See* 290 U.S. at 416. Moreover, a non-party's actions to offer some relief to property owners has no impact on whether Governor Murphy violated the Contracts Clause or whether Plaintiffs are entitled to the declaratory and injunctive relief they seek. Proposed *amici*'s suggestion to the contrary is as inapposite as it is inappropriate for proposed *amici* to attach such extra-record evidence at the motion-to-dismiss stage. *See supra* note 2.

[7] The Brookings Institute has argued that "emergency rental assistance resources should prioritize those facing the most severe housing insecurity, including those at high risk of homelessness" and also include rental assistance, which "is critical to protect the long-term housing of tenants—and smaller landlords, too." Kristen E. Broady, Wendy Edelberg, & Emily Moss, *An Eviction Moratorium Without Rental Assistance Hurts Smaller Landlords, Too*, Brookings Institute (September 21, 2020), *available at* https://www.brookings.edu/blog/up-front/2020/09/21/an-eviction-moratorium-without-rental-assistance-hurts-smaller-landlords-too. And California has tailored its tenant-assistance legislation by requiring tenants to return a declaration under penalty of perjury swearing that they have suffered a hardship because of COVID-19, and the law also includes protections for housing providers with four or fewer units. State of California, *Tenant, Homeowner, and Small Landlord Relief and Stabilization Act of 2020*, *available at* https://www.gov.ca.gov/wp-content/uploads/2020/08/Factsheet-Tenant-Homeowner-and-Small-Landlord-Relief-and-Stabilization-Act-of-2020.pdf.

Finally, nothing in EO 128 compensates Plaintiffs for the diminished value of their contract during the pendency of the order. *See Blaisdell*, 290 U.S. at 442. To the contrary, Plaintiffs must now bear additional costs of litigating small-claims actions to seek reimbursement for property damage that their security deposits should have covered. By doing so, EO 128 has diminished the value of Plaintiffs' contracts. *See Green*, 21 U.S. at 75-76.

Through EO 128, Governor Murphy unilaterally reapportioned the value of residential leases in the tenants' favor. He picked winners and losers, interfering with contracts on behalf of a favored constituency—precisely what the Contracts Clause prohibits. Because EO 128 substantially impairs Plaintiffs' contracts, it must fail. Plaintiffs have stated a Contracts Clause claim on which relief can be granted.

## III.   EO 128 VIOLATES PLAINTIFFS' RIGHT TO DUE PROCESS OF LAW

Defendants violated Plaintiffs' right to due process through the passage and enforcement of EO 128. *See* U.S. Const. amend. XIV, § 1. When a change in state law retroactively affects the legitimate expectations and economic rights of its citizens, the inherent unfairness triggers a due-process inquiry under the Fourteenth Amendment. *See Romein*, 503 U.S. at 191.

Typically, laws "adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality" and courts give "strong deference" to the legislature. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 47 U.S. 717, 729 (1984). But as explained above, EO 128 deserves no such deference or presumption of

36

constitutionality because Governor Murphy acted through executive fiat rather than the proper constitutional channels. Moreover "retroactive legislation does have to meet a burden not faced by legislation that has only future effects. It does not follow that what Congress can legislate prospectively it can legislate retrospectively." *Id.* at 730 (cleaned up). To meet this burden, retroactive application of the law must be a rational means of furthering a legitimate legislative purpose. *Id.* at 729-30. For the same reasons that EO 128 was not sufficiently tailored to satisfy the Contracts Clause analysis, the order's retroactive application lacks a rational basis under the Due Process Clause. EO 128 is overbroad and not a legitimate way to further the order's stated purpose.

Secondly, EO 128 violates Plaintiffs' right to due process by disregarding established procedures and depriving Plaintiffs of the rights secured by their respective leases—including the right to enter those contracts free from retroactive government interference. *See Reich v. Beharry*, 883 F.2d 239, 242-43 (3d Cir. 1989). Plaintiffs have a fundamental right to contract, protected by the United States Constitution. Although parties to a contract cannot sue in federal court for any deprivation of the property rights secured by contract, *see id.*, the state is not free to disregard the republican form of government to issue *ultra vires* orders that deprive the right to contract. *See* U.S. Const. art. IV, § 4 (guaranteeing each state will maintain a republican form of government). Without following New Jersey's established procedures, Governor Murphy issued EO 128 *ultra vires* and deprived Plaintiffs of their rights without due process of law. Typically, a citizen is heard during the lawmaking process through his or her elected

representatives. Governor Murphy circumvented the established (and constitutionally guaranteed) legislative processand created law outside the democratic process. By doing so, Governor Murphy again denied Plaintiffs due process of law.

EO 128 penalizes non-compliance pursuant to the Civilian Defense and Disaster Control Act. But that Act does not authorize the Governor to issue Executive Order 128. Without a lawful source of authority to issue the order, the Governor cannot criminalize the failure to comply with his unlawful order. Any prosecution based on the failure to abide by an unlawful order violates due process. Nor does a landlord have to violate the EO 128 to challenge the unlawful criminal penalties contained in it.

These due-process violations were adequately set out in Plaintiffs' Amended Complaint to state a claim under the Due Process Clause. There is no adequate remedy at law, as there are no damages that could compensate Plaintiffs for the deprivation of their constitutional rights, and they will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from enforcing EO 128.

## IV.   EO 128 DENIES PLAINTIFFS EQUAL PROTECTION OF THE LAWS

Plaintiffs have also stated a claim that EO 128 denied them equal protection of the law. The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "This is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

By granting special relief to residential tenants, EO 128 singles out residential housing providers to suffer an extra loss during the pandemic. *See* N.J.S.A. 46:8-26, -27 (explaining that the act applies to rental properties used for dwelling purposes). Governor Murphy's animus toward and scapegoating of housing providers has been clear from his public remarks. *See* Am. Compl. ¶ 70-72. In a press conference discussing EO 128, Governor Murphy encouraged tenants to report their landlords to the state if they are "getting screwed by their landlord." *Id.* at ¶ 71 (quoting video at 49:50). His singling out of a disfavored group for unequal treatment under the law has had cognizable consequences for Plaintiffs. Plaintiffs' tenants (and other tenants throughout New Jersey) took Governor Murphy's disfavored treatment of housing providers, in conjunction with EO 128, as permission to abandon their contractual obligations.

Although courts traditionally defer to the policy judgments of the legislature when analyzing an equal protection claim, *see Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018), such deference is inappropriate given this case of executive fiat for all the reasons stated *supra* in Section II.C.2.a. The Governor cannot rely on public-policy rationale to defend executive edicts in the same way the legislature can to defend legislative acts. *Cf. Commc'ns Workers*, 413 N.J. Super. at 265–66, 272. Regardless, there is no rational basis to support EO 128. *See Newark Cab Ass'n*, 901 F.3d at 156. The bases that Governor Murphy asserted in support of EO 128 are wholly arbitrary and irrational. *See id.* The Governor's order purports to respond to a health pandemic and does so by telling owners of residential property that provisions of their leasehold

contracts are void. As Plaintiffs have outlined above, the connection between the stated rationale and the decision to treat residential housing providers differently under the law is beyond tenuous. Plaintiffs have sufficiently stated a claim for relief under the Equal Protection Clause.

Finally, Plaintiffs preserve for appeal that the Privileges or Immunities Clause protects substantive rights often incorporated through the Due Process Clause.[8]

## CONCLUSION

With all New Jerseyans facing a once-in-a-century crisis, Governor Murphy abandoned the legislative process and the rule of law to relieve a discrete constituency of its contractual obligations at the expense of Plaintiffs' contractual and constitutional rights. The founders considered this exact eventuality and adopted a Constitution that prohibits orders such as EO 128. Plaintiffs have set out these claims in much more detail than the Rules of Civile Procedure require. This Court should deny Defendants' Motion to Dismiss and allow Plaintiffs to prosecute their claims.

Dated: November 18, 2020                    Respectfully submitted,

                                            */s/ Kara Rollins*
                                            KARA ROLLINS (Attorney ID 107002014)
                                            Litigation Counsel
                                            HARRIET HAGEMAN (*Pro Hac Vice*)

---

[8] Plaintiffs recognize that the Privileges or Immunities Clause has been disfavored by courts since the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873), which erroneously wrote that provision out of the Constitution in the wake of Reconstruction. *See McDonald v. City of Chi.*, 561 U.S. 742, 808 (2010) (Thomas, J., concurring in part).

Senior Litigation Counsel
JARED MCCLAIN (*Pro Hac Vice*)
Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210

*Counsel to Plaintiffs*

41

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2020, I electronically filed the foregoing Response in Opposition to Defendants' Motion to Dismiss with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*s/ Kara Rollins*
KARA ROLLINS (Attorney ID 107002014)
Litigation Counsel
