**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MATTHEW JOHNSON, et al.,          1:20-cv-06750-NLH

          Plaintiffs,          **OPINION**

    v.

PHILIP D. MURPHY, et al.,

        Defendants.

**APPEARANCES:**

KARA ROLLINS
NEW CIVIL LIBERTIES ALLIANCE
1225 19TH STREET NW
STE 450
WASHINGTON, DC 20036

      *On behalf of Plaintiffs*

STUART MARK FEINBLATT
TIM SHEEHAN
HEATHER LYNN ANDERSON
OFFICE OF THE ATTORNEY GENERAL
HUGHES JUSTICE COMPLEX
25 W. MARKET STREET
TRENTON, NJ 08625

RACHEL SIMONE FREY
LITTLER MENDELSON, P.C.
1085 RAYMOND BLVD, 8TH FLOOR
NEWARK, NJ 08625

      *On behalf of Defendants*

JOSEPH C. O'KEEFE
PROSKAUER ROSE LLP
11 TIMES SQUARE
NEW YORK, NEW YORK 10036

*On behalf of Interested Parties Fair Share Housing*
*Center, Lawyers' Committee For Civil Rights Under Law,*
*Housing & Community Development Network of New Jersey,*
*National Association For the Advancement of Colored*
*People - New Jersey State Conference, and The New*
*Jersey Latino Action Network*

**<u>HILLMAN</u>, District Judge**

Plaintiffs Matthew Johnson, Charles Kravitz, Dawn Johanson-Kravitz, Little Harry's LLC, Margarita Johnson, John Johnson, Two Bears Property Management, Andrew Van Hook, and Union Lake Enterprises, LLC (collectively "Plaintiffs") are residential landlords and they have sued Defendants Philip D. Murphy ("Governor Murphy"), Gurbir S. Grewal, and Defendant Administrator Judith M. Persichilli (collectively "Defendants") challenging Executive Order 128 (the "Order" or "EO 128"), which was issued to address certain economic consequences of the novel coronavirus known as COVID-19. As of today, over twenty-nine million Americans are known to have contracted COVID-19 and five hundred thirty-six thousand seven hundred thirty-four Americans have died from the disease. These numbers are steadily increasing, and they have increased significantly since the filing of this lawsuit on June 2, 2020. See <u>COVID Data Tracker</u>, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited March 19, 2021). New Jersey alone, as of today, has recorded more than seven hundred fifty-eight

thousand confirmed cases and twenty-one thousand five hundred
eighty-eight confirmed deaths.  See New Jersey COVID-19
Dashboard, State of New Jersey Department of Health, available
at https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml
(last visited March 19, 2021).

At issue here is Governor Murphy's Executive Order 128,
which allows residential tenants to apply security deposit funds
to past due rents.  Plaintiffs ask this Court to enjoin
Executive Order 128 on the grounds that the Order violates their
rights under the United States Constitution's Contracts Clause,
Due Process Clause, Privileges or Immunities Clause, and Equal
Protection Clause.

Presently before this Court is Defendants' Motion to
Dismiss.  (ECF No. 26.)  For the reasons expressed below,
Defendants' Motion will be granted.

## BACKGROUND

### A. New Jersey's Response to COVID-19

In response to the COVID-19 pandemic, Governor Murphy
declared a public health emergency and state of emergency on
March 9, 2020.  The stated purpose of Executive Order 103 was
"to protect the health, safety and welfare of the people of the
State of New Jersey."  N.J. Exec. Order 103.  Governor Murphy
explained he was exercising certain emergency powers of the
Governor provided under "the Constitution and statutes of the

3

State of New Jersey, particularly the provisions of N.J.S.A. 26:13-1 et seq., N.J.S.A. 38A:3-6.1, and N.J.S.A. 38A:2-4 and all amendments and supplements thereto." (Id.) Governor Murphy expressly reserved the right "to utilize and employ all available resources of the State government and of each and every political subdivision of the State, whether of persons, properties, or instrumentalities, and to commandeer and utilize any personal services and any privately-owned property necessary to protect against this emergency," which Governor Murphy explained was "[i]n accordance with the N.J.S.A. App. A:9-34 and N.J.S.A. App. A:9-51." (Id.)

Following Executive Order 103, Governor Murphy issued several executive orders with the purpose of attempting to monitor, plan for and mitigate the spread of COVID-19. To reduce the spread of COVID-19, on March 16, 2020, Governor Murphy ordered gatherings in New Jersey limited to no more than 50 persons and mandated the closure of schools, casinos, racetracks, gyms and fitness centers, entertainment centers, bars, and restaurants (except for takeout and delivery). N.J. Exec. Order 104. On March 15, 2020, the national Centers for Disease Control and Prevention ("CDC") recommended that gatherings of 50 or more people should be cancelled or at least postponed throughout the United States for the following eight weeks. (Id.) Governor Murphy implemented that recommendation

in Executive Order 104. (Id.)  Governor Murphy further explained

that the "CDC has advised that COVID-19 spreads most frequently

through person-to-person contact when individuals are within six

feet or less of one another" and that for this reason, the CDC

has recommended individuals through the United State to practice

social distancing.  (Id.)  Governor Murphy ordered that any

violator of Executive 104 may be subjected to criminal

penalties.

Five days later on March 21, 2020, Governor Murphy issued

Executive Order 107, which mandated the closure of non-essential

businesses to the public and required that New Jersey residents,

with limited exceptions, remain at their residence.  N.J. Exec.

Order 107.  In doing so, Governor Murphy explained that "to

mitigate community spread of COVID-19, it is necessary to limit

the unnecessary movement of individuals in and around their

communities and person-to-person interactions in accordance with

CDC and DOH guidance."  N.J. Exec. Order 107.  Governor Murphy

ordered that any violator of Executive 107 may be subjected to

criminal penalties.

New Jersey has also taken a number of measures to help

mitigate the risk of housing insecurity as a result of COVID-19.

Through these measures, New Jersey has placed protections on

homeowners, landlords, and renters.  First, New Jersey initiated

a residential mortgage relief program, which would help mitigate

the financial struggles faced by mortgagors.  Under this program, state and national financial institutions agreed to (1) provide a 90-day grace period for mortgage payments; (2) waive or refund mortgage-related late fees and other fees for 90 days; (3) start no new foreclosures for 60 days.  In addition, late or missed payments would not be shared with credit reporting agencies for residents taking advantage of the residential mortgage relief program.  N.J. Dep't of Banking & Ins., COVID-19 & Residential Mortgage Relief, available at https://www.state.nj.us/dobi/covid/mortgagerelief.html (last accessed February 24, 2020).

Second, New Jersey initiated a Small Landlord Emergency Grant Program, which provided "financial support for small rental property owners (and, indirectly, to renters) who are struggling due to the COVID-19 emergency in the State of New Jersey."  This 25-million-dollar grant program reimbursed such owners for lost revenue due to COVID-19 from April through July 2020. See N.J. Housing & Mortgage Finance Agency, "Small Landlord Emerg. Grant Program," available at https://www.nj.gov/dca/hmfa/rentals/sleg/index.shtml (last accessed February 23, 2021).

Third, Governor Murphy issued Executive 106, which placed a temporary emergency moratorium on evictions or foreclosures for residential properties.  In Executive Order 106, Governor Murphy

explained that "many New Jerseyans are or will be experiencing
substantial loss of income as a result of business closures,
reductions in hours, or layoffs related to COVID-19, impeding
their ability to keep current on rent and mortgage payments."
N.J. Exec. Order 106.  Governor Murphy further explained
"housing security and stability are important to public health,
particularly as homelessness can increase vulnerability to
COVID-19" and that "removals of residents pursuant to evictions
or foreclosure proceedings can increase the risk to those
residents of contracting COVID-19, which in turn increases the
risks to the rest of society and endangers public health."
(Id.)

　　　　For these reasons, Governor Murphy ordered the suspension
of removal actions resulting from eviction or foreclosure
proceedings for residential properties until two months after
the ongoing emergency has ended.  (Id.)  Nevertheless, Governor
Murphy emphasized that Executive Order 106 did "not affect any
schedule of rent that is due" and clarified that "eviction and
foreclosure proceedings may be initiated or continued during the
time [Executive Order 106] is in effect."  (Id.)

　　　　**B. Executive Order 128**

　　　　On April 24, 2020, in response to the continuing pandemic,
Governor Murphy issued the challenged order, Executive Order
128.  In April 2020, New Jersey was one of the eight

7

jurisdictions accounting for two-thirds of COVID-19 cases
identified in the United States and one of the three
jurisdictions accounting for approximately half of all deaths
related to COVID-19.  See CDC, Geographic Differences in COVID-
19 Cases, Deaths, and Incidence — United States, February 12–
April 7, 2020,

https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e4.htm.

Governor Murphy recognized that as of April 13, 2020,
"there were 856,528 unemployment claims filed by New Jerseyans
over the previous five weeks."  N.J. Exec. Order 128.  Governor
Murphy said the measures included in Executive 128 were
justified because "tenants may be suffering from one or more
financial hardships that are caused by or related to the COVID-
19 pandemic, including but not limited to a substantial loss of
or drop in income, and additional expenses such as those
relating to necessary health care."  (Id.)  Governor Murphy
explained Executive Order 128 was further justified because "in
addition to eviction proceedings being initiated and the
continued risk of eviction upon termination of the Order,
individuals may face other consequences from a late payment of
rent, including interest and late fees, which they may be unable
to satisfy in light of their substantial loss of income, as well
as negative credit reports that may affect their ability to find
housing options in the future."  (Id.)  Governor Murphy

acknowledged that, under New Jersey law, "a security deposit and the accumulated interest and earnings on the investment of such deposit remain the property of the tenant." (Id.)  For this reason, Governor Murphy concluded "enabling individuals to pay portions of their rent with the security deposit they own will allow those individuals to mitigate the consequences regarding evictions and accumulation of interest and late fees upon termination of Executive Order No. 106 (2020), and thus is plainly in the public interest."  (Id.)  Governor Murphy ordered that any violator of Executive 128 may be subjected to criminal penalties.

Executive Order 128 suspends any provisions of the Security Deposit Act, N.J.S.A. 46:8-19 et seq., which are inconsistent with the Order until 60 days following the end of the emergency declared by Executive Order 103.  (Id.) ("Use of a security deposit for the purposes outlined in this Order shall not be considered a violation of N.J.S.A. 46:8-19 et seq.  Any provisions of N.J.S.A. 46:8-19 et seq. that are not inconsistent with this Order remain in full force and effect.").

Leaseholds in New Jersey are "highly regulated by statute" and "[s]ecurity deposits specifically are regulated by N.J.S.A. 46:8-19 et seq." Am. Compl. ¶ ¶86-87.  Security deposits are deposits of rent — most commonly, one month's rent — to provide the landlord with security for the making of repairs to damage

caused by the tenant once the tenant vacates the premises.
Security deposits are limited to an amount equal to one and a
half months rent.  N.J.S.A. 46:8-21.2.  Landlords are required
by law to deposit security deposits in an interest-bearing
account, which must be at a New Jersey or federal chartered
bank, and to give the tenant written notice of whether the money
is deposited.  N.J.S.A. 46:8-19.  The security deposit plus the
"tenant's portion of the accumulated interest or earnings
accumulated thereon as hereinafter provided, shall continue to
be the property" of the tenant.  N.J.S.A. 46:8-19.  The security
deposit "plus the tenant's portion of any interest or earnings
accumulated thereon, less any charges expended in accordance
with the terms of a contract, lease, or agreement" must be
returned to the tenant within thirty days of the termination of
the tenancy.  N.J.S.A. 46:8-21.1.

Executive Order 128 temporarily suspends the operation of
the usual procedures governing the use of security deposits in
order to permit tenants to apply their security deposit funds to
rental payments. More specifically, Executive Order 128 states,
in relevant part:

> Upon written request from a tenant, including
> electronic communication, a security deposit
> governed by the provisions of N.J.S.A. 46:8-
> 19 et seq., as well as the tenant's portion of
> the interest and/or earnings accumulated
> thereon, shall be applied to or credited
> towards rent payments due or to become due

from the tenant during the Public Health
Emergency established in Executive Order No.
103 (2020) or up to 60 days after the Public
Health Emergency terminates.

When a tenant applies or credits such deposit,
interest, or earnings to pay rent pursuant to
Paragraph 1 of this Order, the following
additional provisions shall apply for the
duration of the tenant's current contract,
lease, or license agreement:
   a. The landlord may recoup from the
tenant any monies the landlord expended that
would have been reimbursable by the security
deposit and interest or earnings thereon, at
the time that such reimbursement from the
deposit and interest or earnings thereon would
have taken place; and
   b. The tenant shall otherwise be without
obligation to make any further security
deposit relating to the current contract,
lease, or license agreement. If, however, the
tenant and landlord extend or renew their
contract, lease, or license agreement
following the date of this Order, then the
tenant shall be obligated to replenish the
security deposit in full either on the date
six months following the end of the Public
Health Emergency established by Executive
Order No. 103 (2020), which was extended by
Executive Order No. 119 (2020), or on the date
on which the current contract, lease, or
license agreement is extended or renewed,
whichever is later.

The New York and Connecticut governors also issued similar

Executive Orders that allowed tenants to apply their security

deposits toward unpaid rent.  *See* New York Executive Order

202.28 (May 7, 2020); Connecticut Executive Order 7-DDD § 1(a)

(June 29, 2020).  In issuing Executive Order 128, Governor

Murphy explained that he was relying on the emergency powers

conferred upon him by "the Constitution and statutes of the
State of New Jersey, particularly the provisions of N.J.S.A.
26:13-1 et seq., N.J.S.A. App. A: 9-33 et seq., N.J.S.A. 38A:3-
6.1, and N.J.S.A. 38A:2-4 and all amendments and supplements
thereto."  N.J. Exec. Order 128.

### C. Procedural History and the Pending Motion

Plaintiffs, owners of residential properties, filed their
Amended Complaint on September 24, 2020.  Plaintiffs assert the
following claims against Defendants: (1) Count I: Violation of
the Contracts Clause of the United States Constitution; (2)
Count II: Violation of Due Process Clause of the Fourteenth
Amendment to the United States Constitution; (3) Count III:
Violation of the Equal Protection Clause of the Fourteenth
Amendment to the United States Constitution; (4) Count IV:
Violation of the Privileges or Immunities Clause of the
Fourteenth Amendment to the United States Constitution; (5)
Count V: Violation of the Contracts Clause of the New Jersey
Constitution; (6) Count VI: Violation of Procedural Due Process
Clause of the New Jersey Constitution; (7) Count VII: Unlawful
Waiver of Law under New Jersey law; (8) Count VIII: Violation of
the Separation of Powers Clause of the New Jersey Constitution.

In sum, Plaintiffs seek to enjoin the enforcement of
Executive 128 for violating Plaintiffs' federal and state
constitutional rights.  Defendants moved to dismiss Plaintiffs'

Amended Complaint in its entirety on September 30, 2020.
Following this, the parties stipulated to the voluntary
dismissal of Plaintiffs' claims under New Jersey law: Counts V,
VI, VII, and VIII, which Defendants argued were barred by the
sovereign immunity doctrine.

Defendants argue dismissal of Plaintiffs' Amended Complaint
is warranted for several reasons.  First, Defendants argue
Plaintiffs' *ultra vires* theories, which underly Plaintiffs'
theories that Defendants violated Plaintiffs' federal
constitutional rights, are barred by sovereign immunity.

Second, Defendants contend Plaintiffs' Contracts Clause
claims cannot survive dismissal because (1) security deposits
are highly regulated by New Jersey and thus Executive Order 128
does not substantially impair Plaintiffs' contractual rights;
(2) Executive 128 reasonably furthers New Jersey's legitimate
purpose; and (3) Plaintiffs' Contracts Clause claims are not
cognizable under 1983.

Third, Defendants argue Plaintiffs' Due Process claims fail
for several reasons: (1) the right relied on for these claims,
the right to contract, is the duplicative of the interest
addressed in Plaintiffs' Contracts Clause claim; (2) Plaintiffs'
substantive due process claims additionally fail because
Executive 128 is not egregious conduct that shocks the
conscience; (3) Third, Plaintiffs' procedural due process claims

13

additionally fail because Executive 128 is a rule of general applicability and there was no procedural right to every single landlord before it was issued and, in any event, Plaintiffs failed to avail themselves of other remedies, such as appealing Executive Order 128 to the Appellate Division of the New Jersey Superior Court.

Fourth, Plaintiffs' Equal Protection fails because residential tenants and commercial tenants are not similarly situated and even if they were Executive Order 128 survives rational basis review.

Fifth, Plaintiffs' Privilege or Immunities claims fails because "Plaintiffs do not allege that EO 128 burdens the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State." (ECF No. 26) (quotations omitted.)

The Court has also received and reviewed the brief of *amici curiae* Fair Housing Center, Lawyers' Committee For Civil Rights Under Law, Housing & Community Development Network of New Jersey, National Association for the Advancement of Colored People – New Jersey State Conference, and The New Jersey Latino Action Network (collectively, the "*Amici*"). (ECF No. 27.) In addition to the arguments made by Governor Murphy, *Amici* stresses COVID-19 has and will continue to disproportionately effect working families of racial and ethnic minorities, which

14

will likely lead to a disproportionate amount of minorities
suffering from their inability to pay rent, due to no fault of
their own.

**DISCUSSION**

**A. Subject Matter Jurisdiction**

This Court exercises jurisdiction pursuant to 28 U.S.C.
§1331.

**B. Legal Standard**

**a. Standard for Dismissal under 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) provides that a
court may dismiss a complaint for "failure to state a claim upon
which relief can be granted." FED. R. CIV. P. 12(b)(6).  In
considering a motion under Federal Rule of Civil Procedure
12(b)(6), a court must accept all well-pleaded allegations in
the complaint as true and view them in the light most favorable
to the pleader.  Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir.
2005); see also Philips v. Cty. Of Allegheny, 515 F.3d 224, 228
(3d Cir. 2008) ("[I]n deciding a motion under Fed. R. Civ. P.
12(b)(6), [a district court is] . . . required to accept as true
all factual allegations in the complaint and draw all inferences
from the facts alleged in the light most favorable to" the
plaintiff).  A pleading is sufficient if it contains a "short
and plain statement of the claim showing that the pleader is
entitled to relief." FED. R. CIV. P. 8(a)(2).

When weighing a motion to dismiss, the Court does not ask
"whether a plaintiff will ultimately prevail, but whether the
claimant is entitled to offer evidence to support the
claims[.]'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 562 n.8
(2007) (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974));
see also Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009) ("Our
decision in Twombly expounded the pleading standard for 'all
civil actions.'") (citations omitted).

In applying the Twombly/Iqbal standard, a district court
will first "accept all of the complaint's well-pleaded facts as
true, but may disregard any legal conclusion." Fowler v. UPMC
Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Iqbal,
556 U.S. at 678).  Next, the Court will "determine whether the
facts alleged in the complaint are sufficient to show that the
plaintiff has a 'plausible claim for relief.'" Id. at 211
(citing Iqbal, 556 U.S. at 679).

To meet this standard, a "complaint must do more than
allege the plaintiff's entitlement to relief." Id.; see also
Philips, 515 F.3d at 234 ("The Supreme Court's Twombly
formulation of the pleading standard can be summed up thus:
'stating . . . a claim requires a complaint with enough factual
matter (taken as true) to suggest' the required element. This
'does not impose a probability requirement at the pleading
stage,' but instead 'simply calls for enough facts to raise a

reasonable expectation that discovery will reveal evidence of' the necessary element.") (citing Twombly, 550 U.S at 556).  The party moving to dismiss under 12(b)(6) "bears the burden of showing that no claim has been presented."  Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).

### b. Standard for Dismissal under Rule 12(b)(1)

Because "[t]he Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction," Defendants' motion is, in part, a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). See Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 693 n.2 (3d Cir. 1996).

Typically, once a Rule 12(b)(1) challenge is raised, the burden shifts to the plaintiff to demonstrate the existence of subject matter jurisdiction.  See McCann v. Newman Irrevocable Trust, 458 F.3d 281, 286 (3d Cir. 2006). "However, because 'Eleventh Amendment immunity can be expressly waived by a party, or forfeited through non-assertion, it does not implicate federal subject matter jurisdiction in the ordinary sense,' and therefore, a party asserting Eleventh Amendment immunity bears the burden of proving its applicability."  Garcia v. Knapp, No. 19-17946, 2020 WL 2786930, at *3 (D.N.J. May 29, 2020) (quoting Christy v. PA Tpk. Comm., 54 F.3d 1140, 1144 (3d Cir. 1994)).

In deciding a Rule 12(b)(1) motion, "a court must first determine whether the party presents a facial or factual attack because the distinction determines how the pleading is reviewed." Leadbeater v. JPMorgan Chase, N.A., No. 16-7655, 2017 WL 4790384, at *3 (D.N.J. Oct. 24, 2017). "When a party moves to dismiss prior to answering the complaint . . . the motion is generally considered a facial attack." Id.; see also Garcia, 2020 WL 2786930, at *4 ("Defendants, by asserting Eleventh Amendment immunity, raise a facial 12(b)(1) challenge."). In reviewing a facial attack, the Court should consider only the allegations in the complaint, along with documents referenced therein and attached thereto, in the light most favorable to the nonmoving party. See Constitution Party of Pennsylvania v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014).

Thus, a facial motion is handled much like a 12(b)(6) motion, and allegations in the complaint are accepted as true. Leadbeater, 2017 WL 4790384, at *3. Here, the Court will consider Defendants' motion to be a facial attack on the claims against it and therefore accept the alleged facts in the Amended Complaint as true.

**C. Analysis**

    a. *Ultra Vires* **Theory**

Defendants argues Plaintiffs' state law theories and causes of actions are barred by sovereign immunity. (ECF No. 26-1 at

14-18.)   In response, the parties stipulated to the dismissal of
Plaintiffs' state law violations.   (ECF No. 39.)   Nevertheless,
Plaintiffs argues the Eleventh Amendment does not bar
consideration of Governor Murphy's *ultra vires* action of issuing
Executive 128.   (ECF No. 36 at 8-10.)   Defendants respond that
Plaintiffs still base a large portion of their federal Contracts
Claim on the theory that Executive Order 128 exceeds Governor
Murphy's authority under New Jersey law despite abandoning their
state law causes of action.   (ECF No. 40 at 2-5.)   Defendants
contend this argument is barred by the Eleventh Amendment
because the *ultra vires* exception to the sovereign immunity
doctrine "applies only if an official acts 'without any
authority whatever.'"   (ECF No. 40 at 2 (quoting Pennhurst State
Sch. & Hosp. v. Halderman, 465 U.S. 89, 102 n.11 (1984)).
Defendants argue this exception does not apply because
Plaintiffs claim Executive Order "exceeds [Governor Murphy's
power."   (ECF No. 40 at 3 (quoting Am. Compl. at 2.))   This
Court agrees with Defendants and holds it lacks the jurisdiction
necessary to reach the merits of the state law questions raised
by Plaintiffs in regard to Plaintiffs' federal Contracts Claim.[1]

---

[1] On December 23, 2020, counsel for Defendants filed a letter
notifying this Court of a related action that was filed in state
court. Counsel explained how Defendants' pending motion to
dismiss "explain[ed] why this Court should dispose of the
pending federal claims (and grant the State the deference to
which it is owed) without reaching the state law arguments,

"The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'" Pennhurst, 465 U.S. at 101.  And "it is difficult to think of a greater intrusion on state sovereignty than . . . a federal court instruct[ing] state officials on how to conform their conduct to state law."  Id. at 106.  When a litigant claims that a state official lacks delegated power to do something, such a claim is not considered to be against a sovereign because an official acting outside his or her constitutional authority cannot be acting for the state, and the official is therefore not immune.  Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689-90 (1949); Pennhurst, 465 U.S. at 101 n.11.  A state officer is only considered to have acted ultra vires if he or she lacks "any authority whatever." Pennhurst, 465 U.S. at 101 n.11 (citing Fla. Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 697 (1982)).  "A public official's error in analyzing the scope or extent of his powers does not make his

---

which are barred by sovereign immunity in this federal court." (ECF No. 42.) Counsel then asked this court to "defer ruling until the New Jersey court adjudicates these state law issues" if this Court found "those state law arguments are somehow relevant to resolution of the federal constitutional claims that are properly asserted here." (ECF No. 42) (emphasis in original).  Plaintiffs objected to this request.  (ECF No. 43.) This Court finds it lacks jurisdiction to address the issue of New Jersey law raised by Plaintiffs in support of its federal Contracts Claim and thus, this Court finds Defendants' request is now mooted.

actions *ultra vires*." Vill. of Orland Park v. Pritzker, 475 F.
Supp. 3d 866, 888 (D. Conn. Aug. 1, 2020) (citing Pennhurst, 465
at 106-16).

Here, Plaintiffs' federal claims cannot be construed to be
claims that Governor Murphy acted "without any authority
whatever" when he issued Executive Order 128.  Governor Murphy
explained he was relying on the emergency powers conferred upon
him by the Constitution and statues of New Jersey, including the
Civilian Defense and Disaster Control Act when issuing Executive
Order 128.  The Disaster Control Act contains a broad provision
stating that "the Governor is empowered to make such orders,
rules and regulations as may be necessary adequately to meet the
various problems presented by any emergency," including "[o]n
any matter that may be necessary to protect the health, safety
and welfare of the people or that will aid in the prevention of
loss to and destruction of property." N.J.S.A. App. A:9-45.

While it is within the realm of possibility that Governor
Murphy exceeded his statutory powers or violated the New Jersey
Constitution by issuing Executive Order 128, a mistake in
understanding the scope of Governor Murphy's emergency powers
under the various constitutional and statutory provisions cited
by Governor Murphy in Executive Order does not render his
actions *ultra vires*. See Park, 475 F. Supp. at 888 (in a
similar challenge to COVID-19 orders, finding allegations that

Governor "exceeded his statutory powers" did "not render his actions *ultra vires*"); Auracle Homes, LLC v. Lamont, 478 F. Supp. 3d 199, 219 (D. Conn. 2020) (in a similar challenge to COVID-19 orders, finding Plaintiff's theory that Governor "is acting beyond the scope of his official capacity . . . under color of law" asked the Court to "cure violations of state law" and thus such theory was barred by the Eleventh Amendment); Elmsford Apartment Assocs., LLC v. Cuomo, 469 F. Supp. 3d 148, 162 (S.D.N.Y. 2020) (agreeing the *ultra vires* doctrine is inapplicable if "claim is not that the Governor lacks the power to respond to the COVID-19 emergency—only that he has abused that power").

This court lacks jurisdiction to address the issues of New Jersey law raised by Plaintiffs in relation to their federal Contract claims. Accordingly, this Court will not consider theories based on the idea that Defendants violated Plaintiffs' federal Contracts Clause constitutional rights by Governor Murphy's alleged *ultra vires* action.

### b. Contracts Clause

"The Contract Clause provides that no State shall pass any law 'impairing the Obligation of Contracts.'" United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands, 842 F.3d 201, 210 (3d Cir. 2016) (quoting U.S. Const. art. I, § 10). "The Clause

is not, however, the Draconian provision that its words might seem to imply." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240 (1978). "The Contract Clause 'does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public,' even though contracts previously entered into may be affected." United Steel Paper, 842 F.3d at 210 (quoting Spannaus, 438 U.S. at 241). "[T]he Contract Clause 'does not trump the police power of a state to protect the general welfare of its citizens.'" Id. (quoting Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 367 (2d Cir. 2006)). "Thus, state laws that impair an obligation under a contract do not necessarily give rise to a viable Contracts Clause claim." Buffalo Teachers Fed'n, 464 F.3d at 368.

The Supreme Court has developed a two-part test to determine whether there has been a violation of the Contracts Clause. Sveen v. Melin, 138 S. Ct. 1815, 1821 (2018). "The threshold issue is whether the state law has 'operated as a substantial impairment of a contractual relationship." Id. at 1821-22 (quoting Spannaus, 438 U.S. at 244). If it has, then the Court asks "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" Id. (quoting Energy Reserves Grp., Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12 (1983)).

23

"When, as in this case, the challenged law only impairs private contracts, and not those to which the state is a party, courts 'must accord substantial deference to the [State's] conclusion that its approach reasonably promotes the public purposes for which [it] was enacted.'" Elmsford, 469 F. Supp. 3d at 169 (citing Sal Tinnerello & Sons, Inc. v. Town of Stonington, 141 F.3d 46, 54 (2d Cir. 1998)). "Accordingly, the law affords States a wide berth to infringe upon private contractual rights when they do so in the public interest rather than sel." Id. (citing U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 16 (1977)).

To determine if the state law operates as a substantial impairment, courts consider the "extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." Sveen, 138 S. Ct. at 1817. "An important factor in determining the substantiality of any contractual impairment is whether the parties were operating in a regulated industry." Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff, 669 F.3d 359, 369 (3d Cir. 2012) (citing Energy Reserves, 459 U.S. at 411). "When a party enters an industry that is regulated in a particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships

are foreseeable." _Id._; _see also_ _Elmsford_, 469 F. Supp. 3d at
169 (quoting _Sullivan v. Nassau Cty. Interim Fin. Auth._, 959
F.3d 54, 64 (2d Cir. 2020) (recognizing "a long line of cases
teaches that the foreseeability of an impairment on contractual
rights, and therefore the extent to which such impairment
qualifies as substantial, 'is affected by whether the relevant
party operates in a heavily regulated industry'")).  "For those
who do business in a heavily regulated industry, 'the expected
costs of foreseeable future regulation are already presumed to
be priced into the contracts formed under the prior
regulation.'"  _Elmsford_, 469 F. Supp. 3d at 169 (quoting _All. of
Auto. Mfrs., Inc. v. Currey_, 984 F. Supp. 2d 32, 55 (D. Conn.
2013), _aff'd_, 610 F. App'x 10 (2d Cir. 2015)).

The Supreme Court "has consistently affirmed that States
have broad power to regulate housing conditions in general and
the landlord-tenant relationship in particular[.]"  _Loretto v._
_Teleprompter Manhattan CATV Corp._, 458 U.S. 419, 440 (1982)
(citing _Heart of Atlanta Motel, Inc. v. United States_, 379 U.S.
241 (1964) (discrimination in places of public accommodation);
_Queenside Hills Realty Co. v. Saxl_, 328 U.S. 80 (1946) (fire
regulation); _Bowles v. Willingham_, 321 U.S. 503 (1944)
(upholding rent control); _Home Bldg. & Loan Ass'n v. Blaisdell_,
290 U.S. 398, 439 (1934) (upholding mortgage moratorium); _Edgar_

A. Levy Leasing Co. v. Siegel, 258 U.S. 242 (1922) (upholding emergency housing law)).

"Because past regulation puts industry participants on notice that they may face further government intervention in the future, a later-in-time regulation is less likely to violate the contracts clause where it 'covers the same topic [as the prior regulation] and shares the same overt legislative intent to the protect [the parties protected by the prior regulation].'" Elmsford, 469 F. Supp. 3d at 169 (quoting Currey, 984 F. Supp. 2d at 55.

Here, it is undisputed that residential leases, specifically security deposits, in New Jersey are heavily regulated. See N.J.S.A. 46:8-19 to -26; see also Am. Compl. ¶86 ("Leaseholds in New Jersey are highly regulated by statute."); see id. ¶87 ("Security deposits, specifically are regulated by N.J.S.A. 46:8-19."); id. ¶88 ("States governing security deposits regulate everything from how a security deposit is paid, maintained, and returned, N.J.S.A. 46:8-19, -21.1; how large of a security deposit a landlord may require, N.J.S.A. 46:8-21.2; how and with whom the security deposit must be invested and accrue interest, N.J.S.A. 46:8-19; how and when the depositor must pay interest on the deposit, N.J.S.A. 46:8-19, -21.1; how a security deposit should be handled during a foreclosure, bankruptcy, or conveyance of the property, N.J.S.A.

46:8-20, -21; and how the parties can adjudicate their rights regarding security deposits, N.J.S.A. 46:8-21.4, -31, -35, & -41."). In New Jersey, pursuant to the Security Deposit Act, the security deposit "shall continue to be the property of the person making such deposit." N.J.S.A. 46:8-19. Thus, Executive Order 128's "modification of statutorily permissible uses of security deposits thus cannot amount to a substantial impairment of Plaintiffs' rights under their rental agreements." Auracle Homes, LLC v. Lamont, 478 F. Supp. 3d 199, 225 (D. Conn. 2020).

Indeed, in two recent district court decisions examining two executive orders, which also allowed residential tenants to use their security deposit funds to rents due and owing, the courts conclusively found such executive orders did not substantially impair plaintiffs' rights under their contracts with tenants. In Auracle, the court recognized that "Plaintiffs operate in a heavily regulated industry," and that the security deposit Executive Order therefore could not "operate as a substantial impairment of Plaintiffs' contractual rights" because it could not have been "wholly unexpected government legislation." 478 F. Supp. 3d at 224-25. The court focused on the fact that security deposit still belonged to the tenant and concluded that "modification of statutorily permissible uses of security deposits thus cannot amount to a substantial impairment of Plaintiffs' rights." Id.

In reaching its holding, the District of Connecticut relied on the Southern District of New York's decision in Elmsford Apartment Assocs., LLC v. Cuomo, 469 F. Supp. 3d 148 (S.D.N.Y. 2020), which upheld an analogous New York executive order. Id. at 170 (after detailing regulation of security deposits, finding "the foreseeability of additional regulation allows states to interfere with both past and future contracts," and thus that "the Contracts Clause also permits states to modify and abrogate existing contract terms long since agreed to"); see also HAPCO v. City of Phila., No. 20-3300, 2020 WL 5095496, *7 (E.D. Pa. Aug. 28, 2020) (also relying on Elmsford to reject Contracts Clause challenge to Philadelphia law allowing tenants to pay rent past due without late fees because "residential leases have been heavily regulated for many years" by local ordinances).

This Court agrees with the reasoning in Elmsford and Auracle and concludes that an executive order, like Executive Order 128, that "modifies aspects of the statutory scheme relating to permissible uses of security deposits . . . should have come as a no surprise to the landlord Plaintiffs, and thus could not amount to a substantial impairment of their rights." Elmsford, 469 F. Supp. 3d at 170.

Moreover, this Court agrees with Defendants that Executive Order 128 sufficiently safeguards Plaintiffs' ability to realize the benefit of their bargain. In Executive Order 128, Governor

Murphy explicitly allows a landlord to "to recoup from the tenant any monies the landlord expended that would have been reimbursable by the security deposit and interest or earnings thereon, at the time that such reimbursement from the deposit and interest or earnings thereon would have taken place." N.J. Exec. Order. 128. Moreover, Executive Order 106 explains that Governor Murphy's actions do not "affect any schedule of rent that is due." N.J. Exec. Order. 106. "For that reason, the other two aspects of a 'substantial impairment' enumerated in Sveen – the extent to which an impairment undermines the contractual bargain, and the ability of the impaired party to safeguard or reinstate their rights at a later time – weigh against finding a substantial impairment arising from the security deposit provisions." Id.

Similar to the executive order in Elmsford, Executive Order 128 "does not displace the civil remedies always available to landlords seeking to recover the costs of repairs or unpaid rents still owed at the end of a lease term." Elmsford, 269 F. Supp. 3d at 171. Just as in Elmsford, nothing in Executive Order 128 "diminishes the tenant's rental obligation by even a nickel" and the changes in Executive Order 128 are temporary. Id. In addition, this Court disagrees with Plaintiffs' position that they are no longer protected during the temporary period of the emergency because they may have to pursue legal action

rather than deduct unpaid rent or costs for damages from the tenants security deposit and instead finds the reasoning in Elmsford, where the court rejected this exact argument, persuasive.  In Elmsford, the court noted, although it was true that a landlord might have to "obtain a judgment for the amount expended in repairs," this "whole scheme is no different than what actually happens in the real world, where tenants routinely forfeit their security deposit by allowing it to 'cover the last month's rent' on a lease."  Elmsford, 469 F. Supp. 3d at 171. The court further explained "[t]he landlord can collect all he is owed at the end of the day by the simple expedient of going to some court when the courts are fully reopened. The fact that landlords would prefer not to avail themselves of their legal remedies—because it is often not worth the trouble to pursue a deadbeat tenant—does not mean that the state has impaired their contractual rights."  Id.

Accordingly, this Court agrees with Defendants that "the availability of court remedies shows there are ways for Plaintiffs to safeguard or reinstate their rights, even during the temporary period [Executive Order] 128 is in effect."  (ECF No. 26-1 at 23.)  Thus, Executive Order 128 does not substantially impair Plaintiffs' contract rights.

Because the Court concludes that Executive Order 128 does not substantially impair Plaintiffs' contract rights, it does

not address the second step of the Contracts Clause test:
whether Executive Order 128 is drawn in an appropriate and
reasonable way to advance a significant and legitimate public
purpose.  Accordingly, Plaintiffs' Count I fails to state a
claim and must be dismissed.

**c. Due Process Clause**

As the only two courts interpreting analogous executive
orders have held, "Plaintiffs' failure to demonstrate
substantial impairment of their property rights is fatal to
their procedural due process claim, too." <u>Elmsford</u>, 469 F.
Supp. 3d at 172; <u>see also</u> <u>Auracle</u>, 478 F. Supp. 3d at 226-27
("[T]he Due Process Clause cannot 'do the work of the Takings
Clause' because '[w]here a particular Amendment provides an
explicit textual source of constitutional protection against a
particular sort of government behavior, that Amendment, not the
more generalized notion of substantive due process, must be the
guide for analyzing these claims.'").

"It is elementary that procedural due process is implicated
only where someone has claimed that there has been a taking or
deprivation of a legally protected liberty or property
interest," and that "possessory interests in property invoke
procedural due process protections." <u>Abbott v. Latshaw</u>, 164
F.3d 141, 146 (3d Cir. 1998)(citing <u>Board of Regents v. Roth</u>,
408 U.S. 564, 569 (1972) and <u>Fuentes v. Shevin</u>, 407 U.S. 67, 87

(1972)).  "Because Plaintiffs have failed to demonstrate a
substantial impairment of their property rights, they 'ha[ve]
pointed to no specific constitutional guarantee safeguarding the
interest [they] assert ha[ve] been invaded." Auracle, 478 F.
Supp. 3d at 226-27 (quoting Paul v. Davis, 424 U.S. 693, 700
(1976)); Wilkinson v. Austin, 545 U.S. 209, 221 (2005) ("The
Fourteenth Amendment's Due Process Clause protects persons
against deprivations of life, liberty, or property; and those
who seek to invoke its procedural protection must establish that
one of these interests is at stake.").

     Here Plaintiffs have not identified a property interest
independent of the interests addressed by their Contracts
Claims.  This is fatal to their due process claims.  As the
Supreme Court has held when "a particular Amendment provides an
explicit textual source of constitutional protection against a
particular sort of government behavior, that Amendment, not the
more generalized notion of substantive due process, must be the
guide for analyzing these claims." Stop the Beach
Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. 702,
721 (2010)(quotations omitted).

     As Defendants note, and this Court agrees, it is evident
Plaintiffs' argument in support of their due process argument is
based on the alleged interference with their right to contract,
which is the same interest addressed by the Contracts Clause.

Two courts relying on this rule of law from Stop, while interpreting similar executive orders, have already held, this is fatal to both Plaintiffs' substantive and procedural due process claims.  Elmsford (denying Plaintiffs' procedural due process clams because Plaintiffs "have not identified a property interest independent of the interests addressed by their other constitutional claims"); Auracle (holding plaintiffs' substantive due process and procedural due process claims failed because "they have not identified an independent liberty or property interest").

Accordingly, this Court will dismiss Count II of Plaintiffs' Complaint.

### d. Equal Protection Clause

Plaintiffs contend that Executive 128 "singles out residential providers to suffer an extra loss during the pandemic" by granting special relief to residential tenants. (ECF No. 36 at 38-39.)  Plaintiffs argue the traditional deference given to policy judgments of the legislature is inappropriate here "given this case of executive fiat." Nevertheless, Plaintiffs argue Executive 128 cannot even satisfy the rational basis test because "the connection between the stated rationale and the decision to treat residential housing providers differently under the law is beyond tenuous."  (ECF No. 36 at 39-40.)

In response, Defendants argue that the Plaintiffs complain Defendants granted relief to residential tenant without "identifying the *similarly situated* group that was discriminated against." (ECF No. 40 at 15)(emphasis in original). Defendants contend Plaintiffs focus instead seems to be that Governor Murphy violated New Jersey law. Defendants conclude that Plaintiffs have failed to show that Executive 128 cannot satisfy the rational basis test. (Id.)

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall make or enforce a law that "den[ies] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. This "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). This Court has previously explained, "as long as there is no violation of a fundamental right or differences being drawn along suspect lines, the court applies rational-basis review even where it is 'factually probably correct' that Plaintiffs are 'being treated unequally and disproportionately.'" Nat'l Ass'n of Theatre Owners v. Murphy, No. 20-8298, 2020 WL 5627145, at *13 (D.N.J. Aug. 18, 2020); see In re Asbestos Litig., 829 F.2d 1233, 1238 (3d Cir. 1987) ("[A]s a general rule, classifications that neither regulate suspect classes nor burden fundamental rights must be

sustained if they are rationally related to a legitimate governmental interest.").

Under rational basis, government regulations are "presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest." City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).  "Where such rational basis review applies, 'the classification is presumed constitutional,' and the burden is on the party attacking the classification to negate 'every conceivable basis which might support it.'" McGee v. Thomas, No. 16-5501, 2019 WL 2515982, at *8 (E.D. Pa. June 17, 2019) (quoting Armour v. City of Indianapolis, Ind., 566 U.S. 673, 681 (2012)).

Plaintiffs asserts that Defendants violated the Equal Protection Clause by treating them differently based on their status as residential property owners.  This does not implicate a suspect class or fundamental right warranting heightened scrutiny.  Therefore, rational-basis review applies to the state action at issue, and Executive Order 128 will survive constitutional review as long as their restrictions bear a rational relationship to some legitimate end.  Park, 475 F. Supp. 3d at 886 (applying rational-basis review to plaintiffs' equal protection challenge to an executive order issued by Governor Pritzker that imposed greater restrictions on

restaurants and bars than other establishments, such as grocery stores, salons, etc.).

However, this Court must first address the threshold issue of whether commercial and residential tenants are even similarly situated in the first place to see whether it should advance to the rational basis analysis. Castaneira v. Potteiger, 621 Fed. App'x 116, 121 (3d Cir. 2015) ("Under the Fourteenth Amendment, no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend. XIV, § 1. This is essentially a direction that all persons similarly situated should be treated alike. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). The threshold question is thus whether Castaneira and in-state parolee sex offenders, though perhaps treated differently, are in fact similarly situated in the first place."). "Persons are 'similarly situated' for purposes of an equal protection claim when 'they are alike in all relevant aspects.'" Id. (quoting Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008)) (emphasis in original). This Court finds that Plaintiffs are unable to satisfy this threshold requirement.

The SDA "clearly applies only to residential leases." Perlman v. Lee, No. A-5862-12, 2014 N.J. Super. Unpub. LEXIS 2383, at *9 (App. Div. Oct. 2, 2014). Therefore, this Court has

a difficult time accepting Plaintiffs' argument that residential and commercial tenants are similarly situated for constitutional purposes. New Jersey's own legislature chose to include the following words when addressing the coverage of the SDA: the SDA "shall apply to all rental premises or units used for dwelling purposes[.]" N.J.S.A. 46:8-26. "It is apparent from the statute's plain language that the SDA does not apply to commercial leases." Perlman, 2014 N.J. Super. Unpub. LEXIS 2383, at *9 (citing Presberg v. Chelton Realty, Inc., 136 N.J. Super. 78, 84, 344 A.2d 341 (Passaic Cnty. Ct. 1975) (holding that the provisions of the SDA are not applicable to commercial leases). It is pretty evident New Jersey's own legislature appears to agree landlords of residential tenants and landlords of commercial tenants are not similarly situated groups. Given the fact that the extensive regulations of the SDA do not apply to commercial tenants, this Court finds this also cuts against Plaintiffs' argument that the threshold issue of equal protection claims is satisfied.

In addition, as the Defendants note, residential tenants and commercial tenants are especially not similarly situated when it comes "to the consequences of evictions, which have significant public impacts on individuals who are rendered homeless." (ECF No. 26-1 at 38-39.) Governor Murphy further elaborated on the detrimental effects COVID-19 could have on

residential tenants in Executive Order 106 and 128, such as
homelessness, evictions, and negative credit reports, and the
cumulation of late fees, which suggest landlords of residential
tenants and landlord commercial tenants are not similarly alike
in all relevant respects as the effects are not nearly as
crippling for commercial tenants.  N.J. Exec. Order 106
("[H]ousing security and stability are important to public
health, particularly as homelessness can increase vulnerability
to COVID-19" and that "removals of residents pursuant to
evictions or foreclosure proceedings can increase the risk to
those residents of contracting COVID-19, which in turn increases
the risks to the rest of society and endangers public health.");
N.J. Exec. Order 128 ("[I]n addition to eviction proceedings
being initiated and the continued risk of eviction upon
termination of the Order, individuals may face other
consequences from a late payment of rent, including interest and
late fees, which they may be unable to satisfy in light of their
substantial loss of income, as well as negative credit reports
that may affect their ability to find housing options in the
future.").

Moreover, Plaintiffs' Amended Complaint and opposition
papers only seem to highlight that Governor Murphy singled out
residential tenants by not applying Executive Order 128 to
commercial tenants.  Plaintiffs never attempts to demonstrate in

any meaningful way that the two groups are alike in all relevant aspects, which is a threshold issue.  This Court finds Plaintiffs' Count III fails for this reason.

### e. Privileges or Immunities Clause

In Count IV of the Amended Complaint, Plaintiffs allege that "Governor Murphy denied the Plaintiffs the privileges and immunities protected by the United States Constitution. Namely, Executive Order 128 denies the Plaintiffs' right to contract freely and to protect their property."  (ECF No. 24 ¶195.) Defendants argue Plaintiffs' Privileges or Immunities Clause challenge "is particularly inapt, as Plaintiffs do not allege that EO 128 burdens the 'rights of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State.'"  (ECF No. 26-1 (quoting Saenz v. Roe, 526 U.S. 489, 502 (1999)).

In their opposition papers, Plaintiffs do not actually provide an argument in response.  Instead, they note "Plaintiffs preserve for appeal that the Privileges or Immunities Clause protects substantive rights often incorporated through the Due Process Clause."  Plaintiffs further explain they "recognize that the Privileges or Immunities Clause has been disfavored by courts since the Slaughter-Houses cases, 83 U.S. (16 Wall.) 36 (1873), which erroneously wrote that provision out of the

39

Constitution in the wake of Reconstruction." (ECF No. 36 at 40 n.8.)

The Fourteenth Amendment provides, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ." U.S. Const. amend. XIV § 1.  The Privileges or Immunities Clause protects "rights of national citizenship" such as "the right to inform federal officials of violations of federal law, the right to be free from violence while in the lawful custody of a United States marshal, the right to enter the public lands, the right to vote in national elections, the right to petition Congress for redress of grievances, and the right to pass freely from state to state." In re Sacred Heart Hosp. of Norristown, 133 F.3d 237, 245 n.11 (3d Cir. 1998) (internal citations omitted). "[T]he Privileges and Immunities Clause of the Fourteenth Amendment has remained essentially moribund since the Supreme Court's decision in The Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 21 L. Ed. 394 (1872), and the Supreme Court has subsequently relied almost exclusively on the Due Process Clause as the source of unenumerated rights." Id. at 244 (internal quotation marks omitted).  "In the last hundred years, the Supreme Court has only relied on the Privileges or Immunities Clause in connection with the right to travel." Byrd v. City of

<u>Phila.</u>, No. 12-4520, 2014 WL 5780825, at *13 (E.D. Pa. Nov. 6, 2014) (citing <u>Saenz v. Roe</u>, 526 U.S. 489 (1999)).

This Court is unaware of any instances in which the Privileges or Immunities Clause has been used in way that is analogous to what Plaintiffs are now asking this Court to do. It even seems that Plaintiffs recognize this fact by merely responding that they wish to preserve the issue for appeal. Accordingly, this Court concludes Count IV must be dismissed.

## **CONCLUSION**

For the reasons stated above, the Court will grant Defendants' Motion to Dismiss.  An appropriate Order will be entered.


Date: March 22, 2021              s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.